I.   FACTUAL BACKGROUND

ODI was founded as a Houston, Texas based provider of ship management services. ODI, which is a sole shareholder corporation, shares its management personnel with Ocean Ships, Inc., a wholly owned subsidiary of another sole shareholder corporation named Ocean Shipholdings, Inc. These entities have designed, built, financed, and operated oil tankers worldwide. ODI maintains ships operating worldwide under strict standards for employee safety and environmental protection. In fact, the mission of ODI is to provide liquid bulk products for its customers in a safe, efficient, and cost-effective manner with minimal impact on the environment.

   A.   *ODI Hired Mr. Christian When It Assumed Management Of The S/S Cape May Berthed In Norfolk, Virginia.*

In 2005, the United States Department of Transportation, Maritime Administration ("MARAD") awarded ODI a contract to operate two sisterships in its fleet, the S/S Cape May berthed in Norfolk, Virginia, and the S/S Cape Mohican berthed in Alameda, California. The S/S Cape May, aboard which Mr. Christian served as the Electrician, was designed to carry barges. At all times relevant to this action, the S/S Cape May and S/S Cape Mohican each maintained a reduced operational force ("ROF") crew of approximately 10 persons, who worked jointly with an independently contracted Port Engineer to maintain the ships pending a call to active duty.

The S/S Cape May is comprised of the following departments: (i) the Engineering Department; (ii) the Deck Department; and (iii) the Stewards Department. The Chief Engineer, a licensed crewmember, supervises the Engineering Department, the Chief Mate, also a licensed crew member, supervises the Deck Department, and the Chief Steward supervises the Steward


PLAINTIFF'S EXHIBIT
E

Ms. Terri L. Mattoon
April 14, 2006
Page 3 of 13

Department. Mr. Christian, a senior unlicensed crewmember, served in the Engineering Department in his capacity as the Electrician.

Pursuant to its MARAD contract, ODI assumed management of the S/S Cape May on August 15, 2005. Significantly, MARAD requires that ODI include a provision in all of its labor contracts directing that all employees are on probationary status for the first sixty (60) days of employment with ODI. During this probationary period, an employee can be discharged without the ability to grieve his or her discharge through any collective bargaining grievance procedure. Specifically, Article I, Section 5 of the contract into which ODI entered with the Seafarers International Union provides explicitly that:

> [A]ll maintenance crew members shall be considered probationary employees for the first sixty (60) days of their employment. During this probationary period, employment may be terminated by the Company. If employment is terminated during the probationary period, there shall be no recourse through the grievance procedure.

See Ltr. Of Termination, attached as Exhibit B. The Seafarers International Union is a national maritime union that maintains offices in Norfolk, Virginia, and is affiliated with both the Seafarers International Union of North America and the AFL-CIO.

When ODI assumed operation of the S/S Cape May on August 15, 2005, it decided to retain all of the crew members on board the ship during the tenure of the prior ship manager, Interocean Management Corporation. The Chief Engineer to inherit this crew on behalf of ODI, ████████████, spent the days that followed conducting a thorough review of each crewmember to determine who deserved to survive the probationary period based solely on performance. ████████████ conducted these performance assessments, because the Chief Engineer is designated as the officer in charge during ROF status.

Thus, ODI never actually screened and hired Mr. Christian to work aboard the S/S Cape May prior to assuming management responsibilities. Rather, ODI inherited Mr. Christian based on its decision to commence operation of the S/S Cape May during the changeover by accepting the entire crew employed by the prior ship manager. If these crew members performed adequately during the first sixty (60) days of employment with ODI, and met ODI's performance standards, they would become permanent employees of ODI.

  B. *ODI Discharged Mr. Christian Well Before The October 15, 2005, Expiration Of The Probationary Period, And Based This Discharge On Mr. Christian's Poor Performance.*

As a practical matter, ODI affords the Chief Engineer, who is the officer in charge, with latitude in administrative matters, including personnel matters. If time and circumstances permit, however, the Chief Engineer is required to contact ODI's corporate offices to speak with the Vice President of Operations and Director of Engineering to obtain approval of decisions to

Ms. Terri L. Mattoon
April 14, 2006
Page 4 of 13

terminate based on poor performance. Pursuant to this protocol, ▮▮▮▮▮▮ met personally with the Vice President of Operations, ▮▮▮▮▮▮, and the Director of Engineering, ▮▮▮▮▮▮, during their tour of the S/S Cape May (shortly after ODI assumed operational control) to discuss the proposed termination of Mr. Christian for poor performance.

Based on the observations of Mr. Christian's job performance as relayed by ▮▮▮▮▮▮, Messrs. ▮▮▮▮▮▮ approved of the proposed termination. Shortly following this meeting, ▮▮▮▮▮▮ effected the termination of Mr. Christian based solely on the performance deficiencies that he observed during the probationary period, and recited during his meeting with Messrs. ▮▮▮▮▮▮. Specifically, ODI based the termination of Mr. Christian's employment on the following deficiencies: (i) Mr. Christian's ongoing failure to stay on task absent constant supervision; (ii) Mr. Christian's failure to follow the instructions of his supervisors; and (iii) Mr. Christian's insubordinate attitude and behavior.

Excerpts from the Chief Engineer's log book corroborate the grounds for Mr. Christian's termination. Indeed, these contemporaneous documents reflect that the work completed by the seamen for whom Mr. Christian was responsible was substandard in many respects. For instance, on August 16, 2005, the Chief Engineer observed Mr. Christian socializing with the Steward rather than attending to his job duties and responsibilities. See Log Book at 19, attached as Exhibit C. By way of further example, the Chief Engineer observed Mr. Christian interfering with the Bosun's work on the upper deck on August 22, 2005. See Exhibit C at 19. On August 24, 2005, the Chief Engineer observed Mr. Christian relaxing in the lounge watching television while he was supposed to be completing assigned job duties and responsibilities. See Exhibit C at 21. The following day, August 25, 2005, the Chief Engineer discovered that Mr. Christian was not present at his assigned location at the assigned time for the completion of his assigned duties. See Exhibit C at 21.

On August 30, 2005, the Chief Engineer observed Mr. Christian relaxing in the Stateroom taking an unauthorized "break" at 8:30 a.m. See Exhibit C at 24. The following morning, Mr. Christian attended the regular safety meeting, but proceeded to sleep and snore during the meeting with his head down. See Exhibit C at 25. This behavior set a poor example for the crew members subordinate to Mr. Christian, especially considering that Mr. Christian exercised a leadership role in his capacity as a senior, unlicensed crew member. Mr. Christian then made a bad situation worse by proceeding to snicker after the Chief Mate announced that sleeping during a safety meeting is unacceptable. See Exhibit C at 25.

On September 1, 2005, the ▮▮▮▮▮▮ informed the Chief Engineer that Mr. Christian once again displayed poor leadership and an insubordinate attitude during the morning meeting, as Mr. Christian made hand gestures to new crew members during the Chief Engineer's remarks to the crew. See Exhibit C at 25. Mr. Christian's performance further deteriorated to the point where it appeared Mr. Christian was deliberately sabotaging his own career. In fact, on September 6, 2005, the ▮▮▮▮▮▮ witnessed the Electrician lounging in the Stateroom yet again. See Exhibit C at 26. In addition to failing to attend to his job duties and responsibilities