| AWARD/CONTRACT | THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | RATING | PAGE | OF PAGES |
|---|---|---|---|---|
| | | | 1 | 100 |

| 2. CONTRACT (Proc. inst. ident.) NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQUEST PROJECT NO. |
|---|---|---|
| DTMA8C05020 | 07/28/2005 | |

| 5. ISSUED BY | CODE | 00091 | 6. ADMINISTERED BY (If other than Item 5) | CODE |
|---|---|---|---|---|

DOT/Maritime Administration, MAR-380
400 Seventh Street, SW., Room 7310

Washington, DC 20590-

**7. NAME AND ADDRESS OF CONTRACTOR** *(No., street, city, county, State and ZIP Code)*

Ocean Duchess, Inc
16211 Park Ten Place
Houston, TX 77084-5113

| 8. DELIVERY | ☐ FOB Origin | ☑ Other (See below) |
|---|---|---|

**9. DISCOUNT FOR PROMPT PAYMENT**

| 10 days | % |
|---|---|
| 20 days | % |
| 30 days | % |
| days | % |

| 10. SUBMIT INVOICES (4 Copies unless other - wise specified)   To THE ADDRESS SHOWN IN: | ITEM |
|---|---|

| CODE | FACILITY CODE |
|---|---|

| 11. SHIP TO/MARK FOR | CODE |
|---|---|

No Shipping Information

| 12. PAYMENT WILL BE MADE BY | CODE | HQ333 |
|---|---|---|

DOT/Maritime Administration, MAR-330
400 Seventh Street, SW., Room 7325

Washington, DC 20590-

| 13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION: | 14. ACCOUNTING AND APPROPRIATION DATA |
|---|---|
| ☐ 10 U.S.C. 2304(c) ( )    ☐ 41 U.S.C. 253(c) ( ) | No Funding Information |

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | **SEE LINE ITEM DETAIL** | | | | |

| | 15G. TOTAL AMOUNT OF CONTRACT | 0.00 |
|---|---|---|

**16. TABLE OF CONTENTS**

| ( ) | SEC | DESCRIPTION | PAGE(S) | ( ) | SEC | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | **PART I - THE SCHEDULE** | | | | **PART II - CONTRACT CLAUSES** | |
| X | A | SOLICITATION CONTRACT FORM | | X | I | CONTRACT CLAUSES | |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | | | | **PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH.** | |
| X | C | DESCRIPTION/SPECS/WORK STATEMENT | | X | J | LIST OF ATTACHMENTS | |
| X | D | PACKAGING AND MARKING | | | | **PART IV - REPRESENTATIONS AND INSTRUCTIONS** | |
| X | E | INSPECTION AND ACCEPTANCE | | | K | REPRESENTATIONS, CERTIFICATIONS, AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES AND PERFORMANCE | | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

***CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE***

| 17. ☐ CONTRACTOR'S NEGOTIATED AGREEMENT *(Contractor is required to sign this document and return _____ copies to issuing office.)* Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as attached or incorporated by reference herein. *(Attachments are listed herein.)* | 18. ☑ AWARD *(Contractor is not required to sign this document.)* Your offer on Solicitation Number _____ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary. |
|---|---|

| 19A. NAME AND TITLE OF SIGNER *(Type or print)* | 20A. NAME OF CONTRACTING OFFICER |
|---|---|
| | Rilla A. Gaither |

| 19B. NAME OF CONTRACTOR | 19C. DATE SIGNED | 20B. UNITED STATES OF AMERICA | 20C. DATE SIGNED |
|---|---|---|---|
| By _____ *(Signature of person authorized to sign)* | | By _____ *(Signature of Contracting Officer)* | 07/25/2005 |

NSN 7540 - 01 - 152 - 8069
PREVIOUS EDITION UNUSABLE

STANDARD FORM 26 (REV 4 - 85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

| Line Item Summary | Document Number | Title | Page |
|---|---|---|---|
| | DTMA8C05020 | Ship Manager | 2 of 100 |

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0101 | Base year 1, Ship group 20, Ship 1 (CAPE MAY) | (07/28/2005 to 07/27/2006) | 0.00 | LOT | $.000 | $ 0.00 |
| 0101AA | ROS (with crew)  Base year 1, Ship group 20, Ship 1 (CAPE MAY) | (07/28/2005 to 07/27/2006) | 0.00 | DAY | $4,994.000 | $ 0.00 |
| 0101AB | ROS (without crew)  Base year 1, Ship group 20, Ship 1 (CAPE MAY) | (07/28/2005 to 07/27/2006) | 0.00 | DAY | $1,295.000 | $ 0.00 |
| 0101AC | RRF-10  Base year 1, Ship group 20, Ship 1 (CAPE MAY) | (07/28/2005 to 07/27/2006) | 0.00 | DAY | $1,310.000 | $ 0.00 |
| 0101AD | Phase O - operations  Base year 1, Ship group 20, Ship 1 (CAPE MAY) | (07/28/2005 to 07/27/2006) | 0.00 | DAY | $1,711.000 | $ 0.00 |

| Line Item Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | | | | Page<br>3 of 100 |
|---|---|---|---|---|---|---|

| Line Item Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 0101AE | Cost reimbursable items (see Attachment J-9) individually funded via task order<br><br>(07/28/2005 to 07/27/2006)<br><br>Base year 1, Ship group 20, Ship 1 (CAPE MAY) | | 1.00 | LOT | $.000 | |
| 0102 | Base year 1, Ship group 20, Ship 2 (CAPE MOHICAN)<br><br>(07/28/2005 to 07/27/2006) | | 0.00 | LOT | $.000 | $ 0.00 |
| 0102AA | ROS (with crew)<br><br>(07/28/2005 to 07/27/2006)<br><br>Base year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | DAY | $4,994.000 | $ 0.00 |
| 0102AB | ROS (without crew)<br><br>(07/28/2005 to 07/27/2006)<br><br>Base year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | DAY | $1,295.000 | $ 0.00 |
| 0102AC | RRF-10<br><br>(07/28/2005 to 07/27/2006)<br><br>Base year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | DAY | $1,310.000 | $ 0.00 |

| Line Item<br>Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | Page<br>4 of 100 |
|---|---|---|---|

| Line Item<br>Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of<br>Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 0102AD | Phase O - operations<br><br>(07/28/2005 to 07/27/2006)<br><br>Base year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | DAY | $1,711.000 | $ 0.00 |
| 0102AE | Cost reimbursable items (see Attachment J-9) individually funded via task order<br><br>(07/28/2005 to 07/27/2006)<br><br>Base year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | 1.00 | LOT | $.000 | |
| 0201 | Base year 2, Ship group 20, Ship 1 (CAPE MAY)<br><br>(07/28/2006 to 07/27/2007) | | 0.00 | | $.000 | $ 0.00 |
| 0201AA | ROS (with crew)<br><br>(07/28/2006 to 07/27/2007)<br><br>Base year 2, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $5,144.000 | $ 0.00 |
| 0201AB | ROS (without crew)<br><br>(07/28/2006 to 07/27/2007)<br><br>Base year 2, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,334.000 | $ 0.00 |

| Line Item Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | Page<br>5 of 100 |
|---|---|---|---|

| Line Item Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 0201AC | RRF-10 | | 0.00 | DAY | $1,348.000 | $ 0.00 |
| | | (07/28/2006 to 07/27/2007) | | | | |
| | Base year 2, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0201AD | Phase O - operations | | 0.00 | DAY | $1,762.000 | $ 0.00 |
| | | (07/28/2006 to 07/27/2007) | | | | |
| | Base year 2, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0201AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2006 to 07/27/2007) | | | | |
| | Base year 2, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0202 | Base year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | | $.000 | $ 0.00 |
| | | (07/28/2006 to 07/27/2007) | | | | |
| 0202AA | ROS (with crew) | | 0.00 | DAY | $5,144.000 | $ 0.00 |
| | | (07/28/2006 to 07/27/2007) | | | | |
| | Base year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |

| Line Item Summary | Document Number DTMA8C05020 | Title Ship Manager | | | | Page 6 of 100 |
|---|---|---|---|---|---|---|

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0202AB | ROS (without crew) | | 0.00 | DAY | $1,334.000 | $ 0.00 |
| | | (07/28/2006 to 07/27/2007) | | | | |
| | Base year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0202AC | RRF-10 | | 0.00 | DAY | $1,348.000 | $ 0.00 |
| | | (07/28/2006 to 07/27/2007) | | | | |
| | Base year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0202AD | Phase O - operations | | 0.00 | DAY | $1,762.000 | $ 0.00 |
| | | (07/28/2006 to 07/27/2007) | | | | |
| | Base year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0202AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2006 to 07/27/2007) | | | | |
| | Base year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0299 | Cancellation Ceilings (per ship group/per year) | | 0.00 | YR | $7,500.000 | $ 0.00 |
| | | (07/28/2006 to 07/27/2007) | | | | |
| | Base year 2, Ship group 20 | | | | | |

| Line Item Summary | Document Number | Title | Page |
|---|---|---|---|
| | DTMA8C05020 | Ship Manager | 7 of 100 |

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0301 | Base year 3, Ship group 20, Ship 1 (CAPE MAY) | (07/28/2007 to 07/27/2008) | 0.00 | | $.000 | $ 0.00 |
| 0301AA | ROS (with crew)<br><br>Base year 3, Ship group 20, Ship 1 (CAPE MAY) | (07/28/2007 to 07/27/2008) | 0.00 | DAY | $5,299.000 | $ 0.00 |
| 0301AB | ROS (without crew)<br><br>Base year 3, Ship group 20, Ship 1 (CAPE MAY) | (07/28/2007 to 07/27/2008) | 0.00 | DAY | $1,374.000 | $ 0.00 |
| 0301AC | RRF-10<br><br>Base year 3, Ship group 20, Ship 1 (CAPE MAY) | (07/28/2007 to 07/27/2008) | 0.00 | DAY | $1,389.000 | $ 0.00 |
| 0301AD | Phase O - operations<br><br>Base year 3, Ship group 20, Ship 1 (CAPE MAY) | (07/28/2007 to 07/27/2008) | 0.00 | DAY | $1,815.000 | $ 0.00 |

| Line Item Summary | Document Number | Title | | Page |
|---|---|---|---|---|
| | DTMA8C05020 | Ship Manager | | 8 of 100 |

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0301AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | (07/28/2007 to 07/27/2008) | 1.00 | LOT | $.000 | |
| | Base year 3, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0302 | Base year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | (07/28/2007 to 07/27/2008) | 0.00 | | $.000 | $ 0.00 |
| 0302AA | ROS (with crew) | (07/28/2007 to 07/27/2008) | 0.00 | DAY | $5,299.000 | $ 0.00 |
| | Base year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0302AB | ROS (without crew) | (07/28/2007 to 07/27/2008) | 0.00 | DAY | $1,374.000 | $ 0.00 |
| | Base year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0302AC | RRF-10 | (07/28/2007 to 07/27/2008) | 0.00 | DAY | $1,389.000 | $ 0.00 |
| | Base year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |

| Line Item Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | Page<br>9 of 100 |
|---|---|---|---|

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0302AD | Phase O - operations | | 0.00 | DAY | $1,815.000 | $ 0.00 |
| | | (07/28/2007 to 07/27/2008) | | | | |
| | Base year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0302AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2007 to 07/27/2008) | | | | |
| | Base year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0399 | Cancellation Ceilings (per ship group/per year) | | 0.00 | YR | $5,000.000 | $ 0.00 |
| | | (07/28/2007 to 07/27/2008) | | | | |
| | Base year 3, Ship group 20 | | | | | |
| 0401 | Base year 4, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | | $.000 | $ 0.00 |
| | | (07/28/2008 to 07/27/2009) | | | | |
| 0401AA | ROS (with crew) | | 0.00 | DAY | $5,457.000 | $ 0.00 |
| | | (07/28/2008 to 07/27/2009) | | | | |
| | Base year 4, Ship group 20, Ship 1 (CAPE MAY) | | | | | |

| Line Item Summary | Document Number | Title | | Page |
|---|---|---|---|---|
| | DTMA8C05020 | Ship Manager | | 10 of 100 |

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0401AB | ROS (without crew) | | 0.00 | DAY | $1,415.000 | $ 0.00 |
| | | (07/28/2008 to 07/27/2009) | | | | |
| | Base year 4, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0401AC | RRF-10 | | 0.00 | DAY | $1,431.000 | $ 0.00 |
| | | (07/28/2008 to 07/27/2009) | | | | |
| | Base year 4, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0401AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 |
| | | (07/28/2008 to 07/27/2009) | | | | |
| | Base year 4, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0401AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2008 to 07/27/2009) | | | | |
| | Base year 4, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0402 | Base year 4, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | | $.000 | $ 0.00 |
| | | (07/28/2008 to 07/27/2009) | | | | |

| Line Item<br>Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | | | | Page<br>11 of 100 |
|---|---|---|---|---|---|---|

| Line Item<br>Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of<br>Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 0402AA | ROS (with crew) | | 0.00 | DAY | $5,457.000 | $ 0.00 |
| | | (07/28/2008 to 07/27/2009) | | | | |
| | Base year 4, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0402AB | ROS (without crew) | | 0.00 | DAY | $1,415.000 | $ 0.00 |
| | | (07/28/2008 to 07/27/2009) | | | | |
| | Base year 4, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0402AC | RRF-10 | | 0.00 | DAY | $1,431.000 | $ 0.00 |
| | | (07/28/2008 to 07/27/2009) | | | | |
| | Base year 4, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0402AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 |
| | | (07/28/2008 to 07/27/2009) | | | | |
| | Base year 4, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0402AE | Cost reimbursable items (see<br>Attachment J-9) individually funded via<br>task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2008 to 07/27/2009) | | | | |
| | Base year 4, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |

| Line Item Summary | | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | | | | Page<br>12 of 100 |

| Line Item Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 0499 | Cancellation Ceilings (per ship group/per year)<br><br>(07/28/2008 to 07/27/2009)<br><br>Base year 4, Ship group 20 | | 0.00 | YR | $2,500.000 | $ 0.00 |
| 0501 | Award Term Incentive Option 1-year 1, Ship group 20, Ship 1 (CAPE MAY)<br><br>(07/28/2009 to 07/27/2010) | | 0.00 | | $.000 | $ 0.00<br>OPTION PERIOD |
| 0501AA | ROS (with crew)<br><br>(07/28/2009 to 07/27/2010)<br><br>Award Term Incentive Option 1-year 1, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $5,457.000 | $ 0.00<br>OPTION PERIOD |
| 0501AB | ROS (without crew)<br><br>(07/28/2009 to 07/27/2010)<br><br>Award Term Incentive Option 1-year 1, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,415.000 | $ 0.00<br>OPTION PERIOD |
| 0501AC | RRF-10<br><br>(07/28/2009 to 07/27/2010)<br><br>Award Term Incentive Option 1-year 1, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,431.000 | $ 0.00<br>OPTION PERIOD |

| Line Item Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | | Page<br>13 of 100 | |
|---|---|---|---|---|---|

| Line Item Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 0501AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 |
| | | (07/28/2009 to 07/27/2010) | | | | OPTION PERIOD |
| | Award Term Incentive Option 1-year 1, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0501AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2009 to 07/27/2010) | | | | OPTION PERIOD |
| | Award Term Incentive Option 1-year 1, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0502 | Award Term Incentive Option 1-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | | $.000 | $ 0.00 |
| | | (07/28/2009 to 07/27/2010) | | | | OPTION PERIOD |
| 0502AA | ROS (with crew) | | 0.00 | DAY | $5,457.000 | $ 0.00 |
| | | (07/28/2009 to 07/27/2010) | | | | OPTION PERIOD |
| | Award Term Incentive Option 1-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0502AB | ROS (without crew) | | 0.00 | DAY | $1,415.000 | $ 0.00 |
| | | (07/28/2009 to 07/27/2010) | | | | OPTION PERIOD |
| | Award Term Incentive Option 1-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |

| Line Item<br>Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | | | | | Page<br>14 of 100 |
|---|---|---|---|---|---|---|---|

| Line Item<br>Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of<br>Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 0502AC | RRF-10 | | 0.00 | DAY | $1,431.000 | $ 0.00 |
| | | (07/28/2009 to 07/27/2010) | | | | OPTION<br>PERIOD |
| | Award Term Incentive Option 1-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0502AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 |
| | | (07/28/2009 to 07/27/2010) | | | | OPTION<br>PERIOD |
| | Award Term Incentive Option 1-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0502AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2009 to 07/27/2010) | | | | OPTION<br>PERIOD |
| | Award Term Incentive Option 1-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0601 | Award Term Incentive Option 1-year 2, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | | $.000 | $ 0.00 |
| | | (07/28/2010 to 07/27/2011) | | | | OPTION<br>PERIOD |
| 0601AA | ROS (with crew) | | 0.00 | DAY | $5,457.000 | $ 0.00 |
| | | (07/28/2010 to 07/27/2011) | | | | OPTION<br>PERIOD |
| | Award Term Incentive Option 1-year 2, Ship group 20, Ship 1 (CAPE MAY) | | | | | |

| Line Item Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | Page<br>15 of 100 |
|---|---|---|---|

| Line Item Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 0601AB | ROS (without crew)<br><br>(07/28/2010 to 07/27/2011)<br>Award Term Incentive Option 1-year 2, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,415.000 | $ 0.00<br>OPTION PERIOD |
| 0601AC | RRF-10<br><br>(07/28/2010 to 07/27/2011)<br>Award Term Incentive Option 1-year 2, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,431.000 | $ 0.00<br>OPTION PERIOD |
| 0601AD | Phase O - operations<br><br>(07/28/2010 to 07/27/2011)<br>Award Term Incentive Option 1-year 2, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,870.000 | $ 0.00<br>OPTION PERIOD |
| 0601AE | Cost reimbursable items (see Attachment J-9) individually funded via task order<br>(07/28/2010 to 07/27/2011)<br>Award Term Incentive Option 1-year 2, Ship group 20, Ship 1 (CAPE MAY) | | 1.00 | LOT | $.000 | OPTION PERIOD |
| 0602 | Award Term Incentive Option 1-year 2, Ship group 20, Ship 2 (CAPE MOHICAN)<br>(07/28/2010 to 07/27/2011) | | 0.00 | | $.000 | $ 0.00<br>OPTION PERIOD |

| Line Item Summary | Document Number | Title | | Page |
|---|---|---|---|---|
| | DTMA8C05020 | Ship Manager | | 16 of 100 |

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0602AA | ROS (with crew) | | 0.00 | DAY | $5,457.000 | $ 0.00 |
| | | (07/28/2010 to 07/27/2011) | | | | OPTION PERIOD |
| | Award Term Incentive Option 1-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0602AB | ROS (without crew) | | 0.00 | DAY | $1,415.000 | $ 0.00 |
| | | (07/28/2010 to 07/27/2011) | | | | OPTION PERIOD |
| | Award Term Incentive Option 1-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0602AC | RRF-10 | | 0.00 | DAY | $1,431.000 | $ 0.00 |
| | | (07/28/2010 to 07/27/2011) | | | | OPTION PERIOD |
| | Award Term Incentive Option 1-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0602AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 |
| | | (07/28/2010 to 07/27/2011) | | | | OPTION PERIOD |
| | Award Term Incentive Option 1-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0602AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | OPTION PERIOD |
| | | (07/28/2010 to 07/27/2011) | | | | |
| | Award Term Incentive Option 1-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |

| Line Item Summary | Document Number | Title | | Page |
|---|---|---|---|---|
| | DTMA8C05020 | Ship Manager | | 17 of 100 |

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0701 | Award Term Incentive Option 1-year 3, Ship group 20, Ship 1 (CAPE MAY) (07/28/2011 to 07/27/2012) | | 0.00 | | $.000 | $ 0.00 OPTION PERIOD |
| 0701AA | ROS (with crew) (07/28/2011 to 07/27/2012) Award Term Incentive Option 1-year 3, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $5,457.000 | $ 0.00 OPTION PERIOD |
| 0701AB | ROS (without crew) (07/28/2011 to 07/27/2012) Award Term Incentive Option 1-year 3, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,415.000 | $ 0.00 OPTION PERIOD |
| 0701AC | RRF-10 (07/28/2011 to 07/27/2012) Award Term Incentive Option 1-year 3, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,431.000 | $ 0.00 OPTION PERIOD |
| 0701AD | Phase O - operations (07/28/2011 to 07/27/2012) Award Term Incentive Option 1-year 3, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,870.000 | $ 0.00 OPTION PERIOD |

| Line Item Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | Page<br>18 of 100 |
|---|---|---|---|

| Line Item Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 0701AE | Cost reimbursable items (see Attachment J-9) individually funded via task order<br><br>(07/28/2011 to 07/27/2012)<br><br>Award Term Incentive Option 1-year 3, Ship group 20, Ship 1 (CAPE MAY) | | 1.00 | LOT | $.000 | OPTION PERIOD |
| 0702 | Award Term Incentive Option 1-year 3, Ship group 20, Ship 2 (CAPE MOHICAN)<br><br>(07/28/2011 to 07/27/2012) | | 0.00 | | $.000 | $ 0.00<br>OPTION PERIOD |
| 0702AA | ROS (with crew)<br><br>(07/28/2011 to 07/27/2012)<br><br>Award Term Incentive Option 1-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | DAY | $5,457.000 | $ 0.00<br>OPTION PERIOD |
| 0702AB | ROS (without crew)<br><br>(07/28/2011 to 07/27/2012)<br><br>Award Term Incentive Option 1-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | DAY | $1,415.000 | $ 0.00<br>OPTION PERIOD |
| 0702AC | RRF-10<br><br>(07/28/2011 to 07/27/2012)<br><br>Award Term Incentive Option 1-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | DAY | $1,431.000 | $ 0.00<br>OPTION PERIOD |

| Line Item Summary | Document Number DTMA8C05020 | Title Ship Manager | | Page 19 of 100 |
|---|---|---|---|---|

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0702AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 |
| | | (07/28/2011 to 07/27/2012) | | | | OPTION PERIOD |
| | Award Term Incentive Option 1-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0702AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2011 to 07/27/2012) | | | | OPTION PERIOD |
| | Award Term Incentive Option 1-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0801 | Award Term Incentive Option 2-year 1, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | | $.000 | $ 0.00 |
| | | (07/28/2012 to 07/27/2013) | | | | OPTION PERIOD |
| 0801AA | ROS (with crew) | | 0.00 | DAY | $5,457.000 | $ 0.00 |
| | | (07/28/2012 to 07/27/2013) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 1, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0801AB | ROS (without crew) | | 0.00 | DAY | $1,415.000 | $ 0.00 |
| | | (07/28/2012 to 07/27/2013) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 1, Ship group 20, Ship 1 (CAPE MAY) | | | | | |

| Line Item Summary | Document Number DTMA8C05020 | Title Ship Manager | | Page 20 of 100 |
|---|---|---|---|---|

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0801AC | RRF-10 | | 0.00 | DAY | $1,431.000 | $ 0.00 |
| | | (07/28/2012 to 07/27/2013) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 1, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0801AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 |
| | | (07/28/2012 to 07/27/2013) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 1, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0801AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2012 to 07/27/2013) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 1, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0802 | Award Term Incentive Option 2-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | | $.000 | $ 0.00 |
| | | (07/28/2012 to 07/27/2013) | | | | OPTION PERIOD |
| 0802AA | ROS (with crew) | | 0.00 | DAY | $5,457.000 | $ 0.00 |
| | | (07/28/2012 to 07/27/2013) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |

| Line Item Summary | Document Number DTMA8C05020 | Title Ship Manager | Page 21 of 100 |
|---|---|---|---|

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0802AB | ROS (without crew) | | 0.00 | DAY | $1,415.000 | $ 0.00 OPTION PERIOD |
| | | (07/28/2012 to 07/27/2013) | | | | |
| | Award Term Incentive Option 2-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0802AC | RRF-10 | | 0.00 | DAY | $1,431.000 | $ 0.00 OPTION PERIOD |
| | | (07/28/2012 to 07/27/2013) | | | | |
| | Award Term Incentive Option 2-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0802AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 OPTION PERIOD |
| | | (07/28/2012 to 07/27/2013) | | | | |
| | Award Term Incentive Option 2-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0802AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | OPTION PERIOD |
| | | (07/28/2012 to 07/27/2013) | | | | |
| | Award Term Incentive Option 2-year 1, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0901 | Award Term Incentive Option 2-year 2, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | | $.000 | $ 0.00 OPTION PERIOD |
| | | (07/28/2013 to 07/27/2014) | | | | |

| Line Item Summary | Document Number | Title | | Page |
|---|---|---|---|---|
| | DTMA8C05020 | Ship Manager | | 22 of 100 |

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0901AA | ROS (with crew) | | 0.00 | DAY | $5,457.000 | $ 0.00 |
| | | (07/28/2013 to 07/27/2014) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 2, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0901AB | ROS (without crew) | | 0.00 | DAY | $1,415.000 | $ 0.00 |
| | | (07/28/2013 to 07/27/2014) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 2, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0901AC | RRF-10 | | 0.00 | DAY | $1,431.000 | $ 0.00 |
| | | (07/28/2013 to 07/27/2014) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 2, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0901AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 |
| | | (07/28/2013 to 07/27/2014) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 2, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 0901AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | (07/28/2013 to 07/27/2014) | 1.00 | LOT | $.000 | OPTION PERIOD |
| | Award Term Incentive Option 2-year 2, Ship group 20, Ship 1 (CAPE MAY) | | | | | |

| Line Item Summary | Document Number | Title | | Page |
|---|---|---|---|---|
| | DTMA8C05020 | Ship Manager | | 23 of 100 |

| Line Item Number | Description | Delivery Date (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| 0902 | Award Term Incentive Option 2-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | (07/28/2013 to 07/27/2014) | 0.00 | | $.000 | $ 0.00 OPTION PERIOD |
| 0902AA | ROS (with crew) | (07/28/2013 to 07/27/2014) | 0.00 | DAY | $5,457.000 | $ 0.00 OPTION PERIOD |
| | Award Term Incentive Option 2-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0902AB | ROS (without crew) | (07/28/2013 to 07/27/2014) | 0.00 | DAY | $1,415.000 | $ 0.00 OPTION PERIOD |
| | Award Term Incentive Option 2-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0902AC | RRF-10 | (07/28/2013 to 07/27/2014) | 0.00 | DAY | $1,431.000 | $ 0.00 OPTION PERIOD |
| | Award Term Incentive Option 2-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 0902AD | Phase O - operations | (07/28/2013 to 07/27/2014) | 0.00 | DAY | $1,870.000 | $ 0.00 OPTION PERIOD |
| | Award Term Incentive Option 2-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |

| Line Item Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | | Page<br>24 of 100 |
|---|---|---|---|---|

| Line Item Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 0902AE | Cost reimbursable items (see Attachment J-9) individually funded via task order<br><br>(07/28/2013 to 07/27/2014)<br><br>Award Term Incentive Option 2-year 2, Ship group 20, Ship 2 (CAPE MOHICAN) | | 1.00 | LOT | $.000 | OPTION PERIOD |
| 1001 | Award Term Incentive Option 2-year 3, Ship group 20, Ship 1 (CAPE MAY)<br><br>(07/28/2014 to 07/27/2015) | | 0.00 | | $.000 | $ 0.00<br>OPTION PERIOD |
| 1001AA | ROS (with crew)<br><br>(07/28/2014 to 07/27/2015)<br><br>Award Term Incentive Option 2-year 3, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $5,457.000 | $ 0.00<br>OPTION PERIOD |
| 1001AB | ROS (without crew)<br><br>(07/28/2014 to 07/27/2015)<br><br>Award Term Incentive Option 2-year 3, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,415.000 | $ 0.00<br>OPTION PERIOD |
| 1001AC | RRF-10<br><br>(07/28/2014 to 07/27/2015)<br><br>Award Term Incentive Option 2-year 3, Ship group 20, Ship 1 (CAPE MAY) | | 0.00 | DAY | $1,431.000 | $ 0.00<br>OPTION PERIOD |

| Line Item<br>Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | Page<br>25 of 100 |
|---|---|---|---|

| Line Item<br>Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of<br>Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 1001AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 |
| | | | | | | OPTION<br>PERIOD |
| | | (07/28/2014 to 07/27/2015) | | | | |
| | Award Term Incentive Option 2-year 3, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 1001AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2014 to 07/27/2015) | | | | |
| | Award Term Incentive Option 2-year 3, Ship group 20, Ship 1 (CAPE MAY) | | | | | |
| 1002 | Award Term Incentive Option 2-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | 0.00 | | $.000 | $ 0.00 |
| | | | | | | OPTION<br>PERIOD |
| | | (07/28/2014 to 07/27/2015) | | | | |
| 1002AA | ROS (with crew) | | 0.00 | DAY | $5,457.000 | $ 0.00 |
| | | | | | | OPTION<br>PERIOD |
| | | (07/28/2014 to 07/27/2015) | | | | |
| | Award Term Incentive Option 2-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 1002AB | ROS (without crew) | | 0.00 | DAY | $1,415.000 | $ 0.00 |
| | | | | | | OPTION<br>PERIOD |
| | | (07/28/2014 to 07/27/2015) | | | | |
| | Award Term Incentive Option 2-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |

| Line Item Summary | | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | | | | Page<br>26 of 100 |
|---|---|---|---|---|---|---|---|

| Line Item Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 1002AC | RRF-10 | | 0.00 | DAY | $1,431.000 | $ 0.00 |
| | | (07/28/2014 to 07/27/2015) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 1002AD | Phase O - operations | | 0.00 | DAY | $1,870.000 | $ 0.00 |
| | | (07/28/2014 to 07/27/2015) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 1002AE | Cost reimbursable items (see Attachment J-9) individually funded via task order | | 1.00 | LOT | $.000 | |
| | | (07/28/2014 to 07/27/2015) | | | | OPTION PERIOD |
| | Award Term Incentive Option 2-year 3, Ship group 20, Ship 2 (CAPE MOHICAN) | | | | | |
| 2001 | Award Term Incentive Option for Additional Vessels - ROS (with crew) | | 0.00 | | $.000 | $ 0.00 |
| | | | | | | OPTION PERIOD |
| 2002 | Award Term Incentive Option for Additional Vessels - ROS (without crew) | | 0.00 | | $.000 | $ 0.00 |
| | | | | | | OPTION PERIOD |

| Line Item<br>Summary | Document Number<br>DTMA8C05020 | Title<br>Ship Manager | | Page<br>27 of 100 |
|---|---|---|---|---|

| Line Item<br>Number | Description | Delivery Date<br>(Start Date to End Date) | Quantity | Unit of<br>Issue | Unit Price | Total Cost<br>(Includes Discounts) |
|---|---|---|---|---|---|---|
| 2003 | Award Term Incentive Option for<br>Additional Vessels - RRF-10 | | 0.00 | | $.000 | $ 0.00 |
| | | | | | | OPTION<br>PERIOD |
| | | | | | Total Cost: | $0.00 |

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 28 of 100 |
| --- | --- | --- | --- |

## TABLE OF CONTENTS

| | | |
| --- | --- | --- |
| SECTION C -- Descriptions and Specifications | | 29 |
| C.1     INTRODUCTION | | 29 |
| SECTION D -- Packaging and Marking | | 72 |
| D.1     PRESERVATION AND PACKAGING | | 72 |
| SECTION E -- Inspection and Acceptance | | 73 |
| E.1     52.252-02 CLAUSES INCORPORATED BY REFERENCE | FEB 1998 | 73 |
| SECTION F -- Deliveries or Performance | | 75 |
| F.1     52.252-02 CLAUSES INCORPORATED BY REFERENCE | FEB 1998 | 75 |
| SECTION G -- Contract Administration Data | | 80 |
| G.1     GOVERNMENT FORMS | | 80 |
| SECTION H -- Special Contract Requirements | | 89 |
| H.1     PERIOD OF PERFORMANCE | | 89 |
| SECTION I -- Contract Clauses | | 94 |
| I.1     Clauses By Reference | | 94 |
| I.2 | | 94 |
| SECTION J -- List of Documents, Exhibits and Other Attachments | | 100 |
| J.1     LIST OF ATTACHMENTS | | 100 |

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 29 of 100 |
|---|---|---|---|

## SECTION C -- DESCRIPTIONS AND SPECIFICATIONS

## C.1    INTRODUCTION

PERFORMANCE WORK STATEMENT (PWS) FOR READY RESERVE FORCE (RRF) SHIP MANAGER SERVICES

1.1 Mission

The Ready Reserve Force (RRF) is the high readiness subset of the Maritime Administration's (MARAD), Department of Transportation (DOT), National Defense Reserve Fleet (NDRF) established to support the rapid deployment of U.S. military forces. As a key element of strategic sealift, the RRF is specifically structured to transport military unit equipment during initial surge for U.S. forces deploying anywhere in the world.

1.2 Background

This is a performance based service contract (PBSC) issued by MARAD for maintenance and operational services for the RRF. Previous fixed price contracts for these services were awarded in 1988, 1993, and 2000 to U.S. commercial ship operating firms. MARAD expects that this PBSC will improve quality of service, productivity, and maximize cost savings during performance. It is the policy of the Federal Government that agencies use PBSC methods to the maximum extent practicable when acquiring services.

1.3 General Scope

Ship Managers shall maintain assigned RRF ship(s) in Fully Mission Capable Readiness Status and efficiently activate and operate these vessels in support of national emergencies and defense objectives. Services required include labor and supervision to equip, provision, supply, replace, upgrade, maintain or repair structures, equipment, machinery, outfitting, spare parts or supplies. The Ship Manager shall provide administrative support to ensure that all requirements of this contract are accomplished in a timely and efficient manner. Administrative support includes: management personnel, technical support, supplies, materials and services necessary to maintain and operate assigned ships, to the extent that such materials, reporting, and services are not specified as being provided by the Government.

1.3.1 Reimbursables: The omission of any particular item required for the performance of this performance work statement (PWS) does not make the item Government furnished or reimbursable unless expressly provided for in Attachment J-9. All work to be reimbursed shall be authorized by Task Order (TO) prior to commencement of work. All work is to be carried out under competent supervision and completed in a timely and lawful manner.

1.4 Definitions and Abbreviations

Definitions and abbreviations used throughout the contract, Technical Exhibits (TEs) and attachments are contained in TE-1 Section 2.

1.5 The Ship Manager is responsible for the development, implementation, management, and maintenance, including updates and lessons learned, of all required plans under the contract. Ship Managers are responsible for establishing policy and procedures related to these plans, inclusive of all necessary training of supervisory and other appropriate personnel. Ships' officers are responsible for enforcement of Ship Manager policies, plans and procedures. All plans and any subsequent modifications will be incorporated by the Government into its Quality Assurance Surveillance Plan (QASP) (TE-2) as one of the standards which the Government will use to determine compliance. Compliance with all Plans is a performance measurement under the QASP.

1.6 The Order of Precedence Reference.
52.215-8 -- Order of Precedence -- Uniform Contract Format (Oct 1997) Deviation
Any inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order:
(a) The Schedule (excluding the specifications).
(b) Representations and other instructions.
(c) Contract clauses.
(d) Other documents, exhibits, and attachments.
(e) The specifications.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 30 of 100 |
|---|---|---|---|

1.7 DELIVERABLES - Unless specifically directed otherwise, all deliverables, listed in Attachment J-4, shall be delivered in an electronic format.

C.2    MAINTENANCE MANAGEMENT

Performance Goal: Develop and execute a high quality, comprehensive ship-centric maintenance program. The maintenance management program shall ensure assigned ships are fully compliant to prescribed readiness and mission requirements.

2.1 Regulatory Compliance

The Ship Manager shall:

2.1.1 Perform maintenance, repair, and modification of RRF vessels to ensure compliance with all applicable regulatory requirements as dictated by the Government for U.S. Flag Vessels.

2.1.2 Maintain and operate vessels in accordance with the Code of Federal Regulations (CFR), as inspected by the United States Coast Guard (USCG) and classed by the American Bureau of Shipping (ABS).

2.1.3 Maintain and operate RRF vessels in voluntary compliance with the International Maritime Organization Convention for Safety of Life at Sea (SOLAS) except as specifically exempted in writing by MARAD. No exemption list currently exists. RRF vessels are exempt from International conventions and treaties only to the extent that those requirements are not promulgated in domestic regulations (CFR). Continue this practice on assigned vessels in their current configurations. Submit additional requirements to sustain voluntary SOLAS compliance to the Contracting Officer's Technical Representative (COTR) for review and approval. (CDRL M-0001)

2.1.4 Review existing regulatory compliance schedules and develops and delivers a comprehensive plan and schedule for accomplishing any regulatory requirements in RMS. (CDRL M-0002)

2.1.5 Ensure accurate scheduling of all regulatory compliance inspections, surveys, and tests. Do not apply for nor anticipate being granted any extensions to regulatory due dates by the regulatory bodies.
However, if the Ship Manager believes an extension is beneficial, it should advise the MARAD COTR as part of its business plan. MARAD may direct the Ship Manager to request extensions if deemed necessary by the Government.

2.1.6 If at any time and for any reason the Ship Manager cannot maintain the vessel to Regulatory Compliance, shall notify the COTR immediately by telephone with written e-mail follow-up within 24 hours of discovery.

2.1.7 Resolve discrepancies found during the vessel inspection or survey process within the period granted by the regulatory body. Submit a change to their current year Business Plan for corrective actions to be accomplished during the current fiscal year or plan for the work in a subsequent year Business Plan.

2.1.8 Maintain cognizance over changes or additions to regulatory body requirements. The Ship Manager has responsibility to identify changes or additions to regulatory requirements. When changes or additions are identified, notify the COTR in writing. The notice shall clearly describe the change or addition and include a proposal for how the vessel will meet the changed or added requirement. (CDRL M-0003)

2.1.9 Alternative Compliance Program: MARAD has determined that all ROS vessels shall be enrolled in the ABS Alternative Compliance Program. The Government reserves the right to grant exceptions. Exceptions shall be in writing, by the Chief, Division of Ship Maintenance and Repair (MAR-611). Requests shall be submitted to the COTR. All vessels enrolled in ACP must meet the applicable eligibility criteria established by USCG including full voluntary compliance with ISM.

The following specific work items are envisioned as being required to bring a vessel into ACP:
1.    All vessels shall within COI anniversary window submit CG 3752 form for inspection to OCMI with notification thereto of becoming a participating vessel in the ACP Program.
2.    OCMI /ABS will coordinate with Vessel for joint inspections (hand-off survey)
3.    After successful "hand-off survey" the OCMI notifies G-MOC of same.
4.    G-MOC (USCG Headquarters, Office of Compliance - G-MOC) is the Program Manager and notifies the vessel's owner by letter (Copy to ABS Coordinator and OCMI) of vessel enrollment into the ACP.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 31 of 100 |
|---|---|---|---|

2.1.9.1 Classification Surveys: ROS motor and steam vessels shall maintain machinery in an ABS approved Preventative Maintenance/Condition Monitoring (PM/CM) program to the maximum extent feasible within the guidelines of the scheduled sea and dock trials. Hull and machinery surveys for ROS-4 and ROS-5 vessels shall remain as continuous except where otherwise approved, in writing, on a case by case basis by the Chief, Division of Ship Maintenance and Repair (MAR-611). Requests shall be submitted to the COTR. The schedule and requirements associated with or supporting the Continuous Hull and/or Machinery Survey (CHS/CMS) Class of ROS-4 and ROS-5 vessels shall be integrated into their Maintenance Management Plans. All other RRF vessels shall remain under special periodic surveys for hull and machinery. It is MARAD's desire to have as many ROS vessels in continuous survey as possible, however, it is recognized that some Ship Manager's preventative maintenance programs and ship configurations are better suited to periodic surveys. This is an acceptable alternative to continuous survey.

2.1.10 Maintain currency of regulatory body due dates, comments and remarks, as appropriate, within the MARAD Ready Reserve Force Management System (RMS).

2.2 Readiness

2.2.1 Maintain assigned ships in the designated readiness corresponding to the activation timeframe requirements in TE-4. Readiness is defined as the measure of material condition and preparedness of a vessel to activate within its assigned "R-Status" and sustain operations for 180 days.

2.2.2 Report via R-STARS to the assigned COTR the recommended material condition status of the vessel(s). Utilize the following condition status "C-ratings" in making the report (CDRL M-0004):
R-STARS is a web based module which allows Ship Managers to identify deficiencies which may impact the C status of each RRF vessel assigned. MARAD will provide training in R-STARS.

C-Status Title Definitions  Description
C-1     No Mission Degrading Deficiencies          Describes a ship having no known deficiencies which impact its mission or activation within assigned R-Status
C-2     Documented and Correctable Mission Degrading Deficiencies Describes a ship which has mission degrading deficiencies which can be corrected within the assigned R-Status
C-3     Mission Degrading          Describes a ship, which can be activated within its prescribed R-Status, but has deficiencies, which cannot be corrected within the R-status, and limits the full mission capability of the ship.
C-4     Major Deficiencies prevent the ship from activating or performing its primary mission and cannot be corrected within the assigned R-StatusDescribes a ship that cannot be fully mission capable within the assigned R status, or a ship that has a COI that will expire within 15 days, or a COI that has expired. C4 Status applies to unscheduled or otherwise planned events that result in the vessel's downgrade in readiness.
C-5     Scheduled major repairs in progress; unable to meet assigned R-Status          Describes a ship undergoing scheduled major repairs, which prevent it from meeting its assigned R-Status. C5 is only for planned availabilities.

2.2.3 Phase M and Phase O: Vessels shall be in one of the two phases, Phase M or Phase O, as defined below, while assigned to the Ship Manager.

2.2.3.1 Phase M - Maintenance: In this phase, the vessel is preserved, tested (including maintenance sea trials), repaired and maintained in its required state of readiness. Vessels may be in a partially crewed or reduced operating status (ROS-4 or ROS-5) or may be in deep lay-up (RRF-10). During this phase the vessel must be capable of activation within the assigned time frame and of operating continuously for 180 days.

2.2.3.1.1 RRF-10 Phase M: RRF-10 vessels are normally in National Defense Reserve Fleets in cold lay-up with no crews assigned. Offerors may propose as an alternative to the RRF-10 vessel being laid up in the Fleet, that is, lay up at a commercial outport facility with a retention team for each ship bid. The retention team will perform maintenance within their capability and keep the vessel in a high state of readiness. A retention crew is not an ROS crew, although they may be given the option of becoming a nucleus crewmember. They are not required to obtain the same level of training (Attachment J-13) as an ROS crew would have, nor do they have the same benefits (permanent billets) as ROS crewmembers. If joining the Phase O crew, they must meet standard FOS requirements (see Sections C.5.10 and C.5.4.1). They are not required to maintain internal vessel security.

The Ship Manager is not required to obtain a layberth for the RRF-10 vessels as part of its proposal, however, during the course of the contract, MARAD may request its assistance at obtaining layberth services as a Prime. RRF-10 vessels with outport locations are listed in TE-4.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 32 of 100 |
|---|---|---|---|

2.2.3.2 Phase O - Operation: This Phase involves the operation of the vessel for a specific mission or exercise. The vessel is to be operated in accordance with standard commercial practice and the RRF Operations Management Manual (TE-1). In Phase O the ship is normally under Military Sealift Command's (MSC) operational control.

2.2.4 While in Phase M and Phase O, maintain the vessel in a C-1 or C-2 status.

2.2.5 MARAD recognizes that events will occur which will result in a C-3 or C-4 status.

2.2.5.1 Notify the COTR within 24 hours of discovery whenever an event occurs which would place the vessel in a C-3 or C-4 status.

2.2.5.2 Initiate planning and as directed by TO take necessary action to correct promptly a C-3 or C-4 deficiency and return the vessel to the required readiness level. Submit a change to the current year Business Plan to reflect corrective actions.

2.2.6 MARAD recognizes that the vessel will have to be scheduled for C-5 status periods due to regulatory inspections, upgrades, and major maintenance periods.

2.2.6.1 Identify these periods within the vessel's business plan. (CDRL M-0005) The Ship Manager may be expected to adjust its proposed C-5 periods per the direction of the COTR when fleet-wide readiness is evaluated.

2.2.6.2 While the C-5 period must be kept to a minimum, evaluate cost against premium time and work acceleration expenditures in returning the ship to its required C-rating status.

2.3 Preventative Maintenance Plan Development

2.3.1 Develop two (2) preventative maintenance plans for each vessel one (1) for Phase M and one (1) for Phase O. Compliance with these Plans, and any of their modifications, is considered a performance measurement under the QASP. The preventative maintenance plans shall take into consideration all facets of inspection, testing, and conditioning the vessel's machinery, equipment, outfitting, and spaces (including structure, habitability areas, cargo areas, etc). The preventative maintenance plans shall include all regulatory body inspections and tests, as required.

2.3.1.1 A ship-specific Phase M Preventative Maintenance Plan, which incorporates both regulatory and preventative maintenance actions, shall be developed when the vessel is inactive. It shall reflect the assigned ROS-4; ROS-5 or deep lay up status (RRF-10). This plan shall be developed so as to ensure the vessel can be activated within the designated activation period, and subsequently sustain operations continuously for 180 days. The Ship Manager will be provided the existing preventative maintenance plan Maintenance and Repair Tracking System (MARTS) Vessel Maintenance Action (VMA) database for ROS-4 and ROS-5 vessels and Phase IV procedures for RRF-10 vessels. Existing preventative maintenance plans shall be utilized upon notice to proceed. Revise the existing plan as deemed fit or develop a new Phase M Preventative Maintenance Plan. Ship Manager may use their own format in developing Preventive Maintenance Plan. The Phase M Preventative Maintenance Plan shall be submitted to the COTR. (CDRL M-0006)

Scheduled maintenance activations and sea trials are reimbursable and shall be included in the Phase M Preventative Maintenance Plan. Provide a cost estimate for maintenance activation and/or sea trial. Acquire qualified Thermography Assessment and Vibration Analysis services to attend sea trials and provide written reports on the condition of vessel electrical installations and machinery per the direction of the COTR. Provide diesel engine analysis for diesel ships. Maintenance actions that can only be conducted or are most practically conducted during the maintenance activation, sea trial, or subsequent deactivation shall be identified in the Phase M Preventative Maintenance Plan and scheduled accordingly. Conduct sea trials and dock trials on each assigned vessel at the following intervals:

Intervals Requirement
ROS-4      One (1) Sea Trial Annually
ROS-5   One (1) Sea Trial every other year and one (1) dock trial every other year (alternate years) Sea and dock trials should be based upon the 5 year COI cycle with sea trials performed in the renewal year and the intermediate inspection year. Annual endorsement years get a dock trial.
RRF-10 One (1) Sea Trial every other year. Sea trials performed in the renewal year and intermediate inspection year only. No dock trials.

2.3.1.1 Phase M. Preventative Maintenance Plans for Vessels in NDRF sites
Ship Managers are responsible for the development of a preventative maintenance methodology.
For RRF-10 Vessels in the Fleet: Offerors have a choice:

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 33 of 100 |
|---|---|---|---|

a.      If the NDRF Fleet personnel perform maintenance procedures they will use the generic preventative maintenance procedures in the VOA Tech Library - "RRF 10 Maintenance Procedures." If the Ship Manager requires any additional preventative maintenance, they must itemize this in the Phase M. Preventative Maintenance Plan including an hourly estimate ($59/hr).

b.      Or the offeror will take the generic maintenance procedures, explain any modification to these in the Phase M. Maintenance Plan and complete all of the work with their own resources.

For outported RRF-10 vessels: Provide in the Phase M Preventative Maintenance Plan an hourly estimate of the time (in hours) and cost (per skill level) to accomplish this work. This estimate is part of the annual business plan (CDRL M-0007).

2.3.1.2 A Phase O Preventative Maintenance Plan shall be developed for execution while the vessel is in an operational status and shall be implemented should the vessel be activated for a period greater than thirty (30) days. (CDRL M-0008)

2.3.1.3 The Preventative Maintenance Plans shall be submitted to the COTR for initial review. After initial submittal, both the Phase M and Phase O Preventative Maintenance Plans shall be included with the Ship's Business Plan. Any revisions to either plan after initial submittal shall be identified in writing to the COTR. (CDRL M-0009)

2.3.1.4 The Ship Manager shall utilize the Preventative Maintenance module in RMS to develop, schedule and document the preventative maintenance plans in both Phase M and Phase O. The vessels' existing preventative maintenance plans for Phase M will have been installed on the vessels in RMS at NTP.

2.3.2 Utilize the MARAD's Water Chemistry support contract for procurement of kits and chemicals for the testing and conditioning of boiler water and diesel engine cooling systems. Provide reports on equipment as required. (CDRL M-0010)

2.3.3 Participate in the MARAD's Lube Oil Analysis program. The Lube Oil Analysis program requires samples be submitted to the MARAD's support contractor for all identified machinery as depicted in the vessel-specific testing schedule.

2.3.4 Integrate water chemistry and lube oil analysis into both preventative maintenance plans as applicable.

2.4 Corrective Maintenance and Repairs

2.4.1 Subject to the limitations of funding provided by MARAD, accomplish all corrective maintenance and repairs to the vessel. Corrective maintenance and repairs include all tasks necessary from initial identification of an unsatisfactory condition through final acceptance of the corrected item. This includes, but is not limited to, overhauling, repairing, or replacing with new machinery, equipment, installations, and spaces (including structure, habitability areas, cargo areas, etc.) to remedy an unsatisfactory condition.

2.4.2 Recommend and, as directed by COTR, accomplish modifications or upgrades determined to be beneficial to the vessel and its performance, extend the vessels life cycle, or enhance its cargo carrying capacity.

2.4.3 Identify deficiencies on the vessel which impact or may potentially impact the performance of the vessel, readiness, regulatory status, safety of the crew, and threaten the environment.

2.4.4 Enter all deficiencies into MARAD's RMS as an official record. (CDRL M-0011)
The deficiency shall be depicted within MARAD's RMS with a clear and concise statement of work that includes a cost estimate, planned completion date, duration to complete (number of days), contractor assistance required, and if the vessels readiness will be impacted during the repair period. Identify the impact of each work item on the readiness of the vessel and determine the applicable "C-status" for that item (reference Section C.2.2 or TE-1 Section 2 for definition of C-status).

2.4.5 Determine if deficiencies require immediate accomplishment or can be deferred to a later date or during the next activation (scheduled or unscheduled). Any deficiency that will place the vessel in a C-2 status shall be entered into MARAD's RMS within 48 hours of initial identification. Notify the COTR within 24 hours of identification for any maintenance or repair item or cumulative items that will place the vessel in a C-3 or C-4 status and enter the deficiency into MARAD's RMS at the next opportunity. All other repair items, upgrades, and enhancements shall be entered into MARAD's RMS at the discretion of the Ship Manager for funding consideration

2.4.5.1 In the event that a situation or condition develops that poses a threat to life, limb, property or the environment, take immediate action to protect or preserve the same.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 34 of 100 |
|---|---|---|---|

2.4.6 Performance of Repair Work

All repair and/or up-grading work required in conjunction with the contract (including all surveys and correction of sea trial deficiencies, or any other deficiencies that may be noted up to time of delivery and acceptance previously noted or not) necessary to meet all requirements of this contract shall be accomplished in a U.S. ship repair facility, unless the work is for emergency, or mission essential repairs, or for pre-positioned ships which are deployed overseas, or for any vessel forward deployed outside of the United States.

2.5 Business Plan Development (Maintenance and Repair)

2.5.1 The Business Plans shall encompass all known facets of the budget, scheduling, maintenance, repair, manning, training, regulatory compliance, and operation (if planned) of the vessel. The Business Plans shall identify all estimated resources and scheduling for successful execution.
\fs20
2.5.1.1 Submit initial detailed estimates of activation, operation, and deactivation costs for each vessel by item.

2.5.2 Submit with the Business Plans an estimate, by category (ship work breakdown structure), for emergent work which may arise during the year. Base these estimates on their experience as a ship operator and on historical data.

2.5.3 Identify the required work; estimate the cost and schedule for projected actions, i.e., preventative maintenance, corrective maintenance, and regulatory surveys and inspections; define the necessary resources; and schedule the execution of these actions to sustain the vessel in its required readiness. Documentation of these proposed actions and scheduling is part of the vessel's Business Plan. (CDRL M-0012)

2.6 Business Plan Execution (Maintenance and Repair)

Execute the Current Year Business Plan for each assigned vessel in accordance with the respective Plan's scope and schedule, subject to the obligation of funds. This shall be applicable regardless if vessel is in Phase O or M. Report status of individual tasks within the plan utilizing RMS. Maintain all data in RMS reflecting start and completion dates (planned and actual); work items (planned, in progress, and completed); method to complete; obligated and actual costs; and other supporting data elements as required by the system. (CDRL M-0013)

2.6.1 Maintain a historical database of work and repairs accomplished, to include associated costs accurately categorized by equipment, system or space. Use RMS database to refine and justify outyear business plans.

2.6.2 During the course of executing the business plan, MARAD recognizes that there may be events which will cause the Ship Manager to append or deviate from the plan as it was agreed upon, e.g., no-notice activations, MARAD imposed funding limitations, changes to readiness level, shipyard availability, unforeseen and unanticipated repairs, implement upgrades or changeouts, etc.

2.6.3 Notify the COTR within 24 hours for any unplanned situation or condition, which changes the readiness status of the vessel. In the event that a situation or condition develops that poses a threat to life, limb, property or the environment, take immediate action to protect or preserve the same.

2.6.4 Notify the COTR in the event a change is required in the Business Plan. Recommend an appropriate course of action and identify all impacts to the balance of the Business Plan (including outyears, if necessary). Make all necessary modifications to RMS to reflect the changes.

2.6.5 Revise business plans and maintenance methodology and ROS crew makeup, if required, by changes in layberth arrangement. Costs associated with the move will be reimbursable as listed in Attachment J-9 and approved by the PCO.

2.7 Turnover of RRF Vessels

2.7.1 Initial turnover. Within 14 days after NTP, a joint MARAD/Ship Manager material condition survey shall be conducted as follows:

- MARAD will provide a print out of deficiencies per vessel. All known deficiencies and requirements will have been entered in the RMS. A MARAD surveyor and the Ship Manager's representative shall verify these deficiencies and conduct a joint material condition survey of the vessel using an MA-58 (Ship Survey) as a checklist.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 35 of 100 |
|---|---|---|---|

- New repair and maintenance requirements shall be entered into RMS by the Ship Manager.

- Recommendations to remove or modify existing requirements shall be provided to the MARAD COTR as part of the business plan.

- A completed Ship Survey Form, MA-58, with narrative attachment shall be provided to the MARAD COTR .

- Concurrent with this survey, other requirements of the contract may also be conducted, for example, C.4.3.4.2.1 baseline security assessment.

2.7.2 Within forty-five (45) days prior to the completion of this contract, a joint MARAD/Ship Manager Material Condition Survey shall be conducted and documented on form MA-58 (SHIP SURVEY REPORT). If the contract is terminated for default or convenience, MARAD will arrange a mutual date to conduct the survey. This condition report shall be delivered to the MARAD COTR within one week of the survey date. A copy shall be provided to the ACO.

3.1 Logistics, Activations, and Operations

The Ship Manager shall:

3.1.1 Responsibility. Account for all Government Furnished Properties (GFP) in accordance with the contract. This includes, but is not limited to, all shipboard accountable property, technical manuals, drawings and spare parts. Preserve, manage and control all spare parts, accountable property, ship's drawings and technical manuals in a manner that prevents waste, theft and unnecessary procurement.

3.1.2 Property Control Systems. Maintain a MARAD approved Property Control System in accordance with Federal Acquisition Regulations (FAR) 45.5, the RRF Logistics Management Manual, (TE-5), and the PC-SAL Users Manual. (NOTE: PC-SAL is a legacy MARAD computer system. The functionality of PC-SAL will be incorporated in RMS. During the first year of the SMC, MARAD will replace or re-issue manuals as required to reflect RMS applications for logistics operations and spare parts management. The term "PC-SAL" has been replaced in contract documents, however other documents may still refer to this legacy system. Whenever such references are encountered, the term RMS is substituted.) The Ship Manager is not responsible for translating foreign language documents, contained in the property control system, into English.

3.1.3 Records. Maintain complete, current and auditable records of all GFP transactions in accordance with FAR 45.5 and TE-5. Records of spare parts, accountable property, technical manuals, and drawings shall be maintained in the vessel's RMS computer system in accordance with the RMS manual.

3.1.3.1 Maintain the following files onboard each vessel:

a) Documents used to ship any item of GFP off the vessel or receive any item of GFP onboard the vessel; and

b) Copies of Reports of Survey (DOT Form 4410.1) initiated by the Ship Manager for items lost, damaged or destroyed onboard the vessel.

3.1.4 Training. MARAD regional Logistics Management Officer (LMO) will schedule training and issue passwords for the MLSS before Ship Manager personnel use it.

3.1.5 Accountable Property – Acceptance Inventory. Conduct a joint (with MARAD) and complete physical inventory of all of the vessel's accountable property. RMS will be adjusted to reflect the results of the inventory. At the conclusion of this reconciliation process the Ship Manger will acknowledge the receipt of the entire inventory of accountable property as well as the accountable property database contained in RMS. (CDRL L-0001)

3.1.6 Completion or Termination Inventory. At the completion or termination of the contract, conduct a joint (with MARAD) and complete physical inventory of the vessel's accountable property. The results of this inventory will then be reconciled with the accountable property database contained in RMS. Provide a written survey for each item found to be lost, damaged or destroyed. (CDRL L-0002)

3.1.7 Maintain a complete and 100% accurate inventory of all accountable property in RMS

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 36 of 100 |
|---|---|---|---|

3.1.8 Anniversary Inventory. Conduct and report the results of a complete physical inventory of accountable property in accordance with TE-5. (CDRL L-0003)

3.1.9 Post Phase O Inventory. Conduct and report the results of a complete physical inventory of accountable property in accordance with TE-5. This includes sea trials as well as Phase O. (CDRL L-0004)

3.1.10 Accountable Property. Submit a DOT Form 4410.1 for all lost, damaged or destroyed accountable property in accordance with TE-5. The COTR is responsible for determining whether or not to replace missing accountable property. A region survey board will decide the issue of liability. If the Ship Manager is deemed liable for missing, lost or damaged property, the Contracting Officer (CO) will deduct the appropriate value of the item from monies due the Ship Manager.

3.1.11 Failure to Submit Required Survey Form (DOT Forms 4410.1) within five (5) working days after the Completion or Termination Inventory. The value of the items found lost, damaged or destroyed will be deducted from monies due the Ship Manager until the required documents have been both submitted by the Ship Manager and fully reviewed and processed by MARAD.

3.1.11.1 Recovery of Funds for failure to use agency assets. Except as provided for in TE-5, the Administrative Contracting Officer (ACO) will deduct from monies due the Ship Manager as recovery of funds for the cost of spare parts procured by the Ship Manager when the same item (or a valid serviceable alternate), was available in any of the three (3) Shore-based Spares (SBS) warehouses at the time the purchase order was placed unless it is determined by MARAD that special circumstances preclude such a deduction. A Ship Manager has ordered a part which MARAD deducts the cost of because it is available within the 3 SBSs, may return the same part for vendor credit. The SM will pay all associated costs of the return.

3.1.12 Spare Parts, Technical Manuals and Ship's Drawings

3.1.12.1 Acceptance Inventory of Spare Parts, Technical Manuals and Ship's Drawings. Jointly with MARAD, obtain and inventory a sample of the vessel's spare parts, technical manuals and ship's drawings in accordance with the statistical standards provided in TE-5. The results of this inventory will be jointly recorded. (CDRL L-0005) This sample will include spare parts stored in the following locations:

a) Loose spare parts;
b) Spare parts mounted on bulkheads; and
c) Spare parts contained boxes and cabinets, both sealed and unsealed.

3.1.13 Acquisition of Spare Parts: Unless otherwise directed by the COTR, be responsible for the acquisition of spare parts in accordance with the Shipboard Allowance List (SAL) and available funding.

When a requirement for any replacement or spare part is identified, review the most recent MLSS CD-ROM and confirm that no valid serviceable asset is available in the three (3) MARAD SBS warehouses. Except as provided for in TE-5 and in accordance with 41 CFR101-26.107, if a valid serviceable spare part (or alternate) is available in any SBS warehouse, request the item. Ship Managers will be reimbursed for travel to warehouse to verify the serviceability of parts. Ship Managers who order parts may return them for vendor credit. All costs associated with the return of improperly order parts will be to the Ship Manager's account.

3.1.13.1 Termination or Completion Inventory of Spare Parts, Technical Manuals and Ship's Drawings. Jointly with MARAD, obtain and inventory a sample of the vessel's spare parts, technical manuals and ship's drawings in accordance with the statistical standards provided in TE-5 and (CDRL L-0006). The results of this inventory will be jointly recorded. This sample will include spare parts stored in the following locations:

a) Loose spare parts;
b) Spare parts mounted on bulkheads; and
c) Spare parts contained boxes and cabinets, both sealed and unsealed.

3.1.14 Standards for Repair Parts. In addition to the requirements set forth in FAR 45.5 and TE-5, maintain the following logistics management standards for repair parts managed in RMS:

a)        Maintain a 95% (or greater) accurate inventory of spare parts NOT secured by a MARAD applied seal; and

b)        Accurately mark, record and stow repair parts in accordance with FAR 45.5 and TE-5 within five (5) working days of receipt by the Ship Manager.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 37 of 100 |
|---|---|---|---|

3.1.15 Replenishment of Spare Parts. Integrate into the annual Business Plan requirements for the acquisition of spare parts for the next fiscal year. Requirements must identify and estimate the cost of all Criticality Code 4 spare parts that are not on board the vessel and not available from MARAD SBS warehouses. Requirements will also identify any other spare parts the Ship Manager considers to be important for the safe and efficient operation of the vessel. (CDRL L-0007)

3.1.16 Ship Configuration Management. Preserve and maintain the vessel's configuration record in accordance with TE-5, and maintain the following configuration management standards:
a) Record all changes, removals, additions, upgrades and modifications to the installed equipment configuration of the vessel; and

b) Prepare and submit Allowance Change Requests in accordance with TE-5.

3.1.17 Offshore Petroleum Discharge Ships (OPDS), Offshore Utility Boats (OUB), and Improved Mooring System (IMS) outfitting and spare parts.

The OPDS vessels have specialized OPDS, OUB and IMS equipment, spare parts, and outfitting. A significant portion of this outfitting is regularly issued to Navy personnel during OPDS evolutions and the Naval Sea Systems Command (NAVSEA's) Material Readiness Assessment (MRAs), and as such, requires special management attention by Ship Managers of OPDS vessels.

3.1.17.1 Configuration Management. Review, maintain, revise, and update the vessel's OPDS, OUB and IMS equipment configuration, technical manuals and drawings in RMS in accordance with MARAD approved NAVSEA technical specifications.

No NAVSEA initiated changes to OPDS, OUB or IMS outfitting, spare parts, equipment configuration, technical manuals or ship's drawings are to be made without the prior written (or email) approval of the COTR.

3.1.17.2 OPDS, OUB, and IMS Outfitting Management Procedures. Provide a set of detailed written procedures that implement NAVSEA PMS 325 letter 325R32/0668 dated 25 July 2000. This correspondence is provided as TE-5.
These procedures must comply with FAR 45.5 and TE-5 specifically addressing the following: (CDRL L-0009)

a) The management of OPDS, OUB and IMS allowances;

b) The issue of OPDS, OUB and IMS outfitting and spare parts to military personnel;

c) The collection or turn-in of OPDS, OUB and IMS outfitting and spare parts from military personnel during and after OPDS and MRA evolutions;

d) The preservation, marking and storage of OPDS, OUB and IMS outfitting and spare parts; and

e) The generation of OPDS, OUB and IMS Shortage Lists.

3.1.17.3 Generation of OPDS, OUB and IMS Shortage Listings. Within thirty (30) days of the conclusion of any OPDS exercise or NAVSEA MRA, generate and forward an OPDS Shortage List. (CDRL L-0010)

3.1.17.4 Procurement Standards for NAVSEA Baseline Shortages. Maintain "100% on hand or on order" for all OPDS, OUB and IMS outfitting and spare parts listed in the MARAD approved NAVSEA Base Line (TE-5).

3.1.18 MARAD OPDS Shore Set. Depending on the availability of funding, MARAD may, at its discretion, maintain limited quantities of OPDS, OUB and IMS spare parts and outfitting at its three (3) SBS warehouses. This subset of Shore-based Spares is referred to as the "OPDS Shore Set." A sample list of possible OPDS Shore Set items that MARAD may stock is provided in TE-5. With the exception of unique Navy Stock Numbered (NSN) items that can not be purchased commercially, the Ship Manager must NOT rely on the MARAD Shore Set to replenish OPDS, OUB or IMS outfitting and spare parts.

3.1.18.1 Maintain the independent capability to research, identify and commercially purchase any item of OPDS, OUB and IMS equipment, spare part or outfitting throughout the life of the contract.

3.2 Activation. There are two (2) categories of activations: scheduled and unscheduled. The former is an integral part of the scheduled preventive maintenance requirements of the vessel and associated with its assigned R-Status. The latter is associated with a specific Department of Defense (DOD) initiated request or requirement. The five (5) specific types of activations within these two (2) categories, which the Ship Manager may be required or directed to perform, are defined in TE-1 - Section 2.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 38 of 100 |
|---|---|---|---|

3.2.1 For Mission Activations:

3.2.1.1 Provide all resources and support equipment required to accomplish all the necessary work of activating the ship within the ship activation readiness period as defined in TE-4 to ensure that the vessel is capable of sustained operations for up to 180 days.

3.2.1.2 Direct the work of all subcontractors and provide periodic reports to COTR.

3.2.1.3 Activate, store, crew, and provision assigned ships, obtain USCG, ABS and other regulatory tests surveys, inspections or certifications within its assigned readiness period.

3.2.1.4 Bunker the vessel as directed by the COTR.

3.2.1.5 Receive and load cargo.

3.2.1.6 Operate the vessel for up to 180 consecutive days.

3.2.2 Simultaneous activations can be expected, and unless assigned vessel is in readiness category C-3, C-4, or C-5, which indicate it is not able to be activated within the prescribed timeframe, activation timelines are mandatory.

3.2.3 For Notice and No-Notice Activations: Perform all tasks of Section 3.2.1. However, the COTR may reduce requirements (quantities of provisioning, stores, extend timelines, etc.) as required by the specific activation or planned operation scenario.

3.2.4 For Maintenance Activations: Conduct in accordance with the Ship Manager developed Preventative Maintenance Management Plan.

3.2.5 Activation Plan

3.2.5.1 Develop, implement, manage, and maintain the ship-specific Activation Plan. (CDRL L-0009)

3.2.5.2 Compliance with the Activation Plan, and any of its modifications, is considered a performance measurement under the QASP.

3.2.6 Cost Estimates. The Ship Manager shall provide, within forty-eight (48) hours of being notified of an activation, a cost estimate, inclusive of overtime costs, for the activation, operation and subsequent deactivation of the vessel. (CDRL A-0001)

3.2.7 Activation Reporting.

3.2.7.1 Develop, manage, and submit timely and accurate reports as defined below, entering data into RMS. COTR Reports include:

3.2.7.1.1 Status Reports - Daily. Provide daily status to the COTR on vessel activation progress. COTR will direct time and frequency of this report for each activation. (CDRL A-0002)

3.2.7.1.2 Status Reports - Special. Provide required special status reports in RMS when requested by COTR or by the MARAD HQs Crisis Management Team. These reports usually involve security, Chemical, Biological, Radiological-Defense (CBR-D) outfitting, reporting crew shortages, or other issues unique to a military operation. (CDRL A-0003)

3.2.7.1.3 Vessel Movements (MOVEREPS)

3.2.7.1.3.1 Enter into the RMS vessel movement data including date, time, and location of vessel movement. (CDRL A-0004)

3.2.7.1.3.2 Scan into RMS a PDF copy of all ship delivery reports between MARAD/MSC. This is not the same as the noon or pre-arrival reports required by MSC.

3.2.7.1.4 Crew List(s)

Provide and maintain currency a crew list including military personnel onboard. This list is provided upon request by COTR. (CDRL A-0005)

3.2.7.1.5 Task Order Accounting

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 39 of 100 |

Enter into RMS activation cost information and data including current obligated fund totals, anticipated funding requirements.

3.2.7.1.6 Crew Questionnaire

Arrange for and assist in the collection of data associated with the crew survey forms. (CDRL A-0007)

3.2.7.1.7 Lessons Learned

3.2.7.1.7.1 Collect the following data for mission related activations.
MARAD Reports (submitted as part of the activation and ops) (CDRL A-0008)
- General condition of ship upon Activation
- Equipment problems encountered at Activation
- Administrative problems
- Voyage summaries
- Operating history, commencing at activation notification, and inclusive of:

· Activation notification received from MARAD
· Dock Trials
· Tender to MSC
· Shift to loading
· Commenced Loading
· Completed Loading
· Departure Sea Buoy
· Transit
· Funding
· Correspondence
· Personnel
· Sea Trials
· Deficiencies (Operating casualty history and repairs)
· CASREP/CASCOR and associated actions taken
· Vessel Reports
· Vessel Logs
· Thermography and Vibration Analysis Survey Reports
· Deliverables
And an (optional) submission of Photographs (digital, if possible,) for use by MARAD in briefings or public affairs articles.

3.2.7.2 Maintain throughout both Phases the onboard property, inventory and currency of MSC, USCG, and other nautical publications and instructions.

3.2.7.3 Report any discrepancies (inventory and/or currency) to the COTR (for items, which MARAD furnishes,) and undertake necessary efforts to replace or update the deficient items.

3.2.7.4 Ensure missing documents or publications are obtained prior to the completion of load-out or departure from CONUS, whichever occurs first. Items in the Standard Administrative Yellow Filing cabinet onboard each vessel are found in CDRL BUS-0004.

3.2.7.5 Embarkation of military personnel. Ship Managers and Masters may be required to support the embarkation of Government personnel including military as passengers, supercargo personnel, and/or observers as directed by MARAD. This includes military stationed as a temporary security force, for example Guardian Mariners.

3.2.7.5.1 The Ship Manager shall provide berthing, food, medical, laundry, and cleaning services comparable to the equivalent shipboard rating. These services shall be provided on a cost reimbursable basis. Entertainment for embarked military is not required and it is not a reimbursable nor an allowable expense. No additional exercise facilities beyond what is available for the crew shall be provided.

3.2.7.5.2 COMSC has instructions which address Master's responsibility and relationship with military personnel, allocation of space, shipboard safety, behavior and discipline, weapons security and other related subjects. (See MSC SOM Chapter 2 Section 7)

| Award/Contract | Document No. | Document Title | Page 40 of 100 |
|---|---|---|---|
| | DTMA8C05020 | Ship Manager | |

If issues arise regarding weapons/ammunition, advise MAR-613 by the fastest means possible.

3.2.8 Chart Ordering and Nautical Publications. Ship Managers will gain access to nautical publications and charts (paper copies) ordering service by having a representative attend the MSC provided course (see J-13). Upon authorization which is provided in writing after completion of the course, Ship Managers shall obtain nautical publications and charts for vessels prior to operation and dispose of them during deactivation in accordance with direction from the COTR.

3.2.9 Slop Chest. Ship Managers will obtain all slop chest items at their own expense, operate the slop chest, and dispose of all materials in accordance with their own corporate procedures. MARAD will no longer reimburse slop chest materials.

3.3 Operations

3.3.1 General. Provide all resources and support equipment required to accomplish continuous ship operations for at least 180 consecutive days in accordance with good commercial practice and the laws and regulations of the United States. Ships are required to maintain operational sea speed listed in TE-7 or notify COTR immediately.

3.3.2 Arrange for port services when in port including anchorages and alongside facilities. Ship Managers must expect and be ready for simultaneous operations of vessels. Although most RRF operations are point-to-point service, Ship Managers must remain flexible to changing operational requirements because there are a variety of worldwide missions for RRF ships. Generally, but not always, RRF ships are under the OPCON of MSC. RRF ships are owned by MARAD and the Ship Manager is contractually obligated to MARAD. Administrative control of the RRF remains with MARAD despite mission or operation assigned. See TE-1, Section 2 for Naval operational terminology.

3.3.3    Maintain vessels such that they achieve the minimum operational speed designated in TE-7. Failure to routinely meet operational speed requirements will result in an investigation to determine root causes, such as, but not limited to, severe weather, improper loading, operational or mission considerations, or failure to perform preventative or routine maintenance.

3.3.3.1 If an RRF ship is unable to comply with naval sailing orders during Operations, because the Master determines compliance is not feasible or it jeopardizes the safety of the ship, the Master, as Ship Manager's representative, must advise the naval operational commander and MARAD (COTR, MAR 611 and MAR-613 and if activated, the Crisis Management Team) within one (1) hour by immediate precedence message, unless message traffic is restricted by the naval commander. The message must include intended actions and reasons for not accepting naval operational direction.

3.3.3.2 Keep the naval operational command and MARAD (see Section 3.3.3.1) fully informed of the ship's status until it is capable of complying.

3.3.4 Operations Plan. Develop, implement, manage and maintain the Ship Manager developed ship-specific Operations Plan. Compliance with the Operations Plan, and any of its modifications, is considered a performance measurement under the QASP.

3.3.5    Bunkering

Provide general policy and ship specific plan for bunkering the ship in accordance with Federal, State, and local environmental regulations.
3.3.5.1    Ensure crew members are familiar with the ship's bunkering plan and conduct bunkering operations with the utmost care for environment in strict compliance with the bunkering plan.

3.3.5.2  Bunkering is normally performed after the vessel is reported RFS and accepted by MSC.

3.3.5.3  Bunkering instructions can either be provided in the MSC activation message or by the COTR.

3.3.5.4  Vessels under MSC OPCON must request bunkering instruction from the MSC area commander. The MSC area commander will instruct the vessel to use bunkers or procure bunkers commercially as a reimbursable. Bunkers are GFP or reimbursable (at the discretion of the Government). During operations, request information on availability of bunkers from the local MSC area commander before arriving in port.

3.3.5.4.1 Maintain list of crewmembers to have viewed bunkering video.

| Award/Contract | Document No. | Document Title | Page 41 of 100 |
|---|---|---|---|
| | DTMA8C05020 | Ship Manager | |

3.3.5.4.2 Inventory of oil spill response kit - semi-annually. Coordinate with COTR.

3.3.5.5  MARAD has provided a laminated Bunkering checklist (in the standard administrative filing cabinet) for use during bunkering; and an instructional video for the training of all crewmembers who are involved in bunkering. Maintain a list of crewmembers' names who have viewed this video and reviewed the bunkering checkoff list.

3.3.5.6 Maintain and utilize Government-furnished (GF) Oil Spill response kits onboard RRF ships.

3.3.5.6.1 Maintain, adjust, deploy, or remove GF containment booms as directed by the COTR.

3.3.5.7  Perform inventories of the oil spill response kits at least semi-annually and advise COTR of missing or expired parts. Maintain and utilize Oil Spill response kits onboard RRF ships, in accordance with regulatory body requirements.

3.3.6 Report on the status of bunkers as directed by MSC/MARAD and request the source of bunkers from the MSC Area Commander.

3.3.7 Hydraulic and Lube Oil Analysis. Utilize the analytical services provided by MARAD under the RRF's Fleetwide Oil Analysis Program and currently provided by JOAP for hydraulic and lubricating oils. The costs for testing at this laboratory are paid by MARAD.

3.3.8 Special Mission Operations.  Crew and operate each of the special mission vessels in a manner so that the vessel will be able to perform its designated mission as prescribed.

3.3.8.1 The following vessel types have been designated as special mission RRF vessels since they have been modified to conduct special operations that are not typical of normal cargo operations:

3.3.8.1.1 Aviation Support Vessels (T-AVB) - General cargo ships which have been modified to conduct maintenance and repair (M&R) of United States Marine Corps (USMC) fixed and rotary wing aircraft. When activated, vessels' cargo holds are loaded with container/CADS/Conex boxes which are utilized as repair shops for USMC operations. Vessels each embark up to 300 USMC personnel. Vessels conduct extensive helicopter operations during deployment. USMC personnel are self-sufficient for berthing and messing; however, Ship Manager may be responsible for procurement of victuals and stores on a reimbursable basis as well as conducting maintenance and repair to USMC hotel spaces. T-AVB Vessels are:

SS CURTISS
SS WRIGHT

3.3.8.1.2 Auxiliary Crane Ships (T-ACS) - General cargo ships which have been modified with two (2) or three (3) sets of twin heavy lift cranes to load and offload non-self-sustaining cargo vessels in either unimproved ports or while anchored offshore. Cranes are rated at 30 or 35.5 long tons each and can operate individually, in twin mode or conduct tandem lifts (four (4) cranes together). Military personnel rig cargo and operate the cranes under the authority of the vessel's Master during operations and exercises. The ship's crew shall be responsible for M&R of the cranes. Approximately five (5) military personnel may be embarked on each ship full time and will require berthing, victuals, messing and stores. T-ACS vessels are:

SS GOPHER STATE (T-ACS4 Class)
SS FLICKERTAIL STATE (T-ACS4 Class)
SS CORNHUSKER STATE (T-ACS4 Class)
SS EQUALITY STATE (T-ACS7 Class)

3.3.8.1.3 Modular Cargo Delivery System (MCDS) Vessels - The MCDS vessels have been modified to conduct underway replenishment of Navy combatant and auxiliary ships. Cargo operations are conducted via high line wires between the MCDS vessel and Navy ship or by helicopter cargo operations. MCDS vessels may carry ammunition as cargo. The MCDS vessel's crew shall be responsible for the operation of cargo handling equipment within the cargo holds. Other cargo handling operations will be conducted by Navy personnel embarked on the vessel under the authority of the vessel's Master. Applicable crewmembers shall require specialized training and certification for the conduct of MCDS operations and handling ammunition. Maintenance and repair of MCDS installations and outfitting will primarily be the responsibility of the Navy personnel, however, management of associated spare parts shall be the responsibility of the Ship Manager. Up to 45 Navy personnel may be deployed aboard the MCDS vessel and shall require berthing, victuals, messing and stores. MCDS vessels are:

SS CAPE GIBSON

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 42 of 100 |
|---|---|---|---|

SS CAPE GIRARDEAU
SS CAPE JACOB

3.3.9 Operations Reporting

3.3.9.1 Develop, manage, and submit timely and accurate reports as defined in the Contract Data Requirements List (CDRL) (TE-3), RMS, and as required by the MSC's Standard Operating Manual (SOM) or provided as a special mission requirement from MARAD.

3.3.9.2 Obtain through MSC the latest version of the MSC SOM (CD-ROM format). MSC SOM requirements are not reported in the MARAD CDRL.

3.3.9.3 When an RRF ship is under MSC OPCON, significant reporting is required under MSC SOM. Because this manual (in CD-ROM format) is constantly changing, MARAD directs the Ship Manager to the MSC surge representative to obtain the latest version. If difficulties are encountered advise the COTR immediately. SINCE MARAD IS THE VESSEL OWNER, THE COTR/REGION SHALL BE COPIED ON ALL REPORTS. For classified reports: Using the PC to PC Transfer System (PPTS) , the ship is able to send classified message traffic/reports to the appropriate MARAD regions and Headquarters address.

3.3.9.4 Upon the issuance of weapons/ammunition, the following reports: 1. the Navy Small Arms Asset Verification List; (CDRL O-0001) and 2. The Ammunition Transaction Report shall be submitted to MAR-613. (CDRL O-0002)

3.3.9.5 Notify the COTR immediately, if any vessel in Phase O has not reported in at least once in any twenty-four (24) hour period. Copying the COTR on the Noon Report, usually required by MSC, is sufficient. (CDRL O-0003)

3.3.10 Utilize U.S. Customs Form No. 226 (Attachment J-17) for reporting all repairs and parts procured from foreign sources at the first U.S. port of entry after an overseas voyage. Send a copy of the US custom's form 226 with supporting documentation to MAR-613 at the same time it is submitted to Customs. Additionally, notify MARAD (MAR-613) of any difficulties with U.S. Customs. (CDRL O-0004)

3.3.11 During all Phases, report to MARAD (MAR-613) or, if established, the MARAD HQ Operations Center, significant events, e.g. rescues at sea, medivacs, or political unrest which affects ship operations or in which the ship is involved.

3.3.12 The Casualty Reporting System includes: Casualty Reports (CASREPs); Casualty Situation Reports (SITCASREP); Casualty Corrected Reports (CASCORs) and Casualty Cancelled Reports (CASCANs). (CDRL O-0005)

3.3.12.1 CASREPs. Advise the COTR, MAR-613, MARAD HQ Operations Center, , MSC and the naval operational commander via the Navy's casualty reporting system when a vessel is experiencing a material casualty during Phase O. Provide decision tree rational for C3s and C4s for CASREP in a separate report to MARAD regions/HQ Operations Center. Include COTR, MAR-613, and the MARAD HQ Operations Center on ALL message traffic regarding the casualty.

3.3.12.2 CASCANs. Cancel outstanding CASREPs upon redelivery of an RRF vessel to MARAD by issuance of a CASCAN. Information contained in the cancelled CASREP shall be transferred to RMS.

3.4 Deactivation

3.4.1 General. Deactivation is part of Phase M that occurs after redelivery of the vessel to MARAD from Phase O.

3.4.2 Conduct the necessary planning and preparations to return the vessel to its assigned readiness status, capable of being re-activated and operated for 180 consecutive days, to include the following:

a)      Accurately document all known equipment and system malfunctions and other material deficiencies.

b)      Accomplish deactivation procedures, repairs, and regulatory requirements.

c)      Clear Navy CASREP reporting system of any outstanding deficiencies and enter them into RMS.

3.4.3 Deactivation Plan. Develop and maintain a vessel-specific Deactivation Plan. Compliance with the Deactivation Plan, and any of its modifications, is considered a performance measurement under the QASP.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 43 of 100 |
|---|---|---|---|

3.4.3.1 In developing the Deactivation Plan, the Ship Manager may consult any of the Government's available procedures:

a) TE-1 Section 31 - Deactivation Procedures and Standard Lay-up Procedures for selected vessel's equipment and systems.

. b) The MARAD NDRF Fleet manual available from MAR-612, provides information for vessels laid up in the NDRF.
3.4.4 Execute the Deactivation Plan and associated specifications.

3.4.5 Ensure that both ROS and non-ROS vessels are deactivated and laid up in a manner that prevents deterioration of the vessel, or vessel's equipment and outfitting.

3.4.6 Provide all resources and support equipment required to accomplish all the necessary work of deactivating the vessel as authorized by Task Order.

3.4.7 Deactivation Work Items (For ALL vessels)

3.4.7.1 Provide a detailed deactivation cost estimate by ship work breakdown structure. (CDRL D-0001)

3.4.7.2 Accept vessel tender from the operational commander on behalf of MARAD, if directed by the COTR.

3.4.7.3 Supervise the discharge of final cargo and cleaning of vessel's spaces by military personnel. Attempt to obtain signatures when damage has been discovered or cleaning is unsatisfactory. Report damage and unsatisfactory cleaning to COTR. (CDRL D-0002)

3.4.7.4 Box, inventory, secure with a MARAD seal all pilferable items. This includes items, which in aggregate have a high value: e.g., special tools, such as torque wrenches.

3.4.8 Box charts (or chart CDs) for storage or disposal in accordance with direction from COTR.

3.4.9 Return and verify all items in standard administrative cabinet. Notify MARAD (MAR-613) of missing materials.

3.4.9.1 As authorized by TO, arrange for and coordinate all lay-up services with appropriate vendor (shipyard, tugs, pilots) or regulatory agency.

3.4.9.2 As directed by TO, perform material condition surveys which may include: sea trials and, if directed by COTR diagnostic testing such as Thermography or vibration analysis. (CDRL D-0003)

3.4.9.3 As directed by TO, accomplish all voyage repairs and outstanding classification and certification items via ROS crews or with industrial assistance in accordance with the annual business plan.

3.4.9.4 RESERVED

3.4.9.5 Obtain guidance on the disposition of weapons and ammunition from the HQS (MAR-613) COTR for weapons and ammunition.

3.4.10 Deactivation Work Items (ROS vessels)

3.4.10.1 After 48 hours of redelivering the vessel to MARAD, the per diem rate will change from Phase O to Phase M.

3.4.10.2 Accomplish the following:

a)  Inventory, box, and secure pilferable items except those required by crew.

b)      Voyage repairs, and outstanding class items as directed by task order.

c)      Arrange for vessel to be properly moored at the outport location and connected to the required hotel/shoreside hookups (i.e., power, water, telephone, etc.)

d)      Arrange for all lay-up systems (dehumidification, intrusion, fire, and flood alarms and hull protection) to be in place and activated as required in light of ROS crew requirements.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 44 of 100 |
|---|---|---|---|

3.4.11 Deactivation (RRF-10 day vessels)

3.4.11.1 Issue solicitation for deactivation in accordance with task order and award subcontract within thirty (30) days.

3.4.11.2 Identify in the business plan, the type by rating and number of personnel who will remain with the vessel for up to ten (10) days to conduct deactivation work. If authorized, MARAD will reimburse the cost of the designated crew wages.

3.4.12 Transfer vessel to location where voyage repairs, outstanding classification items, and/or lay-up work will be performed.

3.4.13 For RRF-10 day vessels (berthed in the NDRF)

3.4.13.1 Transfer vessel to the NDRF location.

3.4.13.2 Vessel mooring, hookups, and security will be accomplished by Government fleet personnel.

3.4.13.3 There will be limited power for dehumidification and cathodic protection, ensure alarms systems are operational (flooding, intrusion, and fire). Notify the COTR if alarms are not functioning.

3.4.14    For RRF-10 day vessels (outported)

3.4.14.1 Transfer the vessel to the outport site.

3.4.14.2 Arrange for vessel to be properly moored and connected to the required shoreside hookups (i.e., power, water, alarms, etc.)

3.4.15 Deactivation Reporting (all vessels)

3.4.15.1 Enter the Delivery/Re-delivery Report into RMS. (CDRL D-0004)

3.4.15.2 Ensure that fuel data is recorded before re-delivery and provided to Navy (NEURS) and COTR. (CDRL D-0005)

C.4    SAFETY, ENVIRONMENTAL AND SECURITY

4.1 Introduction

Although the RRF program's primary function is to serve as a source of strategic sealift during national emergencies, MARAD fosters other long-term goals during the execution of the Program. These include: improvements to the sustainability and livability of U.S. communities; reduction in the number of RRF shipboard injuries and deaths; and reduction of the adverse effects of the RRF on ecosystems and the environment. To accomplish these goals, MARAD will work in partnership with the Ship Manager to maximize safe performance for all personnel, and foster high security and environmental standards and achievements. Should a Ship Manager have any question at any time with respect to public vessel compliance and regulatory statutes, questions shall be directed to MAR-611 with copy to the regional COTR. Note: MARAD, as vessel owner, promulgates an Occupational Health and Safety Program (OHS Program). This Program is not approved by a third party - for International Safety Management (ISM) certification. If upon reading the MARAD safety actions in the OHS Program, the Ship Manager finds a conflict between its ISM certificate and the MARAD safety actions, the Ship Manager shall advise MARAD HQS (MAR-611) OHS COTR immediately. MARAD's OHS Program is not meant to replace or supersede the Ship Manager's ISM certificate. The Ship Manager's Safety Management Program which is the vessel's safety program takes precedence until the issue can be worked out. MAR-611 will take appropriate measures to arrange a waiver to individual requirements should one be needed.

The Ship Manager shall:

4.1.1 ISM Certificates

4.1.1.1 International Safety Management (ISM) Document of Compliance (DOC): Maintain a valid ISM DOC, for itself as a corporation, for the vessel types awarded for the performance period of the contract. The entity/offeror who will perform management of the ships must have a separate ISM DOC or interim DOC at NTP.

4.1.1.2 Vessel Safety Management Certificate (SMC): In accordance with appropriate USCG regulations and NAVICs for public vessel voluntary ISM compliance, obtain and maintain for the performance period a valid ISM SMC or interim SMC for designated

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 45 of 100 |
|---|---|---|---|

vessels in Sections 4.1.1.2.1 and 4.1.1.2.2. ABS fees in connection with this are reimbursable. (see Attachment J-9) Internal audits for DOC are not reimbursable; audits and other fees for the maintenance of the Ship Management Certificate are reimbursable.

4.1.1.2.1 For ROS vessels with a valid interim Ship Management Certificate review the assigned ships' Ship Management Certificate or renew, a valid interim Ship Management Certificate for the vessel within twelve (12) months.

4.1.1.2.2 For ROS vessels without an SMC or if a new Ship Manager has been assigned the vessel, Ship Managers will apply for and obtain a valid an interim SMC for their assigned ships within twelve (12) months.

4.1.1.3 ISM Safety Management System/Vessel Safety Plan: Update the ISM Safety Management System to incorporate characteristics of awarded vessels, and as conditions warrant. Copies of the safety management system shall be available to all crewmembers and to the Government. (CDRL SFTY-0001) The Ship Manger's ISM Safety Management System becomes the Vessel's Safety Plan for the performance period of the contract. MARAD will not review or approve as this document as it is part of the Ship Manager's ISM DOC.

4.1.1.4 MARAD will hold periodic meetings with the Ship Manager, the ISM designated person, ship's officers, MARAD regional COTR, and MARAD Safety COTR at a place of mutual agreement to discuss specified agenda items. MARAD Safety Officer will provide the agenda.

4.1.1.5 Notify MARAD regional COTR before internal audits are conducted. MARAD COTR may attend as an observer. See Section 6.7.2.3.

4.1.2 Logs: Ship Managers shall maintain an deck log(s) at all times when a crew of any size is aboard. (CDRL SFTY-0002) Safety information shall be recorded, as applicable, in the deck log:

· Emergency, Steering Gear, Abandon Ship, Firefighting, and Boat drills/training
· Security Training/Drills
· Monthly Safety Meeting Findings Training
· Quarterly MSDS and warning label Training
· Quarterly Personal Protection Equipment (PPE) and CBR-D Training
· Duty officer notes - by exception and related to safety
· Results of side-by-side emergency drills (combining crews) for ships nested or located
  near to each other.

4.1.3 Conduct, via the ship's Safety Committee, pre-firefighting training, drills, and actual practice with ship's equipment in full gear. Further, ship supervisors in all departments must know the location of the ship's fire plan.

4.1.4 Post Station Bills: Ensure, via the senior deck officer, that all station bills are properly posted and emergency equipment (personal floatation devices, exposure suits) is functioning properly or replaced. Materials required for drills is either GF or reimbursable at the Government's direction - consult COTR.

4.1.5 Cooperation. The Ship Manager shall cooperate with MARAD to develop and implement to the maximum extent possible the policies, plans, and procedures of MARAD's OSH Program and to offer recommendations for its improvement. Ship Manager personnel shall attend, as directed and funded by the COTR, OSH conferences organized by MAR-611. These are normally twice a year trips to Washington DC.

4.1.6 Cargo Handling: The Ship Manager shall promulgate, to shipboard personnel, procedures incorporating all federal, state, and local statutes and regulations, and equipment manufacturers' safety requirements for cargo handling in U.S., foreign ports, and in-the-stream for the safe handling of all types of cargo, including HAZMAT.

4.1.6.1 Ship's cargo gear includes, but is not limited to cranes, winches, davits, booms, Roll-on/Roll-off (RO/RO) ramps, SEABEE or Lighter Aboard Ship (LASH) barges, elevators and transporters, underway replenishment (UNREP) and vertical replenishment (VERTREP) cargo gear, and Material Handling Equipment (MHE) items such as, forklift trucks, pallet jacks, and hand trucks.

4.1.6.2 The Ship Manager via crew supervisors is responsible for ensuring that the crew utilizes proper protective clothing during work. Advise COTR if special sizing of PPE is required.

4.1.6.3 Operate cargo support equipment when required for any cargo operation and in accordance with the applicable manufacturer's operating manuals and instructions.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 46 of 100 |

4.1.6.4 Master is responsible to ensure his ship is properly loaded, secured, discharged, and cleaned.

4.1.7 Workforce Planning: Reconcile the potential of military exercises which often are scheduled for twenty four (24) hour periods two 10 hour shifts with 4 hours for maintenance with the crewing requirements of Title 46, Subtitle 1 Part F, Chapter 81, section 8104 Watches.

4.1.8 Unsafe Operations: Instruct the Master that any unsafe practice, by military or military contracted stevedores, noted by a ship's officer during cargo operations, shall be reported to the senior military official present and a copy of the incident kept in the ship's files. If unsafe practices continue, the Master has the authority to cease cargo operations until the situation is corrected.

4.1.9 Cargo Operations/Plans: Recognizing that stow plans are fluid, ensure, via the Master, that a copy of the loading/stow plan (and master cargo stowage plan for firefighting and damage control) is required from DOD Surface Distribution and Deployment Command (SDDC formerly MTMC) terminal supervisors and/or MSC representatives prior to sailing.

4.1.10 Personal Flotation Devices: All personnel working in an operating environment including ship ramps, or lighters, shall wear USCG-approved, buoyant, personal floatation devices equipped with a light and whistle. DOD personnel, unfamiliar with ocean environments frequently are unaware of this regulation. The Master shall enforce this safety procedure. The ship's crew shall set an example by wearing such equipment themselves when working in lifeboats, over the side, or on ramps.

4.1.11 Seaman's Injury Claims and Maintenance and Cure

4.1.11.1 Process Seaman's Injury Claims and Maintenance and Cure (M&C) in accordance with Attachment J-3 and provide administrative claims and litigation support in accordance with Attachment J-3 and Section G.7 of the contract.

4.1.11.2 Reports. Be responsible for documenting on a quarterly basis (CDRL SFTY-0003) all costs incurred in providing emergency services or other medical treatment, transportation, and all other costs incidental thereto.

4.1.11.3 Provide a report and maintain its currency at least quarterly for as long as a specific case is active. More frequent updates than quarterly are encouraged particularly during the initial stages of an injury or illness.  This ensures funding is available and owner exposure is minimized. (CDRL SFTY-0004)

4.1.11.3.1 The report will initially be provided by email. It will be accessed and used by MAR-380, 580, 610, 611, 613, and 220 personnel during planning and litigation. If any part is password protected, provide password to MAR-611.

4.1.11.3.2 At the end of the contract performance period provide a full electronic report of outstanding litigation and all open M&C actions including required payments to MAR-220, 611, and COTR (CDRL SFTY-0005)

4.1.11.3.3  The Ship Manager shall obtain, report, and manage the information and data required by Attachment J-3 to the extent that it is not available in RMS.

4.1.12 Severe Weather Plan. Note the terms "hurricane plan," "emergency evacuation plan," or "Plan for Getting underway" are interchangeable with "severe weather plan."

4.1.12.1 Develop, and if required execute, a Severe Weather Plan (CDRL SFTY-0006) which accounts for both remaining alongside and getting underway. Obtain approval of the USCG COTP. At the Ship Manager's discretion this plan may be part of the overall activation plan, or a separate document. In either case it must be easily recognizable. Note: the Mooring plan below may be part of the severe weather plan or stand as an independent document. This is the Ship Manager's choice.

4.1.12.1.2 For vessels located on the West Coast the Severe Weather Plan shall address the plan of action in anticipation of Earthquakes.

4.1.13 Mooring Plan

4.1.13.1 Obtain from COTR a copy of the outport vessel's Mooring Plan. MARAD does not have Mooring plans for all vessels contained in TE-4. However, MARAD will provide a copy of those it has. See TE-4, Column K. Obtain copy for review after NTP from MAR-612. Review this plan, correct if required, and resubmit as the Ship Manager's Mooring Plan.  If a mooring plan is unavailable, contact MAR-612 for directions.  Ensure that the vessel is properly moored in accordance with its parameters at all times.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 47 of 100 |
|---|---|---|---|

Comments should be provided to the COTR. Take additional action if winds are anticipated to exceed 70 mph. Note: MARAD uses the Navy's (NFESC) guidance to moor ships that are going to remain in port in heavy weather to a standard referred to as "Mooring Service Type III". The wind speed varies by port and ranges from 70 mph to 113 mph. A copy of the table is in Attachment J-15. However, during the performance period of the contract, the most recent copy can be obtained from MAR-612. Attachment J-15 will not be updated. NDRF moored vessels may obtain copy of Fleet Mooring plans, however, fleet personnel are responsible for the vessel's safe mooring. (CDRL SFTY-0007)

4.1.14 NDRF Safety Requirements. All contract or subcontractor personnel working at MARAD's NDRF work sites and onboard MARAD's outported ships shall follow safe work practices and abide by the NDRF's safety and health rules, as applicable, in the performance of their duties.

4.1.15 Cargo Safety. The Ship Manager shall comply with the Occupational Safety and Health Act of 1970 (29 U.S.C. et) for safety in loading and discharging of cargo.

4.2 Environmental

4.2.1 Pollution Prevention: All RRF ships shall comply with all federal, state, local, and foreign hazardous material and hazardous waste regulations unless waived in foreign ports. Masters of RRF ships shall conform to USCG and Environmental Protection Agency (EPA) laws and regulations where foreign regulations are less stringent.

4.2.2 General: Provide personnel resources with adequate environmental training to accomplish the functional tasks anticipated. This includes Port Engineering staff, ship manager staff supervisory or staff personnel, or ship's crew. The Ship Manager shall take all prudent actions to prevent violations of law. Violations of law will be reported to the appropriate enforcement agency for civil or criminal prosecution.

4.2.3 Policy Directives: Develop, and execute programs, policies, and procedures to ensure proper execution of pollution prevention measures in accordance with applicable regulatory requirements.

4.2.3.1 Incorporate MARAD provided directives (Vessel Response Plan/Shipboard Oil Pollution Emergency Plan VRP/SOPEP) (CDRL E-0001) into Ship Manager programs, policies, and procedures and promulgate as necessary. Advise COTR and MAR-613 of any conflicting guidance or deficiencies. Carry out the procedures contained therein with the VRP and SOPEP and COMSCINST 5090.1B CH-1 (All RRF Ships), COMSCINST 5090.5 CH-1 (Tankers) and COMSCINST 5090.6 CH-1 (Non-Tankers.) Copies of each of these documents are contained in the standard administrative cabinet. Ship Managers desiring copies for corporate office retention must reproduce them at their expense. It is imperative that Ship Manager and Ship Manager employees be aware of the laws and programs for abating and controlling the release of harmful pollutants. For spills of any size, immediately notify MARAD region COTR and MAR-613 who maintains the MARAD oil pollution insurance policy.

4.2.4 Environmentally Related Research: RRF vessels may occasionally be used for environmental research by other governmental organizations. Be responsive and flexible during research conducted by MARAD-approved sources.

4.2.5 Hazardous Materials (HAZMAT): The term "hazardous material", as used in this section, is as defined for hazardous chemicals in 29 CFR 1910.1200, the U.S. (OSHA) Hazard Communication Standard, and the Emergency Planning and Community's Right-To-Know Act. No RRF ship shall transfer (donate) hazardous materials or hazardous waste to any private sector, state or local/city agency.

4.2.5.1 Hazardous Material – Asbestos
The EPA has determined that asbestos is a hazardous air pollutant. All persons are cautioned that asbestos may be found on pipes, ducts, boilers, tanks, reactors, turbines, or structural members, engine exhausts, etc., or in the holds or compartments of the vessels to be managed.

4.2.5.2 HAZMAT Training: Provide personnel resources with adequate HAZMAT environmental training to accomplish the functional tasks anticipated.

4.2.5.2.1 Group Environmental Training: Provide ship and shoreside personnel as directed via task order to attend periodic booming demonstration(s) in connection with HAZWOPER refresher materials.

4.2.6 TE-1 Section 19: MARAD policy, procedures and directives involving environmental concerns are provided in TE-1 Section 19. Ship Managers shall incorporate MARAD provided directives into Ship Manager programs, policies, and procedures and promulgate as necessary. Advise COTR of any conflicting guidance, or deficiencies.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 48 of 100 |
|---|---|---|---|

4.2.7 Material Safety Data Sheets (MSDS): Develop and execute programs, policies and procedures for receiving, handling, inventorying and reporting, Material Safety Data Sheet (MSDS) labeling, maintaining MSDS labels in readable condition during loading/unloading, proper securing and stowage of hazardous materials to the ship(s) in all Phases including the maintenance and appropriate filing of associated records. (CDRL E-0002)

4.2.8 Minimum HAZMAT During Retention: Maintain minimal amounts of HAZMAT onboard RRF vessels during all phases and this HAZMAT will be properly labeled, and handled. Additional general guidance includes:
a) Retained HAZMAT shall have a shelf life of two (2) years or more.
b) All ships entering the NDRF will be inspected by NDRF representative.
c) Stowage locations for all HAZMAT, solvents, and chemicals will be directed by COTR.

4.2.9 Disposal of HAZMAT: Ship Managers shall develop, manage, and execute programs, policies, and procedures to ensure the lawful disposal of HAZMAT including the retention of associated records. (CDRL E-0003)

4.2.10 Air Testing: Ship Managers with ROS crews shall develop, manage, and execute programs for their environmental training and safety including ambient air baseline testing; orientations; drills as first responders to various emergencies including, but not limited to fire, oil spills, health; and maintain all associated personnel records.

4.2.11 Waste Management and Control: In accordance with Annex V of MARPOL 73/78 and 33 CFR 151.51 through 151.77 and industry best practices, develop, manage, execute and monitor the Master's execution of both an individual shipboard solid waste management plan and a shipboard recycling plan, which minimizes the use of plastics during all Phases; and addresses the collection, processing, storing and disposal of garbage or medical waste during activation, operation, and deactivation. If applicable, address execution variation during Phase M and vessel activation.

4.2.12 Environmental Responsibilities During Ship Repair Availabilities: The Ship Manager shall develop programs, policy, and plans for the identification and disposal of any unused, or unidentified HAZMAT or HAZMAT with an expired shelf life, during repair availabilities. The Ship Manager shall address, as applicable, two (2) scenarios in the development of its shipwork solicitation:

1. the removal of waste generated during vessel operations.

Only upon written direction (no verbal permitted) from the COTR, the Ship Manager is responsible to obtain all appropriate EPA Identification Numbers and permits and/or state/local equivalent to track the removal of this waste. These numbers shall be provided to the repair facility. The repair facility shall price and accomplish the removal of this waste in accordance with all applicable laws and regulations.

2. the removal of waste generated during the repair, by the repair facility.
Ship Managers shall require that the repair facility:

a) complies with all applicable federal, state, and local environmental laws and regulations

b) addresses the use of properly licensed (permitted) transporters and storage, treatment, disposal facilities and provides as a deliverable prior to the commencement of work:

c) photostatic copies of all required EPA identification numbers permits and/or licenses and or state/local equivalent

d) a copy of its waste removal plans, and any other plans and programs related to the required work

The Ship Manager shall ensure that his subcontractor prices and is responsible as the generator of all hazardous and solid waste that results from the activities of the subcontractor under the subcontract.

The Ship Manager shall provide copies of all documentation of work performed to the COTR or his representative pertaining to sampling, analysis, storage, transportation and disposal of all hazardous, industrial, and special wastes generated from work resulting from a subcontract. (CDRL E-0004)

Ship Managers must be knowledgeable in the regulations that pertain to vessel operations and shipyard/repair activities and ensure that these regulations are complied with. Questions regarding this section shall be forwarded to MAR-611 who will coordinate with MAR-820 and provide guidance.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 49 of 100 |
|---|---|---|---|

4.3 Security

4.3.1 General. Owners (MARAD) and operators (Ship Managers) have the primary responsibility for ensuring the physical security and safety of vessels. MARAD and Ship Managers shall work together to develop a comprehensive national program for response to a variety of security conditions based upon homeland security levels.

4.3.2 Internal Security: Provide resources, programs and procedures to provide routine internal security for ROS vessels 24/7. Routine internal security involves responding to vessel alarms; maintaining operational shipboard equipment; and the prevention of unauthorized personnel from vessel entry. The vessel must be manned 24/7 by someone who can properly respond to a fire, security breach, or equipment failure.

4.3.3 "Heightened security" will be as directed by MARAD via the COTR and is reimbursable. Heightened security is anticipated only during Homeland Security assessment codes of orange and red and may include armed guards from military, private, or non-Ship Manager contract sources.

4.3.4 MARAD, as a vessel owner, complies with the Maritime Security Act of 2002, the International Ship and Port Security (ISPS) Code, and subsequent USCG regulations and requires its Ship Managers to execute this policy.

4.3.4.1 Identification of Company/Vessel Security Officers. Provide in RMS the name and contact data for the Company Security Officer(s) (ISPS Code Part A 1.3 paragraph 11) and individual Vessel/Ship Security Officer - one (1) per ship (ISPS code Part A 1.3 paragraph 12). It is strongly suggested that the property custodian for weapons/ammunition and force protection ATO should also be the Ship Security Officer, although they may be separate people. (CDRL SEC-0001) Note: Services of Company security officer should be pro-rated among all ships managed by the Ship Manager and included in G and A. The Ship Security Officer shall be included in the fixed price.

4.3.4.2 Vessel and Layberth Security Risk Assessments: Conduct periodic security risk management assessments for both vessel (ISPS Code Part A 1.3 paragraph 8, ISPS Code Part B and USCG NVIC 10-02), and if applicable, the outport (wharf/pier and any area which the Vessel Security Officer determines may pose a security risk). Perform an annual security audit of the Vessel Security Plan for each vessel in accordance with ISPS and subsequent USCG regulations.

4.3.4.2.1 Baseline security assessment of vessel internal spaces. After NTP, the MARAD COTR/Ship Manager representative shall conduct a joint baseline assessment of security consisting of a joint inspection of all storage areas to ensure that all storerooms, cages, spare part boxes, etc. are locked, sealed, or otherwise secured. A joint security statement indicating completion of the inspections and certifying the condition of the secured spaces shall be prepared by the Ship Manager representative and provided to MARAD. (see Section C.2.7.1)

4.3.4.3 International Ship and Port Security (ISPS) Security Plan: The Ship Manager will be provided a copy of the USCG approved ISPS Security Plan in accordance with ISPS (Part A Section 9.4 and Part B Section 9) and the Maritime Transportation Security Act of 2002. The Ship Manager will review and re-submit this plan to the USCG. {Note: if USCG establishes a shorter required timeframe for this deliverable, the Ship Manager will be advised by the COTR. At the time of publication, rules have not yet been established for the transfer of this document.} IMO requires that audits and inspections be conducted to formally assess the effectiveness of the ISPS Security Plan. (see also Section C.1.5) (CDRL SEC-0002)

4.3.5 Reports: Maintain, via the Company Security Officer, the Continuous Synopsis Record in accordance with ISPS, (Chapter XI-1 Regulation 5 and Chapter XI-2) and shall report security incidents in accordance with ISPS Part A paragraph 12.2.8. (CDRL SEC-0003) If required for public vessels, MARAD (MAR-613) will perform the initial application.

4.3.6 Exterior Security Drills: Conduct both shoreside and waterside security drills in accordance with ISPS (Part A paragraph 13.4) and the vessel security plan.

4.3.7 MARAD Security Directives: Incorporate the following MARAD security directives into security procedures against terrorism, hostage situations, demonstrations, stowaways, sabotage, piracy, and hostile acts at any time and especially in areas where incidents are likely to occur:

· Post visible sign(s) - "Government-owned vessel. Restricted area. No solicitation. No unauthorized visitors."

· RRF vessels do not carry spouses, dependents, friends or guests of either the crew or DOT/DOD personnel. In special circumstances, MARAD HQs MAR-610 may waive this requirement for specific events.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 50 of 100 |
|---|---|---|---|

· Official visitors - See TE-1 Section 2.

· Non-official visitors must sign a Waiver of Responsibility for Injury, Accidents or Illness occurring while onboard the vessel and have the waiver approved by the Director, Office of Ship Operations prior to visiting the vessel. Non-official visitors are not authorized to remain overnight onboard any RRF vessel. The Director, Office of Ship Operations on the occasion of ceremonial events or other activities onboard RRF vessels may authorize exceptions.

· Since RRF vessels are public vessels, they shall not be used for commercial or personal profit. Any such use or attempted uses will result in disciplinary action.

· Ships lifeboats shall not be used for liberty, or recreation.

· Report any breach of security on any Government property (leased or owned) to COTR and Fleet superintendent (if applicable).

· Execute the Ship Manager's Physical Security Plan, and Bomb Threat Response Plan.

· Determine threat level and provide for gangway security, extra watch standers, roving patrols, or request outside (non-ship's force) assistance, upon direction of COTR.

Positive security control of entrance into an RRF ship is required at all times in all phases. A visitor log shall be maintained entering the time of arrival/departure, name of person, and reason for visit. This includes vendors. The senior deck officer shall authorize the inspection of all persons and materials coming onboard and ensure there are procedures in place to summon additional assistance. Personnel not assigned to the vessel shall present identification.

· The senior deck officer shall ensure the Watch Standing Mate, when utilized, understands his/her responsibilities with respect to physical security of the vessel even when military personnel are present. Watch standing Mate must be familiar with standing orders, and be familiar with emergency procedures to summon assistance as well as to report threats to proper authorities.

· Take any action within his/her authority and capability to prevent or minimize loss or damage to ship/cargo from theft, espionage, sabotage and other criminal activities.

· Use the resources provided by Navy operational commanders, host nation or other sources to enhance the security of the ship.

· The senior deck officer shall maintain signature custody records on MARAD provided weapons by serial number at all times. (MAR-613 is POC for weapons and ammunition.)

· A locked stateroom door is not a secure place. The Master may, at his/her discretion, allow crewmembers to store personal items (cash, etc.,) in the vessel's safe. Masters are to ensure the crewmember understands that neither the Government nor the Ship Manager assumes liability for items stored in the vessel's safe.

· The ROS crew participates in external security. ROS crewmember orientation shall be accomplished within fourteen (14) days of reporting onboard. ROS crewmembers shall be provided Ship Manager-developed procedures for several "routine" security conditions, i.e., unauthorized personnel attempting to board vessel, person found onboard without authorization, personnel leaving with what appears to be ship's equipment as well as "terrorism" scenarios, such as bomb threats, unidentified person in water adjacent to vessel. Ship Managers shall advise the ROS crew what outside resources are available to them for maintaining security (including local police, fire, Naval Investigative Service (NIS), Federal Bureau of Investigation (FBI), MSC, port authorities etc.,) and vessel systems.

4.3.8 Training for Crewmembers: Comply with Attachment J-13 for security training of personnel. For ROS crewmembers see "Training section" under Human Resources. For Fully Operational Status (FOS) crewmembers that join the vessel, security training is to be provided as part of vessel orientation.

4.3.9 Notification to MARAD: Throughout the performance period of the contract, notify the COTR of any layberth deficiency that may affect the security of the vessel.

4.3.10 Review the Vessel Security Plan provided by MARAD and ensure a statement of the Master's Authority (see also Section C.5.11.1) is contained. The vessel's Master is responsible for shipboard security in accordance with maritime law.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 51 of 100 |
|---|---|---|---|

4.3.11 At Sea Security: Ship Managers and Masters shall provide for physical security while ships are at-sea, at-anchor, and in-port. The latest edition of COMSCINST 5530.3, Subj: MSC Ship Physical Security provides guidance. Reasonable, not total compliance, with this directive is required.. For example, if the vessel does not have a wash down system, the Ship Manager is not required to install one.

4.3.12 Master Briefing: Discuss with vessel Masters' their Phase O physical security duties, responsibilities, and options. Masters can assign additional officer and crew personnel to security duties, hire outside guards or request additional assistance from MSC Area subarea Commanders. However, such actions shall be reported on the daily POSREP (See CDRL O-0006) so that the COTR may assure funding is available.

4.3.13 Force Protection/Information Security. Be flexible and cooperate with MARAD and other authorized U.S. Government officials in the development and management of force protection and security. This includes:

· Designating the FOS Chief Mate as the Force Protection Officer with commensurate collateral duties. (see Maritime Transportation Security Act) Note: this may be the 2nd Mate in ROS.

· Obtaining and maintaining a list of all shipboard clearances and associated personnel data at all times.

· Coordinating and tracking crew force protection and security training.

· Maintaining custody of and inventorying and managing small arms, weapons, ammunition, CBR-D Personnel Protection.

· Protect all classified documents and materials.

· If small arms are issued to the vessel by MSC, maintain custody of them, determine when it is appropriate to use small arms, and issue same to qualified personnel.

· Ensure all crewmembers are trained in physical security procedures. This may be incorporated into damage control drills. Ensure five (5) ROS crewmembers have small arms training (see Attachment J-13).

· Ensure the MARAD-provided check-list is used for determining who is eligible for anti-terrorism property custody and training.

4.3.14 Facility Clearance and Classified Materials Manager: Ship Managers shall obtain a DOD facility clearance and maintain a classified materials manager throughout the performance period of the contract. The Ship Manager shall develop and promulgate directives for the handling, retention, safeguarding, and disposition of classified materials. During vessel deactivation no classified material shall be retained onboard ship which will not be needed within ninety (90) days. All classified material, when ready for destruction, must be destroyed in accordance with the DOD Security Manual for Industrial Facilities. (CDRL SEC-0004)

4.3.15 Security Clearances for Mission Operations: The Ship Manager shall provide personnel with security clearances up through SECRET for the Master, Chief Mate, classified materials custodian, communications officer. If personnel are unable to attain security clearances during mission operations, the Ship Manager shall notify the COTR. If additional personnel may be required to obtain security clearances, MARAD will notify the Ship Manager. If the classified materials custodian and the communications officer are the same individual, then at a minimum 3 separate deck officers must have classified security clearances. If during the performance period, a Ship Manager has difficulty in providing these 3 minimum personnel, contact MAR-613 immediately. (CDRL 0005)

C.5 HUMAN RESOURCES

Performance Goal: Ability to adequately crew the ship with qualified marine personnel.

The Ship Manager shall:

5.1 Shoreside Staffing

5.1.1 General: To the extent that such materials and services are not specified as being provided by the Government, provide all administrative support to ensure that all requirements of this contract are accomplished in a timely and efficient manner. Administrative support includes: management personnel, technical and professional personnel irrespective of each an individual's discipline, all overhead and G&A employees, supplies, materials, and services necessary to maintain, activate, and operate assigned ships, and to fulfill all other requirements of this contract and those offered by the Ship Manager.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 52 of 100 |
|---|---|---|---|

The omission of any particular person or item required for performance under this PWS does not make it Government furnished or reimbursable. Reimbursables are listed in Attachment J-9. All work is to be accomplished under competent supervision.

5.1.2 Changes of Personnel. Obtain prior approval by PCO for any changes in personnel that occur within the first sixty (60) days after NTP.

5.1.3 Verification of Personnel Data. Verify that the information for shorebased is valid, entered into RMS, and updated as necessary throughout the life of the contract. (CDRL HR-0001)

5.1.4 President/Owner Data. Enter into RMS the name, work and home phone number of the corporate President/Owner(s). Note: this information shall be password protected and the password provided to MAR-610 by separate cover for use by the Maritime Administrator. (CDRL HR-0002)

5.1.5 Emergency Contact: Provide emergency contact information to the COTR upon NTP and enter into RMS. This information shall provide MARAD the ability to contact the Ship Manager 24/7 during emergencies and no-notice activations. (CDRL HR-0003)

5.1.6 Port Engineering Requirements. Provide port engineering services to execute the requirements of this contract including corrective maintenance.

5.1.6.1 Physical location of PE for ROS ships: Provide on-site office facilities for the Port Engineers/Team who is supporting any ROS vessel or combination ROS/RRF vessel. On-site is defined as being anything within 2 hours response time to the vessel. The facility is defined as a trailer or commercial office space, or equivalent. Use of the ROS vessel is permissible, however, the Ship Manager must plan for re-location of the facility within the activation timeframe without interruption to activation activities.

5.1.6.2 Absence/temporary replacement: Perform any duties normally carried out by the permanent shoreside staff members during any periods of absence.

5.1.7 Overtime for Shoreside Staff: All shoreside staff hours, inclusive of Port Engineer(s), are included in the fixed price for purposes of this contract. No overtime for shoreside staff shall be reimbursable.

5.2 Shipboard Crewing

5.2.1 ARTICLES FOR NEGOTIATION: The Ship Manager shall provide the following for ALL RRF Ships through his negotiated employee agreements:

5.2.1.1 NO STRIKE Clause. Recognizing that critical sensitive services are required under this contract, it is essential that continuous operation of the ships be maintained. Therefore, there shall be no work stoppages of any type, including but not limited to strikes, sympathy strikes, boycotts, slowdowns, sickouts, primary picketing, secondary picketing, protests against unfair labor practices, contract violations, social or political protests and any other protests or interruption or interference with work onboard the vessel(s) for the full term of any voyage or any subsequent extension thereof.

5.2.1.2 RIGHT TO SELECT Clause. A right to approve or reject each licensed and unlicensed member.

5.2.1.3 RIGHT TO FIRE Clause. An agreement permitting the Ship Manager with the right to fire any licensed and unlicensed member.

5.2.1.4 RIGHT TO RESTRICT FUTURE EMPLOYMENT Clause. Any crewmember discharged by the Ship Manager for cause, shall not be eligible for future employment onboard an RRF vessel.

5.2.2 REQUIRED MEDICAL INOCULATIONS: The Ship Manager shall inform its labor sources for crewing the vessel and potential crewmembers that, as a condition of employment on a Ready Reserve Force vessel, all crewmembers are required to receive certain immunizations/inoculations (see Section 5.5.1) and that any crewmember who refuses to take or is medically ineligible to receive such immunizations/inoculations due to medical concerns is ineligible for employment on an RRF vessel.

5.2.3 MARAD, as the vessel owner, reserves the right to approve in advance or request the removal of any RRF vessel Master. The request for removal of a Master will only be made by the Director, Office of Ship Operations through the PCO. No other individual is authorized to do this. Please note: in the past 15 years, MARAD has exercised this option twice.

| **Award/Contract** | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 53 of 100 |
|---|---|---|---|

5.2.3.1 The Ship Manager is solely liable for any amounts agreed to in its collective bargaining agreements or employee labor agreements and any revisions thereto. Simply because the CBA is submitted as part of a Government contract proposal does not obligate the Government in any manner to the contents therein.

5.3 Labor Disruption

5.3.1 Critical, sensitive services are required under the terms of this contract, and it is essential that the continuous operation of the ship be maintained. The Ship Manager submitted with its proposal, and must maintain throughout the contract period, a contingency plan adequate to ensure that there is no interruption of contract service due to labor disruption or phase-in/out of crew. Such plan shall remain continuously in effect throughout the period of performance under this contract, including any options hereunder, and may consist of or include any or all of the following:

(1) CBAs with no-strike, no lock-out provisions.
(2) Employment agreement.
(3) Plans to demonstrate the continuous availability of adequate numbers of qualified personnel in a labor pool to perform services required under this contract.

5.4 The following requirements apply to any and ALL crewmembers.

5.4.1 General: For the safe, efficient and economical operation of the vessel, employ medically/dentally and psychologically fit Deck, Engine, and Radio (when assigned) Officers and unlicensed personnel who meet requirements of STWC-95 or its successor agreement(s); and possess current, valid USCG licenses, including all necessary endorsements, commensurate with the tonnage and classification of the ship. Unlicensed personnel shall have the necessary endorsements on their USCG Mariner's Document for the rating to which they are assigned. Fit for Duty documentation is available in Attachment J-3.

5.4.2 Mariner Citizenship. All licensed crewmembers must be U.S. citizens. Comply with 46 U.S.C. 8103 (b)(1) which permits the employment of unlicensed seamen who are aliens lawfully admitted to the United States for permanent residence, provided not more than 25% of the unlicensed seamen on a vessel are resident aliens. All crewmembers must hold USCG-issued mariner documents for the full length of their assignment.

5.4.3 Mariner Vetting. Provide to MAR-613 each crewmember's vetting information anytime there is a new or relief crewmember. This includes temporary and permanent changes to ROS complement. Vetting information, password protected, includes (CDRL HR-0004):

· Name (Last, First, Middle I)
· Social Security Number
· Date of Birth
· Place of Birth
· Citizenship
· Passport number
· Security clearance

Advise mariners of vetting requirement. MARAD will abide by Privacy Act restrictions in handing this data.

5.4.4 Complaints. The Master and Officers must execute their responsibilities as defined by law and exercise sound judgement at all times. In the event that MARAD has any reason to be dissatisfied with the qualifications, conduct, or performance of any person employed by the Ship Manager, MARAD will notify the Ship Manager and the Ship Manager shall investigate the matter and take appropriate corrective action as warranted.

5.4.4.1 Employment Disputes. Litigation involving an employee who is disciplined by a Ship Manager is at the Ship Manager's expense.

5.4.5 Mariner Status. All crewmembers (ROS and FOS) are direct employees of the Ship Manager. Their performance is the direct responsibility of the Ship Manager. The Ship Manager has the prerogative to institute management actions (e.g., reprimand, reassignment, additional training, additional supervision, dismissal) to achieve acceptable performance. The Government will not interfere with the employer-employee relationship unless there is a violation of Federal statutes or regulations.

5.4.6 Abide by all Federal, state, and local regulations regarding employment and maintain the appropriate records from pre-hire solicitations through dismissal.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 54 of 100 |
|---|---|---|---|

5.4.7 Ship Managers who employ crewmembers through CBAs shall make it clear to the crewmembers and the holders of the CBA, that the crewmember's employment relationship is with the Ship Manager and not the U.S. Government, although they will work on Government-owned vessels. Dismissal for cause is a matter between Ship Manager and crewmember.

5.4.8 Probationary periods, right to transfer previously accrued benefits, accumulation of compensatory time or leave, and Convalescent Pay are totally up to the employer within the parameters of the Service Contract Act (SCA).

5.4.9 Crewing Shortages. If at any time during the contract, the Ship Manager is unable to meet the crewing requirements of the contract, the Government reserves the right to crew the ship using whatever means are necessary, including military, federal or state reservists, civil service, or any other civilian personnel including other competitively obtained contract personnel that meet regulatory and security requirements for the position(s).

5.5 Medical

5.5.1 Requirement for Immunizations: All licensed and unlicensed crewmembers employed to serve aboard RRF vessels shall, as a condition of employment, be required to receive all immunizations associated with commercial trade, and all immunizations/inoculations required by Commander, Military Sealift Command (COMSC) policies including, but not limited to, BUMEDINST 6230.15, as amended. Such immunizations/inoculations may be required at the time of their employment and/or at anytime during their employment. Such immunizations/inoculations may include, for example: Tuberculosis Testing (PPD), smallpox, anthrax, annual Flu shots, various other immunizations against diseases encountered during worldwide travel (such as yellow fever, typhoid). Furthermore, all crewmembers employed on RRF vessels must, as a condition of employment, agree to comply with any supplemental immunization programs later established for RRF vessels through written policies or directives. A seafarer unwilling or medically ineligible to receive all required immunizations or inoculations is ineligible for employment on RRF vessels.

5.5.1.1 ROS Crew - The Ship Manager shall ensure that all ROS crewmembers have received or are medically eligible to receive all required immunizations/inoculations prior to hiring the crewmember and assigning them to a vessel in Phase M status.

5.5.1.2 FOS Crew - The Ship Manager shall ensure that all FOS crewmembers have received or are medically eligible to receive all required immunizations/inoculations before the vessel leaves United States territorial waters.

5.5.1.3 Reimbursable Costs (Attachment J-9)

5.5.1.3.1 Except as specified below, the Government will not reimburse the Ship Manager for wages or any costs associated with repatriating or replacing any ROS or FOS crewmember who is found ineligible to receive any required inoculation/immunization due to a medical condition or who refuses to comply with a previous immunization requirement or a new supplemental immunization directive.

5.5.1.3.2 The Government will reimburse the Ship Manager for the cost of repatriation and up to one month's wages, or as required by articles if foreign articles were signed, as well as the cost of obtaining replacement personnel, for any ROS or FOS crewmember who:

(a) is found ineligible to receive an inoculation/immunization required by Section 5.5.1 above at the time of his/her employment because of a medical condition the crewmember developed after he/she was employed by the Ship Manager; or

(b) is willing to comply with a new supplemental immunization directive that became effective after the crewmember was employed by the Ship Manager but who is ineligible to receive the newly required inoculation because of a medical condition.

5.5.2 In accordance with USCG regulations, include all crewmembers in the Ship Manager's drug testing programs.

5.5.3 Medical Claims. Comply with Attachment J-3 with respect to medical claims.

5.5.4 Medical Screening/Consultative Service: Provide the services of a third party medical invoice screening company to assist with the review and validation of invoices. Provide the ACO a copy of the agreement.

5.5.5 Medical On-call Service: In Phase O, provide shorebased services of a licensed physician on a 24/7 basis to provide comprehensive on-call health care services via ship's communications equipment. Provide to the ACO a cost comparison of this service for twelve (12) months vs. the cost of an individual activation. Follow ACO direction with regard to purchase. This is a reimbursable service.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 55 of 100 |
|---|---|---|---|

5.5.6 Medical Person In Charge: In accordance with best commercial practice, provide a qualified Medical Person In Charge (MPIC), responsible directly to the Master, to provide routine and emergency health care to the crew and all embarked personnel. The MPIC shall conduct and comply with all occupational and health inspections and maintain control of controlled substances.

5.5.7 Notification to USCG. Advise the USCG, as part of its activation plan, that it is the designated operator for a specific RRF vessel(s) and that during the RRF operation USCG medical emergency services may be required.

5.5.8 Screening. Screen all crewmembers to ensure that they are fit for duty per Attachment J-3, and do not have a history of alleged shipboard injuries or inability to perform duties. Complete "The Seafarer's Data Sheet (MA-1001A)" and "Seafarer's Statement of Physical Condition (MA-1001B)". (CDRL TE-3 J-0001 and J-3 appendix) (CDRL HR-0005)

5.5.9 Compliance with Statute Regarding Substance Abuse: The MARAD, DOT, as vessel owner, enforces a zero-tolerance of substance abuse in the work place. THE SHIP MANAGER AND ITS PERSONNEL, INCLUDING ALL CREW MEMBERS, SHALL ABIDE BY ALL STATUTES OF THE UNITED STATES CODE GOVERNING ALCOHOL, CONTROLLED SUBSTANCES, SMUGGLING, DANGEROUS WEAPONS, AND GAMBLING ONBOARD U.S. FLAG GOVERNMENT OWNED VESSELS.

5.6 Training

5.6.1 General. Training for all crewmembers shall be non-discriminatory, job related, skill building, effective, and innovative, yielding effective results oriented employees who are high performers.

5.6.1.1 Approve and coordinate attendance with on-going maintenance and operations.

5.6.1.2 Maintain list of Government-provided training courses per employee. (CDRL HR-0014)

5.6.2 Military Training. When directed by COTR, provide qualified ROS or FOS crew members to support the training of military personnel on a reimbursable basis.

5.6.2.1 For weekend cargo handling training: Duties usually include checking the ship's power source, checking the equipment before and after training to ensure its condition, and being on site two (2) days per weekend.

If additional personnel are required, they shall be added at current wage rate. The Ship Manager's employee(s) may be required to be on-site a day before training commences in order to check out equipment. The COTR will advise the Ship Manager in advance when these personnel are required and issue a task order to cover overtime or reimburse new crewmembers brought on specifically for this service.

5.6.2.1.1 Document damage caused by the cargo handling trainees, so that MARAD may advise the DOD sponsor; and record and correct deficiencies in accordance with standard maintenance procedures. Deficiency correction is a reimbursable item.

5.6.2.2 For a Sealift Emergency Deployment Readiness Exercise (SEDRE): An FOS crew may be required. Cargo is loaded under normal deployment conditions and may be transported to another port for discharge.

5.6.2.2.1 Receive Activation and Operation reimbursrables as appropriate.

5.6.3 Cadet Training. The MARAD fosters cadet training. Coordinate with USMMA and State Academies to offer available training billets for cadets in both ROS and FOS. This is a reimbursable.

5.6.3.1 Provide Cadet subsistence, quarters, and training as required by the cognizant school.

5.6.3.2 Provide Cadet wages not exceed 46 CFR 310.

5.6.3.3 Cadet transportation is reimbursable in accordance with Joint Travel Regulations (JTR).

5.6.3.4 Advise MAR-613 any time a cadet is scheduled to be onboard an RRF vessel. Advance notification to MAR-613 is required.

5.6.4 Merchant Marine Preparedness/Specialized Training

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 56 of 100 |
|---|---|---|---|

5.6.4.1 Vessel Orientation. In accordance with ISM, ensure that all crewmembers are provided ship orientation BEFORE commencing work, as applicable to their departments. Orientation shall include:

· Review of standing orders
· Night orders
· Emergency procedures for fire, flooding, CO2, and the loss of major equipment
· Tag-out procedures
· Navigation, mooring, cargo and ship operations (Deck only)
· Security
· Emergency isolation valves and shutdowns.

5.6.4.2 Required Training. Provide for and coordinate the rotation of ROS crewmembers to permit currency in STCW-95 or successor requirements, as listed at Attachment J-13. The Chief Engineer and 1st AE may not both be absent at the same time for training or for any other reason unless specifically directed or approved by the COTR.

5.6.4.2.1 Optional Training: COTRs may approve additional training for ROS crewmembers, which in the Government's opinion is beneficial to the program. Travel, subsistence and lodging, cost of course and materials, when Government directed, are reimbursable. New STCW training requirements and STCW refresher courses and upgrades are reimbursable. (see Attachments J-9 and J-13)

5.6.4.2.1.1 Ship Manager employed RRF Chief Mates and Chief Engineers, eligible to attend "GMATS National Sealift Training Program" Course, will be reimbursed for two (2) days of travel in accordance with J-13.

5.6.4.3 For the courses listed in Attachment J-13, plus any other course directed by the Government and approved by the COTR see Attachment J-9 "Govt directed training". For non-Government directed training which includes training for STCW-95 and its successor agreements as well as license up-grades, see Attachment J-9 "Non-Govt directed training."

5.7 Reduced Operational Status (ROS)

5.7.1 General: In accordance with TE-4, each vessel designated as ROS will be crewed with an ROS maintenance crew. At a minimum, each ROS crew must consist of ten (10) ROS maintenance personnel including:

· One (1) Chief Mate
· One (1) Boatswain
· One (1) Chief Engineer
· One (1) First Assistant Engineer (1st AE)

Each of who meets the general crewing qualifications cited in Section C.5.4.1.

5.7.2 Provide as necessary and within its fixed price, any ROS crewing, over and above that required by MARAD, for the:
· Performance of the routine schedule preventative maintenance as identified in the Ship Manager's vessel specific ship maintenance management plan including quarterly light-offs, equipment cycling/rotation, etc.
· A quantifiable amount of time for the accomplishment of emergent repairs that may be accomplished during normal working hours.
· Maintaining vessel security, fire and flooding protection
· Performance of all required regulatory body drills
· Maintaining inventory and custody of GFE including spare parts
· Documents, charts, etc.
· All other PWS and TE requirements.

5.7.3 The maximum number of the ROS crew per vessel will be determined by the Ship Manager based upon its assessment of the PWS as provided in its proposal. If selected for the contract, the Ship Manager will have fifteen (15) days from NTP to employ all ROS maintenance crewmembers at the fixed price rate. For co-located vessels (ROS-outported/RRF), the ROS maintenance crewmembers may be interchanged for work between vessels.

5.7.3.1 The ROS crew complement identified and offered by the Ship Manager in its final proposal will be incorporated into the Ship Manager Contract and will become the required ROS crew compliment for the performance period of the contract.

5.7.4 The Ship Manager will not be reimbursed by MARAD for any additional personnel "temporarily hired/subcontracted-for" for the performance of any of the items of the PWS/specification that are considered routine ROS duties and responsibilities. However, the Ship Manager will be reimbursed for additional temporary or sub-contracted personnel for requirements which exceed those defined

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 57 of 100 |
|---|---|---|---|

in this PWS/specification, for example, OPDS exercise preparations frequently require a Master to be brought onboard the ROS ships before the ship is activated.

5.8 General ROS Duties and Responsibilities. ROS Crew Duties and Responsibilities.
This section addresses ROS crew duties and responsibilities. Additional ROS outport requirements are in Sections 35 of TE-1.

5.8.1 The ROS crew's primary duties and responsibilities are to:

- Become completely familiar with shipboard equipment and systems.
- Perform Maintenance Actions.
- Perform general shipboard duties.
- Operate and maintain shipboard equipment and systems during idle status.
- Perform minor repairs and assist in supervising vendor and industrial repairs.
- Maintain the ship's inventory; and
- Activate (transition) and operate the ship, when directed, and train new crew members. An ROS crew may be assigned temporarily to an inactive RRF ship in Phase M or during Phase O to maintain the ship in standby but not fully manned status.
- Become thoroughly familiar with the Activation Plan.
- Maintain unique equipment maintenance requirements and procedures.
- Maintain equipment repair history and status of regulatory inspections and surveys.
- All ROS crewmembers as appropriate to their rating shall:
- Assist in ship activations and sail as a member of the full crew.
- Assist new crew members to become familiar with the proper and safe operation and maintenance of shipboard equipment and systems including all compartments, major systems, as well as fire fighting and damage control equipment and systems.
- Assist the Port Engineer in establishing a good working relationship with local regulatory body representatives and overseeing performance of regulatory inspections and surveys.
- Maintain inventory in accordance with MARAD supply directive/manuals, which are referenced in TE-5, including an inventory of any hazardous materials on board.
- Classified material, if retained onboard, must be in the custody of personnel with security clearance.
- Accommodate visits by MARAD and other government or government-invited personnel during visits.

5.8.2 Work Rules: Uniqueness of ROS Positions:
Ship Managers shall advise ROS crewmembers that many of their duties and responsibilities do not fall under standard seafaring conditions. No officer, such as the Chief Engineer, has a totally administrative function. Officers have an abundance of administrative duties, but they are expected to accomplish other tasks that are primarily "hands on."
5.8.2.1 Due to the size and composition of ROS maintenance personnel, it is understood that ROS maintenance crews shall be expected to work as a team with no regard to departmental boundaries when work is related to maintaining the safety, security and habitability of the vessel. The type of work that all ROS maintenance crewmembers would be expected to do as a team includes, but is not limited to the following:

- Secure Ship for Prevailing Weather Conditions
- Adjust/Double up/stow mooring lines
- Adjust Gangway
- Take on and stow ship's stores/spare parts
- Operate cargo equipment for storing/testing
- Assist with vessel habitability requirements
- Housekeeping.

5.8.3 Provisions of ROS Employment: ROS crewmembers are subject to the following terms and conditions:

a) They must agree to participate as part of the sailing crew (i.e., during Phase O).

b) They may be required to assist in the transitioning of a vessel whether it is their specifically assigned vessel or not. MARAD considers this training. It is MARAD's option to temporarily assign other ROS crewmembers during maintenance activation. Either the Chief Engineer OR the First Assistant Engineer (not both) from a co-located vessel may sail with the transiting vessel as an observer or as a crewmember.

c) If performance was satisfactory, transfer from maintenance (ROS) crewmember to sailing (FOS) crewmember shall not break any continuous employment, and the crewmember shall revert to his/her original maintenance status at lay-up.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 58 of 100 |
|---|---|---|---|

d) In the event of extended operations all crewmembers assigned to the vessel shall be provided reliefs as per the appropriate employee agreement. The Government retains the right to phase reliefs in order to provide continuity.

5.8.4 ROS Work Week: The standard ROS workweek shall consist of eight (8) continuous hours per day (excluding lunch break and hours to fulfill off-hour security duties), five (5) days per week, Monday-Friday. The majority of ROS crewmembers are expected to work during the core hours of 0900-1500. Ship Managers may authorize exceptions.

5.8.5 ROS Overtime:

5.8.5.1 Phase M with ROS crew is a fixed-price CLIN and all work required under that CLIN shall be performed at no additional cost to the Government. Therefore, except for emergencies, (see below) overtime for ROS crew will not be reimbursed unless it is scheduled and approved in advance in writing by the COTR. The Ship Manager shall provide a memorandum to the COTR outlining:
· The cause for the overtime/compensatory time
· Demonstrated cost savings
· The estimated amount of overtime/compensatory time to be earned
· The ROS crew rating which shall be assigned.

The COTR will consider overtime and advise whether or not it is approved. Copy of this authorization will be provided to the ACO. A follow up email report shall be provided to the COTR with copy to the ACO the following day stating what was actually incurred. Overtime shall not be included in the normal performance of M&R in the ship's Preventive Maintenance Plan.

5.8.5.1.1 Overtime is based upon exceeding the standard forty (40) hour workweek as defined above. The Ship Manager is obligated to pay employees at the required overtime rate for any overtime actually worked regardless of whether ROS crew overtime is approved or reimbursed by the Government.

5.8.5.2 Overtime required because of an emergency, i.e. the preservation of life, limb or property, will be reimbursed. The Ship Manager shall report all emergencies requiring ROS crew overtime to MARAD via electronic mail within 48 hours after its occurrence. The notification must include an explanation why the overtime was incurred. Copy ACO on these actions.

5.8.6 Period of Performance: Advise ROS crewmembers that they do not have a commitment of guaranteed employment during the performance period of the contract. For purposes of "expectation of employment" a maintenance crewmember shall consider a six (6) month renewable cycle to be the norm assuming no failure of performance upon the part of the employee.

5.8.7 ROS Roster: Maintain and keep current in RMS, the ROS crew employment lists. Include: Name (Last, First, Middle Initial), rating and phone for recall. (CDRL HR-0015)

5.8.8 Billets: ROS billets shall be crewed each day of the year (e.g. 365) days and billets may not be gapped. Since "gapped" is defined as permanently leaving the vessel, the Ship Manager shall replace the employee. The Ship Manager shall deduct the period of the gapped billet (from the time of departure of the crewmember until the replacement crewmember is onboard, from the appropriate monthly invoice(s)). The Ship Manager shall retain payroll records to substantiate the invoice and provide them to the ACO upon request. See definitions in TE-1 Section 2 for "gapped" and "crewed."

Leave: Temporary absences (sick leave or vacation) are between the Ship Manager and its ROS personnel. The billet remains crewed. Ship Managers are responsible for the continuation of duties and responsibilities with no drop in performance during temporary absences of personnel.

Unpaid Leave for ROS: Unpaid leave changes to a Gapped Billet after 15 consecutive days of absence unless the Ship Manager specifically requests MARAD extend the "crewing" of the position. MARAD approving official for the Ship Manager request is the PCO.
Replacements during temporary absence of ROS crewmember: This is a Government option. Upon the direction of the COTR, the Ship Manager will obtain a temporary replacement. Upon request of the COTR, the Ship Manager shall provide an estimate of replacement costs including transportation and fully burdened wages.

5.8.8.1 With respect to reserve or jury duty, an ROS crewmember may resume a former billet upon return. Payment of ROS wages during reserve or jury duty are between the Ship Manager and its employee.

5.8.8.2 Utilization of leave is between the mariner and his/her employer the Ship Manager.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 59 of 100 |
|---|---|---|---|

5.8.8.3 Assumption of ROS Sick Leave or ROS Vacation Leave from previous Ship Manager Contracts. No ROS sick leave or ROS vacation leave will be permitted to transfer to the 2005 Ship Manager contracts. ROS crewmembers with ROS leave will receive monetary compensation in accordance with instructions to be provided to their employers of record on March 1, 2005.

5.8.8.4  Leave Accrual: Sick leave shall be accrued at the rate of one day for every thirty (30) calendar days worked as an ROS maintenance crewmember (maximum of 12 sick days per year), to be payable when the crewmember is unable to perform his/her normal maintenance duties due to illness. Termination of employment shall result in the loss of any accrued sick leave.

5.8.8.4.1 ROS vacation shall be accrued at the rate of 1.5 days for every thirty (30) calendar days worked as an ROS maintenance crewmember (maximum of 18 vacation days per year).

5.8.8.4.2 Unless the Government declares its intention to exercise an option under this contract, the Ship Manager shall advise ROS crews to use or lose sick and vacation leave during the fourth year of the contract.  MARAD does not intend to "buy out" any ROS leave remaining on the books and will not carry it over into the next SMC.

5.8.9 Paid Federal Holidays: The following are ten (10) Federally-observed holidays:

| | |
|---|---|
| New Year's Day | Labor Day |
| Martin Luther King Day | Columbus Day |
| Presidents Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |

ROS crews shall follow the U.S. Government calendar for exact day of leave if holiday falls on a Saturday or Sunday.

5.8.10 Reserved.

5.8.11 ROS Per Diem. The Ship Manager provides an ROS crew including any and all relief personnel to MARAD under a fixed price CLIN.

5.8.12 Transportation: Transportation shall not be reimbursed if an ROS crewmember elects to terminate his/her employment.

5.8.13 Subsistence and Lodging: The Ship Manager has a choice on whether to provide subsistence and lodging to ROS crewmembers. The Government will not provide reimbursement for subsistence of ROS crewmembers.

5.8.13.1 If the Ship Manager elects to provide this subsistence, provisioning for the subsistence and preparation of food, will be part of the Ship Manager's fixed price per diem.

5.8.13.2 MARAD permits, but does not require, ROS crewmembers to live onboard ship. All costs associated with lodging onboard the vessel in ROS, such as laundry, exchange of linen, etc., are to be included in the Ship Manager's fixed price per diem. If the Ship Manager elects to provide lodging onboard and the vessel becomes uninhabitable, the Government will reimburse the Ship Manager for lodging and subsistence.

5.9     Voluntary Program Support

MARAD, as the Governmental advocate for the maritime industry, occasionally tests program concepts under actual field conditions. This may include the voluntary involvement of ROS crewmembers. For example, the new Ship Owner's Cooperative Program (SOCP) mariner identification card may be one of the tests conducted using ROS crewmembers. No additional compensation is provided for this type of voluntary program support.

5.10 FOS Crew Composition: Provide when ship are activated to Phase O, an FOS crew each of whom meets the general crewing qualifications cited in Section C.5.4.1. The cost of FOS crewing is a reimbursable.

5.10.1 General: Enter FOS fully burdened wages into RMS. Update throughout the performance period. Provide designated Government officials (PCO, ACO, COTR, MAR-611) the password for use in determining task order funding.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 60 of 100 |
|---|---|---|---|

5.10.2 Provide the anticipated FOS crew composition manning, including the number for each rating. Incorporate this proposed manning into RMS as the anticipated point-to-point manning. Deviation from this anticipated manning will be at the COTR's option and direction. (CDRL HR-0008)

5.10.3 Fleeting of ROS personnel during FOS: Notify COTR during activation of any intention to "fleet up" the ROS Chief Mate to Master during operations.

5.10.4 In addition to those requirements which apply to ALL crewmembers, the following sections specifically apply to FOS crewmembers.

5.10.4.1 All personnel hired for the FOS crew shall meet the minimum requirements of Section 5.2.1 above.

5.10.4.2 GMDSS Operation: Ensure that a minimum of two (2) licensed deck officers possess a current "STCW GMDSS endorsement". Provide a dedicated communications officer as part of Section 5.10.2. The volume of communications generated by the military, including responses expected from the ship, far exceeds the volume of communications generated by normal commercial vessel operations. The dedicated communications officer may be a licensed deck officer, radio officer or radio electronics officer. See Attachment J-13 for training requirements.

5.10.4.3 Crew Shortages: Report crew shortages in accordance with 46 U.S.C. 8103 and USCG Navigation Circulars (USCG NAVIC#1-86 Part G.) Provide COTR, MAR-613 and MAR-620 with copies of USCG Form CG729 (report on Crew Shortage). (CDRL HR-0009)

5.10.4.4 Articles. Implement of foreign articles for Phase O crew in accordance with 46 CFR Part 14, and USCG NAVIC No 1-86. Foreign articles are not required for most Turbo activation, maintenance activations, and coastwise voyages. (CDRL HR-0010)

5.10.4.5 ROS Telephone Service: is part of the Ship Manager's fixed price. The Government provides three (3) phones as part of berth service and will reimburse for connections/disconnections during activation/deactivation. ROS telephones are to be used for official business only.

5.10.5 Orientation: In addition to Section 5.6.4.1, provide orientation to the joining members of the FOS crew with respect to safety videos and equipment, shipboard physical security, equal opportunity, and the prevention of sexual harassment and prevention of HIV/Acquired Immune Deficiency Syndrome (HIV-AIDS.) This orientation should be performed during duty hours.

5.10.5.1 Advise the crew of any RRF vessel, that since these are public vessels of the U.S. Government, any attempt to use them for commercial or private profit by the Ship Manager or its employees, shall result in disciplinary action by the USCG and MARAD. This includes transportation of personal items such as cars, etc., with the intent to resell.

Note: Section 5.6.4.1 must be performed before any work is performed. The remainder of the orientation may be performed within the first fourteen (14) days of employment and is not required prior to RFS.

5.10.6 Plans and Procedures for FOS Crewing

In accordance with Section 5.10.5, develop policy, plans and procedures for FOS crewmembers that contain the following, as applicable:

It is the Government intention that mariners complete foreign articles during a Phase O voyage, however, Ship Managers are required to phase FOS crews on an extended voyage (180 days or more of unbroken service). MARAD requires crew rotation to be phased when it occurs. Crew rotation may start as early as the 120th day or earlier if conditions warrant, if the Ship Manager's projections require this with the following restrictions in order to provide maximum continuity and safety of RRF vessel operations:

-    There shall be at least 30 days between the rotation of the Master and Chief Mate;
-    There shall be at least 30 days between the rotation of the Chief Engineer and 1st Assistant Engineer; and
-    Not more than half of the officers or crew shall rotate at one time within the deck, engine or stewards departments

However, for mission operations, if a crewmember requests to remain in service, and both the Ship Manager and the union have no objection, this is permissible to MARAD. Additionally, on a case by case basis, the Ship Manager shall advise MARAD (MAR-613) whether it recommends an overlap of any crewmember prior to relief. It is the Government's option to approve/disapprove overlaps.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 61 of 100 |
|---|---|---|---|

· Communications: In FOS, all personal calls must be at the Master's discretion. Payment may be made in accordance with the Ship Manager procedures that may include, but not be limited to, credit card, calling card, and prepaid phone cards. Private communications are not subject to reimbursement. Crewmembers operating ship to satellite personal communications devices (cell phones) must check with Master to determine if communications are restricted due to vessel's location or mission.

· When docked at a military facility: crewmembers are subject to base regulations including detainment/arrest for violations.

· Contrary to some commercial operations, FOS crewmembers may not have unauthorized personnel visit/sail onboard without MAR-610's consent. This includes family members, relatives, and friends.

· All personnel must have evidence of having had a physical examination within six (6) months preceding the date of assignment.

· Unlicensed personnel must also have a medical envelope or clinic card when reporting onboard. The medical envelope or clinic card will be retained by the Master and should be easily accessible. It shall be returned to the unlicensed crewmember upon discharge, if requested by the employee.

· Crewmembers shall bring an adequate supply of personal prescription medicines for intended voyage
plus reserve with copy of medical prescription.

· Crewmembers shall bring customized personal safety devices such as glasses/shoes.

· When a vessel is in port, crew liberty shall be granted when allowed by local civilian/military authorities and in accordance with the vessel's in-port operating requirements. The local MSC on-site representative can provide the Master with information regarding upcoming vessel operating requirements in order that the sailing board can be posted.

· If the crew is to be restricted to the ship, the Master shall post notice of this in a public location. This notice shall state the reason for restriction and the authority of government agency, which required it. Masters shall make an entry in the vessel's log. If a vessel is not restricted, but no launch service is available, the Master shall post this notice and obtain from local authorities (or at the minimum the local agent) a letter stating that the ship was not restricted but that launch service was not available. Ship's lifeboats or rescue boat shall not be used for liberty or recreation.

· For any Voluntary Resignation of a Crewmember, pertinent statements from the Master/Department Heads shall be obtained and retained. The Master shall execute a Mutual Consent Release Form (CG-713A) with letter from crewmember attached.

5.10.7 Second Seaman's/War Risk Insurance: Ship Managers shall provide Second Seaman's War Risk Insurance for all members of the crew 365 days a year whether the vessel is in Phase M or Phase O. Second Seaman's War Risk Insurance covers loss of life, disability (including dismemberment and loss of function) and loss of or damage to personal effects of the insured, when directly and proximately caused by risks of war and warlike operations. The terms and benefits shall be as set forth in the Second Seaman's War Risk Policy (1952) except that coverage shall be provided 365 days a year not only for the length of the voyage. Second Seaman's War Risk coverage providing a loss of life benefit of $200,000 is a fixed price item. Premiums for coverage in excess of the death benefit authorized will not be reimbursed by the Government and are the Ship Manager's responsibility. Additional premiums for entering an exclusion zone are reimbursable. (CDRL HR-0011)

5.10.7.1 Exclusion zone premiums - If additional premiums (a.p.) are required for coverage in an exclusion zone, the costs will be reimbursed, provided the Ship Manager notified the ACO (with copies to the PCO, the MARAD Ship Ops Ctr, MAR-611, and MAR-782) of the amount of the additional premiums, along with any additional terms and conditions, not more than seven (7) days before they become effective and receives written authorization from the ACO to pay the additional premium. Such notice is required because MARAD reserves the right to provide such additional insurance via a Second Seaman's War Risk Insurance policy issued under 46 U.S.C. §1205. (CDRL HR-0012)

5.10.8 Imminent Danger Pay and War Risk Bonuses: MARAD will reimburse Imminent Danger Pay and War Risk Bonuses once the DOD has issued the applicable geographic region, authorized and provided such payments to MARAD.

When this occurs:

a) Advise FOS crews that such determinations usually take considerable time, however if authorized, payment will be forthcoming.

b) Maintain records of all personnel eligible for payment. War Risk Bonuses and Imminent Danger Pay are not paid concurrently.

| Award/Contract | Document No. <br> DTMA8C05020 | Document Title <br> Ship Manager | Page 62 of 100 |
|---|---|---|---|

5.11 Requirement Unique to Designated Shipboard Positions

5.11.1 Master's Authority

Although the Ship Manager is responsible for all phases, the ship's Master executes special responsibilities on behalf of the Ship Manager when a vessel is operating.
Maintain signed copies of instructions to the Master which shall include the following:

· The Master shall have and exercise full control, responsibility, and authority with respect to the crew, embarked personnel including the ship's force protection teams, navigation, and management of the vessel during Operations. Nothing shall relieve Masters from their responsibility for safe navigation and ship handling, except Panama Canal Pilotage.

· The Master shall determine if there is evidence of alcohol or controlled substance involvement by persons directly involved in reportable marine casualties. Ultimate responsibility to determine whether an individual used alcohol or drugs most appropriately rests with the agency authorized to impose sanctions or penalties for such conduct (i.e., a Coast Guard administrative law judge, Coast Guard civil penalty hearing officer, or judge or Federal district court official). However, documentation of such "evidence" is the responsibility of the ship's Master and shall be provided by FORM CG-2692 and through entries in an official log book. Methods of obtaining such evidence are at the Master's option but may include personal observation and/or chemical testing.

· The Master may conduct or order conducted searches for contraband. The completion of a search and results of it shall be entered into the official log. U.S. crews abide by Custom's duty regulations. Masters shall take every reasonable precaution onboard ship including, but not limited to, the following:

o Prohibiting merchants from conducting sales of any nature onboard ship.

o Inspecting packages brought onboard in foreign ports.

o Posting appropriate regulations in conspicuous locations.

o Conducting periodic surprise searches throughout the ship, especially after leaving a foreign port. Upon discovery or suspicion of narcotics abuse or marijuana use onboard ship, a message shall be sent to the COTR. All unauthorized narcotics, controlled substances, marijuana, and drug paraphernalia discovered onboard shall be confiscated, marked for proper identification by witnesses, and secured until turn over to proper authorities.

5.11.1.1 Overtime. As the Ship Manager's representative, the Master will personally manage and authorize overtime during operations. MARAD will provide to the Ship Manager guidance and funding on discretionary and non-discretionary overtime via a TO prior to the vessel's sailing. The Ship Manager shall forward instructions on the implementation of this overtime to the Master. The Ship Manager is responsible for providing accounting of Phase O overtime via invoices. (CDRL HR-0013)

5.11.1.2 Safety for Non-ship's crew. Vessel Masters shall enforce protective equipment on all stevedores including military personnel. Additionally, any personnel on the ship or lighters made fast to the ship are subject to the ship's safety requirements. If objections arise from military personnel, contact the senior military officer and COTR.

C.6     BUSINESS MANAGEMENT

Performance Goal: Comply with government and company business policies, procedures and practices.

The Ship Manager shall:

6.1     Availability Requirements. Establish procedures to maximize retention and continuity of experienced and high performing shoreside staff and ROS crew.

6.2     Establish procedures to ensure reliable and timely communications between Ship Manager points-of-contact and the MARAD program office on a 24/7 basis. The Ship Manager points-of-contact shall have the inherent authority to commit the company if circumstances deem it necessary.

6.3 Compliance Documents. Comply with applicable performance standards of the documents reflected below (in Sections C.6.3.3.1 through C.6.3.3.3) in successfully performing ship manager services. Standards include:

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 63 of 100 |
|---|---|---|---|

- Voluntary Consensus Standards (Definition TE-1, Section 2)
- Non-consensus Standards (Definition TE-1, Section 2)
- U.S. Government Standards (Definition TE-1, Section 2)

6.3.1 Standards include:

6.3.1.1 Voluntary consensus standards include:

· ISM standards

· Generally Accepted Accounting Principles (GAAP) U.S., as established by the Finance Accounting Standards Board

· IMO and other conventions which the U.S. is a signator to SOLAS

· ABS Rules for Steel Vessels

· ACP

· PMCM

· Code of International Ship Management

· STCW-95 or current agreement

· Current ITU Radio Regulations

· Bridge to Bridge Radio Telephone Act

· International Maritime Satellite (INMARSAT) and MF/HF, UHF, and VHF

· Procedures for communication

· The International Regulations for Preventing Collisions at Sea

· U.S. Inland Rules of the Road

· ISO 9002

· ISO 9000 (series) - refers to all those features of a product (or service) which are required by the customer. "Quality management" means what the organization does to ensure that its products conform to the customer's requirements

· ISO 14000 (series) to minimize harmful effects on the environment caused by its activities

· ISO 18000 Occupational Health and Safety Management Systems (series)

· Trim and Stability Booklet

· Manufacturer's Directions for Safety Handling of Equipment

· Cargo Loading Plan

6.3.1.2 Non-consensus standards include:

· Ship Manager Quality Assurance Plan

· Manufacturer's Equipment Operating Manuals (per ship)

· Ship Manager developed Commercial Procurement Procedures

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 64 of 100 |
|---|---|---|---|

· Ship Manager developed Preventive Maintenance Plan Phase M

· Ship Manager developed Preventive Maintenance Plan Phase O

· Ship Manager developed Activation Plan

· Ship Manager developed Operational Plan

· Ship Manager developed Deactivation Plan

6.3.1.3 Government specific Standards include:

· U.S. CFRs (mandated by law)

· FAR Part 44, Subcontracting Policies and Procedures

· MARAD Operational Management Manual (TE-1)

· MARAD Logistics Management Manual (TE-5) and the following:

· Logistics Management Standards

· General Performance Standards for All GFP. Preserve, manage and control all spare parts, accountable property, ship's drawings and technical manuals in a manner that prevents waste, theft and unnecessary procurement.

· Special Performance Standards for the Management of accountable property

· Maintain a complete and 100% accurate inventory of all accountable property in RMS

· Engineering Operating Manuals (per ship)

· Deck Operating Manuals (per ship)

· The contract itself

· NDRF Severe Weather Plan

· Mooring Plan for Outported vessels

· MSC SOP (electronic version - provided at activation)

· Navy, MSC, and Area Command SOPs (electronic versions provided as needed)

· Rules and regulations of the Federal Communications Commission (FCC)

· COMSC Communications Policies and Procedures Manual

· U.S. Public Health Service Regulations - to maximum extent possible

· Carriage of HAZARDOUS or Explosive CARGOES: USCG regulations, Occupational Safety and Health Act of 1970 (29 USC 655, et. seq.); regulations prescribed by the Department of Labor (DOL) for longshoremen; and COMSC instruction 9023.1 Subj: Safety regulations Governing Handling and Transportation of Ammunition and Other Hazardous Cargoes.

· U.S. Department of State (Passports)

· Admiralty Law

· USCG (Licensing, Documentation, Safety)

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 65 of 100 |
|---|---|---|---|

· U.S. DOL (Wage Determination)

· Occupational Safety and Health Act

· Internal Revenue Service (Taxation)

· State Policies and Regulations (Taxation, Unemployment, Workers Compensation, Safety)

· Industrial Security Manual

· Other (public health, FCC, etc.)

· Exceptions (waivers, public vessel exemptions)

· Claims Package (Attachment J-3)

6.4 The Business Plans shall encompass all known facets of the maintenance, repair, manning, training, regulatory compliance, and operations (if planned) of the vessel. The Business Plans shall identify all estimated resources and scheduling for successful execution. Each vessel shall have three (3) Business Plans associated with it: Current Year Business Plan; Budget Year Business Plan; Five Year Business Plan. Business Plans shall be updated quarterly at a minimum. Attachment J-16 provides MARAD best concept for RMS development and is provided for information only. As with any planning document is SUBJECT TO CHANGE.

6.4.1 Current Year Business Plan - The COTR approved work plan the ship manager executes during the current fiscal year.

6.4.2 Budget Year Business Plan - Estimates, schedules, and projects work the ship manager will execute in the following fiscal year. The Budget Year Business Plan becomes the Current Year Business Plan in the following fiscal year.

6.4.3 Five Year Business Plan - Estimates, schedules, and projects work the ship manager will execute during the five (5) fiscal years subsequent to the Budget Year Business Plan.

6.4.4 A NTP Business Plan. Within 14 days after NTP, the MARAD COTR will provide to the SM a rough outlined Business Plan for the current year (being executed) and following year (Budget year) - to the extent that these materials are available. SM will have 60 days from NTP or until July 1, whichever date comes first, to review and modify these plans as applicable. Thereafter, M.6.4.1 through M.6.4.3 apply.

6.5 Business Plan Development and Update

6.5.1 Current Year Business Plan

6.5.1.1 Establish from the prior fiscal year's Budget Year Business Plan, as approved by MARAD.

6.5.1.2 Effective on October 1 of each contract year

6.5.1.3 Identify the required work; estimate the cost and schedule for projected actions, i.e., preventative maintenance, corrective maintenance, and regulatory surveys and inspections; define the necessary resources; and schedule the execution of these actions to sustain the vessel in its required readiness.

6.5.1.4 Update to reflect actual work performed, costs and dates as work is accomplished and invoices are received.

6.5.1.5 Adjust to include changes as required for unknown work changes to schedules, and MARAD mandated adjustments.

6.5.1.6 Upon completion of the fiscal year, the Current Year Business will become historical data.

6.5.2 Budget Year Business Plan

6.5.2.1 Establish from the first year of the prior fiscal year Five Year Business Plan.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 66 of 100 |
|---|---|---|---|

6.5.2.2 Identify all known and required work; estimate the cost and schedule for projected actions, i.e., preventative maintenance, corrective maintenance, and regulatory surveys and inspections; define the necessary resources; and schedule the execution of these actions to sustain the vessel in its required readiness.

6.5.2.3 Provide cost estimates by equipment, system or space for possible unknown repairs and corrective maintenance actions based on historical data.

6.5.2.4 Continuously update as requirements are identified and refined utilizing RMS.

6.5.2.5 Submit to MARAD by no later than July 1 of each year.

6.5.2.6 Report requirements identified after July 1 and required in the following fiscal year to the COTR for inclusion in the plan.

6.5.3 Five Year Business Plan

6.5.3.1 On October 1 of each contract year, amend to include new fifth year of the plan.

6.5.3.2 Identify all known and required work; estimate the cost and schedule for projected actions, i.e., preventative maintenance, corrective maintenance, and regulatory surveys and inspections; define the necessary resources; and schedule the execution of these actions to sustain the vessel in its required readiness.

6.5.3.3 Provide cost estimates by equipment, system or space for possible unknown repairs and corrective maintenance actions based on historical data.

6.5.3.3.1 Provide actual costs by equipment, system, or space for repairs and corrective maintenance actions in RMS.

6.5.3.4 Recommend to COTR any upgrades, recapitalization projects, or life cycle extension programs.

6.5.3.5 Include any MARAD directed modification or upgrade of the vessel as directed by MARAD.

6.5.3.6 Continuously update in "near real time" as requirements are identified utilizing RMS.

6.6 Business Plan Execution

6.6.1 Through a MARAD issued TO, accomplish all facets of the Current Year Business Plan as approved by MARAD.

6.6.2 Accomplish corrective actions and repairs not specifically identified in the Current Year Business Plan but projected as an estimate for a system or space (see Section 6.4.2.3).

6.6.3 Provide updates to RMS to reflect actual start and completion dates, actual costs, and changes to scope of work.

6.6.4 Notify the COTR of any events or required actions which will warrant a change to the business plan.

6.6.4.1 Accomplish changes to the business plan as directed by the COTR. Changes will be administered through a Contract Modification, new TO, or TO Modification.

6.6.5 MARAD ADP Interface: Provide ISP for vessels while in ROS. DSL is not required for RMS. Ensure Ship Manager ADP is compliance with MARAD ADP system. MARAD ADP system is provided in the Tech Library under MISC.
MARAD will provide the following software programs and appropriate training:
    CARGOMAX
    RMS

6.6.6 ABS Nautical Systems v. 5 (NS5) will be provided as the Ready Reserve Management System (RMS). MARAD will transfer at its expense all legacy systems and provide training in the use of NS5. Enter accurate and timely data into RMS as required. MARAD's license comes with the following mandatory modules which the SM will use:

-    Maintenance
-    Inventory*
-    Reports

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 67 of 100 |
|---|---|---|---|

- Replication

*The inventory module is accompanied by a purchasing module. Ship Manager must use the purchasing module to enter cost data and vendor data. Further use of the purchasing module, is at the optional discretion of the Ship Manager.

MARAD's license comes with the follow modules which it is optional for the SM to use:

Purchasing module except for the items noted above.

Although NS5 may have other modules, MARAD's license does not include these.

6.6.6.1 Ship Manager Responsibilities towards RMS:

6.6.6.1.1 The vessels' existing Preventative Maintenance Plans (currently MARTS VMAs and P4Ps) will be entered into RMS as individual work items. The current frequency will also be entered into RMS with an associated equipment and system. The ship manager shall review and modify the procedure and frequency, as necessary. The ship manager should also assign any sub-equipments (this is managed via pull-down menus where sub-components are already linked to the parent equipment). Ship Managers will have to activate the work item within the system (mouse click on the screen). Based on the frequency of the work item, a schedule will be auto-generated. The ship manager shall record accomplishment of all preventative maintenance actions within RMS as well as any additional maintenance or repairs required.

6.6.6.1.2 The ship manager is required to review all outstanding repair and procurement Work Orders (currently MARTS DSNs). These items should have associated scheduled completion dates and cost estimates as well as associated equipments and systems. Ship Manager shall validate each within the system.

6.6.6.1.3 The ship manager shall use the system to identify new work and procurements required through the utilization of the system's "Work Order". Each item shall include: Title; Priority (4 level); Category (General, Hull, Mechanical, or Electrical) Associated equipment(s), System, or Space(s) (entered via a drop-down menu); clear and concise Statement of Work; Estimated Materials and Labor; Estimated, Committed, and Actual Costs; Vendor; Parts Required if procured or used from onboard or warehouse spares (from existing spare parts database).

6.6.6.1.4 Where applicable, the ship manager shall develop "Events". Events are a group of "Work Orders" that occur during a common time period or shipyard availability (i.e. a drydocking).

6.6.6.1.5 The ship manager shall attach electronic files, as appropriate, within the system. This can occur at various points for work orders or for specific parts. The files may be drawings or contractor reports. Any file format is accepted.

6.6.6.1.6 All spare parts data will be entered into RMS. The ship manager shall record usage and management in accordance with the Logistics Management Manual.

6.6.6.1.7 Establish, apply and maintain appropriate resources to input, maintain and integrate data, information and processes for all contract requirements.

6.6.6.2 Attend MARAD RMS-related user training as directed.

6.6.6.3 Computer requirement. Ship Managers will provide computers for shorebased use, and for use of their port engineering team(s) as follows:

| | |
|---|---|
| Hard drive: | 40 GB |
| Processor: | 1 GHz |
| RAM: | 512mb or higher |
| Display: | Super VGA (1024 x 768) |
| Peripherals: | CD-ROM and DVD, Keyboard, MS Mouse |
| OS | Windows 2000 Pro or Windows XP Pro |

Ship Managers shall provide Microsoft Office 2003 Professional Edition, and capability to attach, transmit, and receive email.

MARAD will provide computers for RRF vessels which meet these minimum requirements.

| Award/Contract | Document No. DTMA8C05020 | Document Title Ship Manager | Page 68 of 100 |
|---|---|---|---|

6.6.7 Reporting and Analysis Support

Provide ADP support to ensure successful generation of all reports required under Reporting Requirements.

6.7 Subcontractor Management

6.7.1 Subcontracting Policies and Procedures – See Attachment J-2.

6.7.1.1 Provide acquisition services compliant with FAR Part 44.

6.7.1.2 Provide timely and accurate data concerning subcontract awards as required by FAR 19.7. (CDRL BUS-0001)

6.7.1.3 Submit subcontract specifications/solicitations for review, obtain consent to subcontract, and provide advance notification in accordance with FAR 44.2 and the subcontracts clause of this contract. In addition, the CO may require review/consent of any individual action or invoke lower thresholds as deemed necessary irrespective of the above review requirements.

6.7.1.4 Submit written commercial purchasing procedures for commercial purchasing system review (CPSR) and notify the CO (PCO and ACO) of any changes thereafter.

6.7.2 Quality Assurance

6.7.2.1 Develop and execute a Ship Manager Quality Assurance Plan (QA). Notify MARAD of any changes to the Ship Manager developed QA which was submitted as part of the proposal. (CDRL BUS-0002)

6.7.2.2 Ensure MARAD receives copies of all third party audits of any Ship Manager policies, procedures, processes or system, in particular those relating to ISM certification and quality assurance. (CDRL BUS-0003)

Permit MARAD employees (ACO or COTR) to accompany third party auditors during their inspections.

6.8 Phone Lines on ROS Vessels: Three (3) phone lines are available for ROS vessels. These are part of the utilities provided under layberth contracts. Additional phone lines are to be included in the Ship Manager's fixed price or may be installed at the Ship Manager's cost during the performance period. Ship Managers are responsible for all costs associated with the use of phone lines. Telephone jacks may be disconnected during activations. Disconnection/re-connection of three (3) telephone lines are reimbursable.

6.9 Provide those items normally associated with Ship Manager staff performance, including, but not limited to: laptop computers, cell phones, personnel assistant devices, dedicated phone, fax and ISP, and required technological up-dates as such items become common to administrative performance.

C.7 FINANCIAL MANAGEMENT

Performance Goal: Effectively manage and control costs.

7.1 Cost Management, Control and Efficiency

7.1.1 Monitor the approved business plan, authorized funding, contract obligations, and actual expenditures to ensure the overall business plan is executed effectively and efficiently.

7.1.2 Provide notification to MARAD on changes in funding requirements and ensure the government receives the best value of contracted goods and services.

7.1.3 Support government reprogramming actions and timely closeout of TOs.

7.2 Expenditure/Obligation Management

7.2.1 Establish procedures, processes and systems to ensure accurate and timely management of expenditures and obligations.

7.2.2 Ensure submission of invoices in government provided electronic invoicing system and encourage prompt submission of all invoices from subcontractors and vendors.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 69 of 100 |
|---|---|---|---|

**7.3 Government Audit Support**
Cooperate with and provide adequate ship manager support to on-site government auditors as reasonably required for them to accomplish their duties.

**7.4 Insurance/Claims Support**
Provide adequate staff support to process all claims and settlements. Develop and execute policies to effectively mitigate the Government's liability.

**7.5 Records Retention Support**
Maintain and make available specific documentation for designated time periods in accordance with FAR 52.215-2 "Audit and Records -- Negotiation" and FAR Subpart 4.7 to satisfy contract negotiation, administration, and audit requirements of the contracting agencies and Comptroller General.

**C.8      GOVERNMENT FURNISHED ITEMS**

The Government will provide:

· Ships and all appurtenances and ancillary equipment

· Shipboard computer hardware/software for CARGOMAX and RMS

· Shipboard computers

· Licensing for ABS NS5

· Outfitting Lists by Department (Deck, Engine, Steward)

· Berth - either a Non-NDRF layberth also known as the Outport Berth. This is a berth at a location which is not part of the NDRF

Or NDRF berth. This is a berth within one of the three (3) NDRFs. No phone lines are connected. DH and cathodic protection are provided.

8.1 Maintenance Documentation

· Existing VMAs/P4Ps per ship

· Water Chemistry Program (services)

· Manuals and training to utilize MARAD's Water Chemistry Program

· Lube Oil Analysis Program (services)

· Manuals and training to utilize MARAD's Oil Analysis Program

· VMAs/P4Ps of each ship as they currently exist

· List of Outstanding Deficiencies per ship - at regional turnover meeting

· Current status of regulatory body documentation (certifications/inspections) at regional turnover meeting

. RSTARS (web access password)

· SAFENET Access (at regional turnover meeting)

8.2 Logistics, Activation, Operations, and Deactivation

· RMS software

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 70 of 100 |
|---|---|---|---|

· Accountable property, spare parts, technical manual and ship's drawing databases

· MLSS CD-ROM (every 3 to 6 months)

8.2.1 Standard Yellow Administrative Filing Cabinet (onboard ships)

This list may be modified by MARAD at any time during the performance period of the contract. MAR-613 maintains the official list with number and content and will periodically update and re-issue the list.

1. Index of Administrative Documents

2. Blue Book of Ship Regulatory Certificates

3. Vessel Response Plan (VRP) for Tankers

3a. Shipboard Oil Pollution Emergency Plan (SOPEP) - rest of RRF

4. Ship's Trim and Stability Booklet

5. Military Sealift Command's Communications Policies and Procedures Manual

6. Military Sealift Command's Standard Operating Manual (CD-ROMs)

7. Commander, Military Sealift Command 5090.1, Environmental Protection Program and Oil/Hazardous Substances (OHS) Spill Reporting Procedures and Contingency Plan

8. RRF Operations Management Manual (aka TE-1)

9. RRF Logistics Management Manual (aka TE-5)

10. RRF Safety Rules and Guidelines Manual

11. Ship Manager Activation Plan (placed onboard by Ship Manager company)

12. Ship Manager Operations Directives (placed onboard by Ship Manager company)

13. MARAD Safety Reference Folder

14. RESERVED

15. GMDSS Master Plan of Shorebased Facilities

16. RRF Videos:

a)      SOPEP VRP Video

b) MARAD SAFETY VIDEOS (8 in series)

· Back Injury, Slips, Trips, and Fall Prevention

· Heat Stress, Sight, Hearing, and Respiratory Protection

· Electrical Safety Overview

· Safety Awareness Overview

· Shipboard Drug and Alcohol Testing Policy

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 71 of 100 |
| --- | --- | --- | --- |

· Shipboard Safety Inspection Program

· Back Care for the Maritime Industry (Two Videos)*

a)      Part One: Lift It Safely (To be viewed by all employees)

b)      Part Two: Minimize the Risk: The Role of Management (Viewed by Officers)

c) Master's Orientation Video (7 in series)

d) Prevention of Sexual Harassment Video

e) Bloodborn Pathogens

f. MSC Surge Representative Pre-Sailing Instructions

17. Marine Fire Prevention, Fire-fighting, and Fire Safety (book)

18. The Ship's Medicine Chest and Medical Aid At Sea (book)

19. ISM Safety Management Plan (placed onboard by the Ship Manager company)

8.3 Safety, Environmental, and Security

· Personal protective equipment listed in TE-1 Section 18

· Safety posters (at various times throughout contract performance period)

· SOPEP/VRP as required per ship

· USCG approved ISPS Security Plan (one per ship)

8.4 Business Management

NTP Business Plan:  The Current year's (currently being executed) Business Plan (BP), the budget year BP and any known material for the five year BP per vessel.

· Software for computer (for RMS)

8.5 Financial Management

· Not applicable


[END OF SECTION C]

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 72 of 100 |
|---|---|---|---|

## SECTION D -- PACKAGING AND MARKING

### D.1    PRESERVATION AND PACKAGING

Preservation, packing, and packaging shall be in accordance with good commercial practices to assure daily delivery at destination.

### D.2 PACKING MATERIAL

The use of shredded paper, whether newspaper, office scrap, computer sheets, or wax paper as packing material for shipment to Government activities is prohibited.

### D.3 MARKING REQUIREMENTS

In addition to the complete address of the addressee and complete return address of the sender, each package shall be marked with the contract number, TO number as applicable, ship name, ship group, and name and address of the contractor, on the outside of the packaging container for identification purposes.

[END OF SECTION D]

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 73 of 100 |
|---|---|---|---|

## SECTION E -- INSPECTION AND ACCEPTANCE

E.1    52.252-02 CLAUSES INCORPORATED BY REFERENCE    FEB 1998

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

http://www.acqnet.gov/far/current/html/FARMTOC.html

| Clause  Title | Date |
|---|---|
| 52.246-02 | Inspection Of Supplies--Fixed Price          August 1996 |
| 52.246-03 | Inspection Of Supplies Cost-Reimbursement May 2001 |
| 52.246-04 | Inspection Of Services- Fixed Price August 1996 |
| 52.246-05 | Inspection Of Services Cost-Reimbursement April 1984 |
| 52.246-16 | Responsibility for Supplies          April 1984 |

E.2 PERFORMANCE QUALITY CONTROL-BOTH PHASES

a. Ship Manager performance shall be evaluated by the ACO throughout the life of the contract. Ship management services which do not meet the minimum quality standards specified in the QASP, TE-2, and elsewhere in this contract, may be subject to deductions or other remedies. These remedies may include but are not limited to the following:
(1) Re-performance by the Ship Manager, as directed by the ACO.
(2) Re-performance by the government, with re-performance costs charged to the Ship Manager.
(3) Reduction in per diem.
(4) Partial Termination for default.
(5) Termination for default.

b. The foregoing shall not be construed as a waiver or modification of any rights available to the Government under FAR 52.246-2 or 52.246-4, as incorporated in Section E; nor of any other right or remedy available to the government.

c. The ACO, with the assistance of the COTR shall prepare a semi-annual Ship Manager performance evaluation in accordance with the Award Term Incentive Option Plan (ATIOP). A copy of this evaluation shall be forwarded to the Ship Manager for review and comment. The Ship Manager shall have no less than thirty (30) days to submit written comments, rebutting statements, or additional information to the ACO. The completed evaluation shall not be released to other than government personnel and the contractor whose performance is being evaluated.

E.3 INSPECTION AND ACCEPTANCE DUTIES FOR REIMBURSABLE ITEMS

The Ship Manager is responsible for inspection and acceptance of reimbursable items that the Ship Manager is authorized to procure. Each reimbursable invoice shall be submitted for payment in accordance with the instructions provided in Section G.

E.4 FINAL ACCEPTANCE

The Government's final acceptance of services provided under this contract shall be made only upon certification of the Final Invoice as defined in the invoicing provisions contained in Section G. Such certification shall be made by the ACO.

E.5 QUALITY ASSURANCE SURVEYS AND INSPECTIONS

a. The Government or persons authorized by the Government shall have the right to inspect, and survey the ships at any time and at any location, in order to ascertain their material condition, as deemed necessary and appropriate by the Government.

b. To the extent accommodation aboard the ship and USCG Certification will permit, the Government shall have the right of assigning personnel aboard the ship to observe or inspect the performance under the contract.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 74 of 100 |
|---|---|---|---|

c. If, in the opinion of the authorized representative of the Government, deficiencies exist in the material condition or appearance of a ship resulting from lack of timely or adequate maintenance and repair, or other failure to perform obligations set forth in this contract, a deficiency report can be issued by the ACO or COTR. Corrections of deficiencies shall be performed at the Government's option in accordance with the provisions of FAR 52.246-4, Inspection of Services-Fixed Price, and provided in the provision at Section E.2, Performance Quality Control - Both Phases.

E.6 THIRD PARTY AUDITS

The Government reserves the right to attend third party audits of ISM and other quality assurance approaches. If the Government is unable to attend a third party audit, it shall be provided a copy of the analysis when it is published.

[END OF SECTION E]

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 75 of 100 |
|---|---|---|---|

## SECTION F -- DELIVERIES OR PERFORMANCE

**F.1    52.252-02 CLAUSES INCORPORATED BY REFERENCE       FEB 1998**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

http://www.acqnet.gov/far/current/html/FARMTOC.html

| Clause | Title | Date |
|---|---|---|
| 52.242-15 | Stop-Work Order | August 1989 |

**F.2 52.211-08          TIME OF DELIVERY                    JUNE 1997**

(a) The Government requires delivery to be made in according with Section B of this solicitation.

The Government will evaluate equally, as regards time of delivery, offers that propose delivery of each quantity within the applicable delivery period specified above. Offers that propose delivery that will not clearly fall within the applicable required delivery period specified above, will be considered nonresponsive and rejected. The Government reserves the right to award under either the required delivery schedule or the proposed delivery schedule, when an offeror offers an earlier delivery schedule than required above. If the offeror proposes no other delivery schedule, the required delivery schedule above will apply.

[OFFEROR'S PROPOSED DELIVERY SCHEDULE ]

(b) Attention is directed to the Contract Award provision of the solicitation that provides that a written award or acceptance of offer mailed, or otherwise furnished to the successful offeror, results in a binding contract. The Government will mail or otherwise furnish to the offeror an award or notice of award not later than the day award is dated. Therefore, the offeror should compute the time available for performance beginning with the actual date of award, rather than the date the written notice of award is received from the Contracting Officer through the ordinary mails. However, the Government will evaluate an offer that proposes delivery based on the Contractor's date of receipt of the contract or notice of award by adding (1) five calendar days for delivery of the award through the ordinary mails, or (2) one working day if the solicitation states that the contract or notice of award will be transmitted electronically. (The term "working day" excludes weekends and U.S. Federal holidays.) If, as so computed, the offered delivery date is later than the required delivery date, the offer will be considered nonresponsive and rejected.

F.3 NOTICE TO PROCEED

The Notice to Proceed (NTP), by the PCO, shall identify the date for the commencement of performance. Performance under this contract before that date shall be at the contractor's risk and shall not be reimbursed.

F.4 NOTIFICATION OF PHASE STATUS

a. The Government shall provide the Ship Manager with a NTP which shall state the phase status and applicable Contract Line Item Number (CLIN) of the ship, i.e., Phase M or O. Payment shall be made in accordance with the appropriate per diem rate for the CLIN, as specified in Section B, for the full 24 hour period.

b. Subsequent changes in phase status shall be accomplished via modification, as executed by the assigned ACO.

F.5 EFFECTIVE DATE OF AWARD AND PERFORMANCE PERIOD

a. The effective date of award for the contract is the date the contract is signed by the PCO. Year 1 of the contract is deemed to be from date of award for a period of twelve (12) months.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 76 of 100 |
|---|---|---|---|

b. Performance shall commence on the date specified in the NTP. The period of performance of this contract shall be from the contract award date until the date specified at the time of award, subject to the availability of funds. However:

(1) Any voyage in progress at the end of the contract performance period shall be completed by the Ship Manager unless otherwise directed by MARAD.

(2) The performance of Phase-In/Phase Out services may be required beyond the scheduled termination date, in accordance with the clause entitled "Continuity of Services" (FAR 52.237-3) incorporated herein in Section I.

(3) During Phase In/Phase Out, the applicable per diem rate for Phase M for that vessel shall be in effect for the period beyond the expiration date.

F.6 PERFORMANCE PERIOD BY SHIP GROUP

a.       The period of performance for ship group 6 (CAPE JACOB) is one (1) year with two 1-year options.

b.       The period of performance for ship group 11 (PETERSBURG, and CHESAPEAKE) is two (2) year base, with eight 1-year options, with a cancellation ceiling in accordance with the provision of FAR 52.217-2, Cancellation Under Multi-Year Contracts, as incorporated in Section I of this contract. (see Section G.2)

c.       All other Ship Groups are multi-year contracts with a base performance period of four (4) years, with annual cancellation ceiling through contract year 3, in accordance with the provision of FAR 52.217-2, Cancellation Under Multi-Year Contracts, as incorporated in Section I of this contract. (see Section G.2)

F.7 CHANGES IN ASSIGNED VESSELS DURING CONTRACT PERFORMANCE PERIOD

a. The Government reserves the right to change the composition of a Ship Group by adding or substituting ships between or within groups or by removing vessels from active RRF status subject to equitable adjustment. The contractor retains the right to accept or reject the addition of ships to the contract.

b. Additional or Substitute Vessels. If the contractor chooses to accept the additional or substitute vessels, the CO may request, and the contractor shall furnish, a cost proposal detailing the cost and schedule impacts (if any) of the changes and a request for equitable adjustment, should costs increase or decrease. A supplemental agreement to this contract shall be executed to incorporate any changes to the number and names of vessels managed by the Ship Manager, and to incorporate any resultant changes to the contract price. Acceptance of additional or substitute vessels by the contractor shall confirm the contractor's acceptance that all terms and conditions of this contract apply to the added vessel(s).

c. If the contractor elects to not accept substitute vessels, the Government reserves the right to terminate the contract.

F.8 PLACE OF DELIVERY BY THE GOVERNMENT

The Government will deliver custody of the ship(s) and all GFP to the Ship Manager at the locations specified in TE-4.

F.9 PLACE AND METHOD OF DELIVERY OF CONTRACT LINE ITEMS BY THE SHIP MANAGER

a. Delivery of services and supplies shall be made F.O.B. Destination as defined in FAR 52.247-34.

b. All documentation and data required by OPCON during Phase O shall be delivered to the COMSC and a copy shall be sent to the cognizant COTR. If Phase O is under MARAD OPCON, not MSC, send reports to the appropriate regional COTR only.

c. Except where otherwise directed in the contract, all documentation and data, (other than (b) above), shall be delivered to the ACO, who shall be designated in Section G of the contract upon award.

d. Deliverables, are the services and data required by this contract, and are listed separately in Attachment J-4.

e. The following addresses shall be used as the delivery locations for the items required in the contract.

ACO = Administrative Contracting Officer as named in the contract award.

| vard/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 77 of 100 |
|---|---|---|---|

COTR = Contracting Officer's Technical Representative as named in the contract award.

PCO = Procuring Contracting Officer as indicated in block #27 of the SF33 (Contract Award)

Maritime Administration
Chief, Division of Accounting Operations
MAR-333, Room 7325
400 7th Street, S.W.
Washington, DC 20590

Maritime Administration
Office of Acquisition
Team Leader, Ship Manager Team
MAR-380, Room 7310
400 7th Street, S.W.
Washington, DC 20590

Maritime Administration
Chief, Division of Marine Insurance
MAR-782, Room 8117
400 7th Street, S.W.
Washington, DC 20590

Maritime Administration
Director, Office of Financial and Rate Approvals
MAR-560 Room 8117
400 7th Street, S.W.
Washington, DC 20590

Maritime Administration
Director, Office of Ship Operations
MAR-610, Room 2122
400 7th Street, S.W.
Washington, DC 20590

Maritime Administration
Division of Ship Maintenance and Repair
MAR-611, Room 2119
400 7th Street, S.W.
Washington, DC 20590

Maritime Administration
Division of Reserve Fleet
MAR-612, Room 2112
400 7th Street, S.W.
Washington, DC 20590

Maritime Administration
Division of Operations Support
MAR-613, Room 2123
400 7th Street, S.W.
Washington, DC 20590

Maritime Administration
Division of Logistics Support
MAR-614, Room 2116
400 7th Street, S.W.

Washington, DC 20590

MSC Commander, Military Sealift Command
Code PM5
Washington, DC 20390-5100

SOUTH ATLANTIC REGION
Maritime Administration
7737 Hampton Boulevard
BLDG. 4D, Rm. 211
Norfolk, Virginia 23505
TEL: 757-441-6393
FAX: 757-441-0812

CENTRAL REGION
Maritime Administration
Hale Boggs Federal Building
501 Magazine Street, Suite 1223
New Orleans, LA 70130-3394
TEL: 504-589-6565
FAX: 504-589-6593

WESTERN REGION
Maritime Administration
201 Mission Street, Room 200
San Francisco, CA 94105-1905
TEL: 415-744-2562
FAX: 415-744-2591

F.10 CONDITION OF SHIPS AT TIME OF CONTRACT AWARD

The ships shall be, insofar as due diligence can make them so, seaworthy, tight, staunch and in every way suitable and adequately fitted, with all gear approved by regulatory bodies, and in all respects ready to receive and transport lawful cargo. Prior to contract award, the ship shall be in class according to ABS and USCG Standards. Upon delivery of the ship(s) to the Ship Manager, the ship(s) shall be surveyed and inventory validated by the Ship Manager in accordance with TE-5 and witnessed by the Government to determine their condition and the type and amount of GFP onboard.

The ship(s) may have some outstanding ABS or USCG requirements and known deficiencies at the time of NTP. The COTR (via the ACO) will provide the Ship Manager with a list of such deficiencies. Correction of such deficiencies will be reimbursable at MARAD's direction.

F.11 REDELIVERY OF SHIPS

a. The ships shall be redelivered to the Government in the same good order and condition, including any enhancements or improvements, as when delivered hereunder except for ordinary wear and tear, other documented legitimate usage and ordinary depreciation, at a port designated by the Government.

b. In accordance with Section C, the ships shall be surveyed and inventoried by the Ship Manager and verified by the Government to determine their condition and the type of GFP on board, at no additional cost to the Government. Unless an exception is authorized by the ACO in writing, the Ship Manager shall be required to return all the Government furnished outfitting, tackle, apparel, supplies, stores, equipment and furnishing or shall be required to replace or reimburse the Government for such items in kind, reasonable wear and tear excepted in accordance with the clause in Section I, Government Property, FAR 52.245-2.

c. A ship shall be deemed redelivered for the purpose of the contract (i) at such time when the Government accepts physical custody of the ship from the Ship Manager; or (ii) if lost, at noon of the day when last heard from; or (iii) from the time and when the ship is declared a Constructive Total Loss by the ACO.

d. In the event the contract period expires or the Government provides notice of its intent to cancel or terminate this contract in whole or in part as provided in any provision of this contract, the Ship Manager shall continue to perform and shall exercise due diligence to

| ,ontract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 79 of 100 |
|---|---|---|---|

μ.    e the ship and all equipment until redelivery to the Government, and shall cooperate fully in the transfer of functions, possessions, and control of the ship to either the Government or the subsequent ship operator.

e. The Ship Manager shall cooperate in the transfer of all records, logs or other materials pertaining to the navigation and operation of the ship either to the Government or the subsequent ship operator. The spare parts, outfitting, technical information, maintenance manuals, drawings and other supplies and materials in the Ship Manager's possession which have been produced or acquired for the performance of this contract shall be provided to the Government or the subsequent ship operator.

## F.12 REPAIR PERIODS DURING OPERATIONS

a. During Phase O, the Ship Manager may, at the Government's option, be placed in a repair period to undergo reimbursable repairs or alterations.

b. During such repair periods, the Government shall determine the number of crew members to be retained onboard for the repair period.

c. The Ship Manager shall arrange for changes in wages, to correspond to ROS status, if directed by MARAD, and for crew transportation. (In Phase O crew wages and transportation are reimbursable-see Attachment J-9.)

## F.13 SUPERVISION

The Ship Manager shall provide at all times, the quantity and quality of supervision necessary for the effective and efficient management of the operation. All supervisors shall have an intimate knowledge of the various tasks, equipment and materials required, to be able to properly train and direct the workers in their individual tasks and to maintain and control an effective operation. If multiple awards are made to one Ship Manager, supervision shall be adequate to fulfill this requirement on each contract.

## F.14 ENGLISH LANGUAGE REQUIREMENT OF ON-SITE SUPERINTENDENT

The Ship Manager's on-site personnel must be able to speak, read and write English for ease of communication with Government personnel.

## F.15 STANDARDS OF EMPLOYEE CONDUCT

The Ship Manager shall be responsible for maintaining satisfactory standards of employee competency, conduct and integrity, and shall be responsible for taking necessary disciplinary action with respect to its employees.

## F.16 EMPLOYEE REMOVAL

If the government has any reason to be dissatisfied with the performance and conduct of any person employed by the Ship Manager, the Ship Manager shall, upon receiving particulars of the complaints, investigate the matter and take immediate corrective action, to include removal from all MARAD activities, when directed by the ACO. The Ship Manager shall immediately notify the ACO of any corrective actions taken.

[END OF SECTION F]

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 80 of 100 |
|---|---|---|---|

## SECTION G -- CONTRACT ADMINISTRATION DATA

### G.1    GOVERNMENT FORMS

Government forms may be obtained from the following:
http://www.gsa.gov/Portal/gsa/ep/formslibrary.do

### G.2 TYPE OF CONTRACT

a. This is a Firm-Fixed-Price (FFP) service contract with cost reimbursable items and priced options subject to Economic Price Adjustment (EPA), Service Contract Act (SCA), and Fair Labor Standard Act (FLSA).

b. All items listed in Section B shall be Firm-Fixed-Priced except for those items identified as reimbursable items and identified options. (see also Attachment J-9, Reimbursables)

c. This is a multi-year contract except for group 6 (CAPE JACOB).

(1) It is anticipated that the services to be performed hereunder will be incrementally funded for each performance period. Performance periods beyond year 1 will be subject to availability of funds.

(2) Awards resulting in a multiyear contract are subject to FAR 17.106-1 which requires the establishment of cancellation ceilings in the second and subsequent base program years, where a reduction in funds or program requirements may mandate cancellation of all or some part of this contract, before the completion date in effect at contract award. These cancellation ceilings will be determined by the PCO based upon an analysis of the nonrecurring costs identified by offerors in their proposals and will be incorporated in Section B, upon contract award.

(i) Base Contract - If the base multi-year contract for a Ship Group is cancelled under FAR 52.217-2, Cancellation Under Multiyear Contracts, the cancellation ceiling set forth for that Ship Group in Section B for the program year cancelled shall apply. The ceiling applies to cancellation of an entire group.

(ii) Incentive Award Term Option - Consistent with FAR 17.107, the "cancellation ceiling" for each program year of a multi-year Incentive Award Term Option shall be zero ($0.00). Consequently, if an Incentive Award Term Option is cancelled, the contractor shall not be entitled to any cancellation charges under FAR 52.217-2.

d. Reimbursable items are defined in Attachment J-9. They are compensated at cost; no overhead, materials handling costs, G&A, or profit may be added to these items, regardless of their cumulative effect.

e. Adjustments to Per Diem Rates

1. Base Years. There shall be no adjustments for per diem in Phase M in Section B for the four (4) base years of the performance period, as all escalations are to be included in the firm fixed price. Offerors shall include wages and fringe benefits which cannot be less than the predecessor contractors' CBA/MOUs as identified in DOL issued wage determinations.

2. Award Term Incentive Options

i)    The Base Year 4 fixed price Per Diem rates for "ROS (with crew)" CLINs will be escalated as follows:

(1)    Price adjustments to the "Crew Costs" element (which included ROS crew wages and bona-fide fringe benefits) will be made in accordance with FAR Clause 52.222-43 Fair Labor Standards Act and Service Contract-Price Adjustment (Multiple Year and Option Contracts); and
(2)    The element "other fixed price" costs will be escalated utilizing the Consumer Price Index as stipulated below.

ii)    The Base Year 4 fixed price Per Diem rates for CLINs without crew will be escalated utilizing the Consumer Price Index as stipulated below.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 81 of 100 |
|---|---|---|---|

3. Incentive Options for Additional Vessels. Since the contract prices for the additional Vessel Option are based on the Base Year 4 prices, if an additional vessel is awarded, the per diem rate will be adjusted as above based on the year in which the option is exercised.

4.      Consumer Price Index (CPI) for Escalation During Contract Performance.
In order to calculate inflation for contract option years, Ship Manager will utilize the CPI Inflation calculator at http://www.bls.gov/cpi/#tables.

The CPI inflation calculator uses the average CPI for a given calendar year. This data represents changes in prices of all goods and services purchased for consumption by urban households.

Ship Managers shall use the fixed price per diem rate from the previous contract year, minus crew wages, and utilizing the CPI Inflation Calculator, shall compute the adjustment for the next contract year. The contractor shall submit its CPI adjustment request in writing to the contracting officer within thirty (30) days of the start of the new option year.

G.3 DIRECTIONS BY GOVERNMENT PERSONNEL

a. Except as specified in paragraph b. below, no order, statement, or conduct of government personnel who visit the Ship Manager's facilities or in any other manner communicate with Ship Manager personnel during the performance of this contact shall constitute a change under the
"changes" clause of this contract.

b. The Ship Manager shall not comply with any order, direction or request of Government personnel that it considers to be outside the scope of the contract, unless issued in writing and signed by the PCO or ACO, or as otherwise directed by this contract.

G.4 CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR)

a. The PCO/ACO may designate Government personnel to act as the COTR to perform functions under the contract, such as review and/or inspection and acceptance of supplies, services, including construction, and other functions of a technical nature. The CO will provide a written notice of such designation to the Contractor after contract award and before NTP. The designation letter shall set forth the authorities and limitations of the COTR under the contract.

The PCO will designate the Chief, Division of Ship Maintenance and Repair as a HQ COTR on all contracts. Ship Managers shall attempt to reach MARAD regional COTR/ACTORs BEFORE contacting MAR-611.

b. The PCO/ACO cannot authorize the COTR, or any other representative, to sign documents (i.e. contracts, contract modifications, etc.) that require the signature of a CO.

c. The COTR may request the appointment of Assistant Contracting Officer Technical Representatives (ACOTRs) by the ACO. Such written requests shall be made to the respective ACOs, or in the case of headquarters personnel, to the PCO. ACOTRs shall be appointed in writing by the PCO/ACO, and a copy of this appointment letter provided to each affected Ship Manager. The appointment letter shall specify the name, inclusive dates, and specific limits to the authority of that person appointed.

G.5 DUTIES OF THE CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR)

a. The COTR is responsible for monitoring the assigned technical aspects of the contract and acts as the technical liaison with the Ship Manager. The COTR is also responsible for the final inspection and acceptance of all reports, and such other responsibilities as specified in their assignment letter. In the event of emergency situations, which threaten the safety of life, limb or property, the Ship Manager shall immediately take all necessary actions, to include expenditure of such funds as may be necessary to preclude such dangers. The Ship Manager shall notify the MARAD ACO and COTR of any such emergency expenditure as soon as possible. A proper TO will be issued at the earliest opportunity practicable.

b. Except as stated elsewhere, the COTR is not authorized to make any commitments or otherwise obligate the Government for any changes, which affect the contract price, terms or conditions. Any contractor request for changes shall be referred to the ACO directly or through the respective MARAD Regional COTR. No such changes shall be made without the prior authorization of the PCO.

c. The COTR may be changed by the Government at any time, and notification of the change shall be provided in writing to the contractor by the ACO or PCO for headquarters personnel.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 82 of 100 |
|---|---|---|---|

G.6 DESIGNATION OF GOVERNMENT PERSONNEL

a. The PCO for this contract is:

Rilla A. Gaither
MAR-380
Phone: 202-366-5757
FAX: 202-366-3237
e-mail: rilla.gaither@marad.dot.gov

b. MARAD personnel responsible for informing Ship Managers of alert notifications and providing activation authorization are:

MARAD HEADQUARTERS
Mr. William Cahill
MAR-610
Phone: 202-366-5776
FAX for HQ: 202-366-3954

Mr. Paul Gilmour
MAR-611
Phone: 202-366-8974

Mr. Kevin Tokarski
MAR-613
Phone: 202-366-2629
Cell Phone: 202-366-8187

Mr. Peter Petrelis
MAR-613
Phone: 202-366-6252

Mr. Mike Franklin
MAR-613
Phone: 202-366-2628

SOUTH ATLANTIC REGION
Mr. Mayank "Nuns" Jain
Mr. Jeffrey McMahon
Mr. Norwood Bailey
Mr. Art Fritz
Mr. Fred Hoffman
Mr. Anthony Salemi
Phone: 757-441-6393
FAX: 757-441-0812

CENTRAL REGION
Mr. John W. Carnes
Mr. Deepack Varshney
Mr. Robert Babin
Mr. Mathew McNally
Phone: 504-589-6565
FAX: 504-589-6593

WESTERN REGION
Mr. Frank X Johnston
Mr. Hank Ryan
Mr. Charles "Chuck" Johnston
Mr. Simon Tao

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 83 of 100 |
|---|---|---|---|

Phone: 415-744-2562
FAX: 415-744-2576

c. Authorities

(1) Director/Deputy Director of Acquisition (MAR-380) appoints the PCO.

(2) The PCO retains the authority to solicit, award and modify the basic terms and conditions of the contract. The PCO shall delegate, in writing, specific authorities to the ACO.

(3) Chief of Contracting Office (COCO) is delegated the authority to appoint qualified ACOs and may perform all the duties of ACO.

(4) ACO has the authority to appoint COTRs and ACOTRs.

## G.7 CLAIMS AND LITIGATION

## G.7.1 THIRD PARTY TORT ACTIONS IN ADMIRALTY

G.7.1.1 The Ship Manager is considered the agent of the United States within the meaning of the Suits in Admiralty Act (SIAA), the Public Vessels Act, and the Admiralty Extension Act for all third party tort actions in admiralty cognizable under the Jones Act, General Maritime Law, or the Clarification Act, inclusive of claims for maintenance and cure. Such actions include, but are not limited to, claims for death and injury to crew members or invitees, claims for maintenance and cure, claims for illness to crew members, and claims for property damage to third parties.

G.7.1.1.1 The Ship Manager is not an agent of the United States under the Contract Disputes Act and nothing contained herein shall be deemed to extend to the Ship Manager the status of "agent of the United States" under any laws relating to contracts. (see Section G.7.2) Neither is the Ship Manager an agent of the United States for non-admiralty actions, particularly employer/employee disputes. (see Section G.7.3)

G.7.1.2 Actions covered by G.7.1.1 must be brought exclusively against the United States. See the Suits in Admiralty Act (SIAA), 46 U.S.C. §741, et seq., which makes the United States the exclusive defendant for all admiralty cases relating to the activities of its agents.

G.7.1.3 The United States will defend the Ship Manager in actions covered by Section G.7.1.1. Such defense will usually be provided through the United States Department of Justice. By entering into this contract, the Ship Manager hereby agrees to accept the representation of the United States in such legal proceedings. The United States will have the sole discretion to determine whether to settle such suits and the United States will control the conduct of the litigation.

G.7.1.3.1 The Ship Manager may, at its own expense, retain legal counsel to work with the United States in defending any claim or suit.

G.7.1.4 Except as set forth in Section G.7.4, Indemnification, the United States bears the sole financial risk for all actions covered by Section G.7.1.1, for which the RRF vessel, the United States, or the Ship Manager is liable provided the liability arose out of the Ship Manager's performance of this contract and the Ship Manager was acting within the scope of this contract.

## G.7.2 SUBCONTRACTOR CONTRACT CLAIMS AND DISPUTES

When the Ship Manager acquires products or services as a prime contractor from a subcontractor under the procedures set forth in Attachment J-2, the Ship Manager is not an agent of the United States. Under the Contract Disputes Act the subcontractor has no direct right to sue the United States or the Maritime Administration for claims and disputes arising under its contract with the Ship Manager since there is no privity of contract between such subcontractor and the Maritime Administration. Therefore, any contract disputes, claims or litigation between the Ship Manager and its subcontractor(s) shall be the responsibility of the Ship Manager consistent with Attachment J-2.

G.7.2.1 The Ship Manager shall comply with the provisions in Attachment J-2 to ensure subcontractor and their agents and employees are properly notified that the vessel is a public vessel NOT subject to maritime liens. (Attachment J-20)

## G.7.3 THIRD PARTY ACTIONS NOT IN ADMIRALTY

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 84 of 100 |
|---|---|---|---|

G.7.3.1 All liability for third party actions which do not lie in admiralty shall be the sole responsibility of the Ship Manager, not the United States, its agents, servants, and employees, nor the vessels owned by the United States. Such liability includes, but is not limited to, all costs of legal representation. Examples of third party actions which do not lie in admiralty include, but are not limited to:

(a) All employer/employee claims or suits brought by the seamen employed by the Ship Manager or by their union, either via arbitration or in court, i.e.:

i) allegations of discrimination, including sexual harassment. Discrimination claims include, but are not limited to, those claims arising under Title VII of the Civil Rights Act, as amended (42 U.S.C. sections 2000e et seq.), the Age Discrimination in Employment Act, as amended (29 U.S.C. sections 621 et seq.), and the Americans with Disabilities Act, as amended, (42 U.S.C. sections 12117 et seq.); or

ii) employment disputes like disciplinary action undertaken by the Ship Manager against its employee; or

iii) enforcement of the terms of the CBAs between the Ship Manager and its unions.

(b) Lawsuits or administrative proceedings brought by federal, state or local authorities alleging the Ship Manager violated federal, state or local laws or regulations; i.e., OSHA or environmental laws and regulations.

G.7.4 INDEMNIFICATION

G.7.4.1 Notwithstanding anything in this contract to the contrary, particularly Section G.7, the Ship Manager agrees to indemnify and hold the United States, MARAD, and its employees and agents harmless from any damages, loss, or injury resulting either directly or indirectly from:

(a) acts of Gross Negligence, Willful Misconduct or Violations of Law or Regulations of the Senior Management of the Ship Manager; or

(b) acts of Gross Negligence, Willful Misconduct or Violations of Law or Regulations performed by employees, servants, contractors, subcontractors, suppliers or agents of the Ship Manager and which occurred with the Privity or Knowledge of Senior Management of the Ship Manager; or

(c) all third party actions covered by Section G.7.3; or

(d) all maritime liens by third parties where the Ship Manager or its subcontractors or agents failed to notify a third party as required in Attachment J-2, that the vessel was a public vessel not subject to lien under the Maritime Lien Act; or

(e) damage caused by a subcontractor or its agents or employees during the performance of their work which is reimbursable by insurance, an indemnification clause or other similar provision required by Attachment J-2.

G.7.4.2 Such indemnification shall be provided upon MARAD's request or, if necessary, the United States may bring a legal action, either directly or in a third party action, against the Ship Manager and/or individuals working for the Ship Manager, for damages, loss, or injury to the United States.

G.7.4.3 Definitions (for purposes of this section):

(a) Senior Management means those individuals responsible for senior management of the Ship Manager's organization with respect to major components of any of its operations relating to the NDRF or RRF vessels. Senior Management will include the chief executive officer, president, vice president(s), and head(s) of vessel operations for the Ship Manager.

(b) Privity or Knowledge means that the relevant individuals had either personal cognizance of the circumstances, which either caused or contributed to the claim or the means to obtain that knowledge of which such person should have availed itself.

(c) Gross Negligence means harm that is willfully inflicted or caused by a wanton disregard of a duty of care.

(d) Third Party means all persons who are not parties to this contract.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 85 of 100 |
|---|---|---|---|

(e) Violation of Law or Regulation means instances where civil or criminal liability results from a violation of a law or regulation that falls on the vessel, the United States and/or the Ship Manager. A Violation of Law or Regulation will not be deemed to occur for purposes of this definition when liability occurs without fault on the part of Ship Manager.

(f) Willful Misconduct means conduct that is either intentional or committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure after knowledge of impending danger to exercise ordinary care or a failure to discover the dangers through recklessness or carelessness.

G.7.5 DUTY OF COOPERATION

G.7.5.1 The Ship Manager has a duty to fully cooperate in the defense of any claim or action (whether or not such claim or action is in admiralty) for which the United States bears a financial risk or a responsibility to defend.

G.7.5.1.1 As soon as practicable after the occurrence of any claim or suit, or any loss or damage for which the Ship Manager believes the United States is at risk under this contract; the Ship Manager shall immediately furnish the assigned ACO, with a copy to the assigned COTR, detailed written notice of such claim, suit, loss, and/or damage as well as a copy of every demand, notice, summons, complaint, or other process received by the Ship Manager or its employees or representatives.

G.7.5.1.2 The Ship Manager will cooperate with the Government and, upon request, will assist in effecting settlements, securing and giving evidence, technical advice, and obtaining the attendance of witnesses for consultation, depositions, and trials. Such information, advice, evidence and documentation will be given by the Ship Manager to the United States in the manner and form the United States requires.

G.8 CLAIMS AND REPORTS

G.8.1 Claims by crew members shall be processed in accordance with the provisions listed in Attachment J-3, Supplement A, Seafarer's Personal Injury/Illness Claims.

G.8.2 Claims submitted by ROS crew members are subject to the same processing of Attachment J-3. However, since ROS seamen do not sign articles, they are not entitled to unearned wages.

G.8.3 Report of Injuries/Illness. The Ship Manager shall submit quarterly (Oct, Jan, Apr, Jun) reports of injuries/illness via email in addition to the information required in Attachment J-3, Supplement A, Section 5. Submissions for multiple ships or contracts may be combined, and shall be provided to the ACO, COTR, and MAR-611.

G.8.4 On an annual basis (prior to the close of the fiscal year) the Ship Manager shall reconcile TO closeouts and notify the ACO/COTR of any excess funding deobligation on any TO which was issued in connection with Maintenance and Cure. The Ship Manager shall provide a revised estimate of anticipated obligations for the upcoming fiscal year. The Government will provide new funding with the next fiscal year allotments.

G.8.5 Upon reporting that a case is closed, Ship Managers shall advise the ACO so that TOs with any remaining reserve funding may be liquidated.

G.9 MEDICAL INVOICE REVIEW SERVICES

Medical Invoice Review services shall be obtained by the Ship Manager from competent commercial sources. Ship Managers shall obtain the use of a third party to assist with reviewing and validating costs submitted on medical invoices. A copy of the service agreement shall be provided to the ACO within sixty (60) days of contract award. Ship Managers shall obtain a medical invoice review service, which operates on a percentage of savings basis. If it is impossible to obtain a percentage payment service, then the cost of this service is reimbursable.

G.10 MINIMUM WORKING CAPITAL REQUIREMENTS

G.10.1 Irrevocable Line of Credit. The Ship Manager shall maintain an irrevocable line of credit of at least $250,000 per ship with a federally insured bank or financial institution. The form and substance of this line of credit shall:

a. be dedicated solely for the purpose of vessel activations under the Ship Manager contract;

b. remain in effect throughout the life of this contract, without change or alteration, without prior approval of the MARAD ACO;

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 86 of 100 |
|---|---|---|---|

c. as part of the provisions of this irrevocable line of credit, the bank or financial institution providing same shall notify the MARAD Office of Financial Approvals of any changes in the outstanding amount, form or substance of the line of credit. This may be accomplished by the bank providing copies of any statements, which are provided to the Ship Manager;

d. the bank or financial institution must be federally insured; and

e. the terms of all proposed irrevocable lines of credit should first be determined acceptable by the MARAD Office of Financial Approvals. The Ship Manager shall notify the ACO if there is any change in the status of their $250,000 line of credit per ship.

G.10.2 Alternative. Where a firm has sufficient financial resources to meet the $250,000 per ship financial requirements, and wishes to rely on those resources instead of obtaining a line of credit, MARAD will consider this alternative financing. To receive MARAD approval for this alternative, a firm must submit, with their proposal, a current audited financial statement of the firm or thhe parent, as appropriate, for MARAD's approval. In addition, firms receiving awards shall submit to the PCO, for MARAD's approval, an annual audited financial statement each year of the contract.

G.11 TASK ORDERS - REIMBURSABLE

G.11.1 General

(1) Any reimbursable supplies and services to be furnished by the Ship Manager under this contract shall be authorized by issuance of TOs.

(2) All TOs are subject to the terms and conditions of this contract. In the event of conflict between a TO and this contract, the contract shall have precedence.

G.11.2 Issuance

(1) The scope of TOs may vary greatly. The Ship Manager shall not commence work until they receive a TO executed by an authorized MARAD CO.

(2) Prior to issuance of a TO, the Ship Manager shall submit a written specification, cost estimate and time estimate, for completion of the required work. The specification will be reviewed, approved or modified by MARAD prior to issuance of a TO. At a minimum, the cost estimate shall include the labor and material costs for each work item. (See PWS in Section C)

(3) A TO is considered issued when posted electronically and notification is sent to the Ship Manager.

G.11.3 Acceptance of the Task Order

(1) Implied Acceptance. Acceptance of the TO by the Ship Manager shall be implied if, after three (3) working days of receipt, the Ship Manager has not notified the ACO, either orally or in writing, of problems and/or disagreements with the TO.

(2) After the commencement of performance under the TO, the Ship Manager shall notify the COTR in writing of the need for required revisions, or to request additional funds.

G.12 EXPENDITURE AND TRACKING OF REIMBURSABLE FUNDS

G.12.1 Upon receipt of the executed TO, the Ship Manager may proceed in accordance with procedures in Attachment J-2.

G.12.2 It is the Ship Manager's responsibility to track all funds expended under reimbursable TOs. The SM shall develop a system, which tracks funds obligated and funds available on each TO. Funds shall be further tracked to show the status of purchase order(s) (PO) issued, funds obligated and expended, and PO closed out. The system shall further track the PO to the deficiency(ies) covered by the TO. At times, a PO may cover several deficiency(ies). Alternatively, a deficiency(ies) DSN may require the use of several POs. The tracking system must be able to accommodate such possibilities. MARAD may request a copy of the tracking document on an "as needed" basis, or as often as monthly.

G.13 PURCHASING RESTRICTIONS

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 87 of 100 |
|---|---|---|---|

a. Interested or Related Company. Agreements or arrangements with any interested company to render any reimbursable service or to furnish any reimbursable stores, supplies, equipment, materials, repairs or facilities hereunder, shall be submitted to the ACO for approval. Unless and until such agreements or arrangements have been approved, compensation paid to any interested or related company shall be subject to review and readjustment by the ACO, who may deny payments, in whole or in part, if such compensation is deemed to be inappropriate or unreasonable.

b. The term "interested company" shall mean any person, firm, or corporation in whom the Ship Manager or related company of the Ship Manager, may own any substantial financial interest therein, either directly or indirectly.

An "interested company" shall also exist when any substantial financial interest in the company (either directly or indirectly) rests with:

1) immediate family members of the Ship Manager
2) any employee of the Ship Manager who is charged with executive or supervisory duties or
3) any member of the immediate family of any such officer, director, employee or
4) any officer or director of any related company of the Ship Manager or
5) any member of the immediate family of any officer or director of any related company of the Ship Manager.

c. The term "related Company" as used to indicate a relationship with the Ship Manager for the purpose of this Article only, shall include any person or concern that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with the Ship Manager. The term "control" (including the term "controlled by" or "under common control with") as used herein, means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Ship Manager (or related company) whether through ownership or control of voting securities, by contract or otherwise.

G.14 TYPES OF INVOICES

a. All invoices shall be submitted for one of the following two (2) categories:
(1) Fixed Price CLIN.
(2) Reimbursable CLIN.

b. General. The Ship Manager shall submit invoices in accordance with Office of Management and Budget (OMB) Circular A-125, Prompt Payment, and FAR 52.232-25, Prompt Payment (Oct 2003), as described herein. All invoices shall be submitted electronically via the MARAD DOT Electronic Invoice Systems (EIS), at https://www.marad.dot.gov/EIS/.

c. Ship Manager shall submit invoices in accordance with instructions contained on the EIS website.

G.15 TRAVEL REQUIREMENTS

G.15.1 Reimbursable travel performed by the Ship Manager, subcontractors and crew, in direct performance of this contract will be reimbursed on an actual, and allowable basis. Travel costs for subsistence and lodging shall not exceed the Federal Travel Regulations (FTR) at http://www.gsa.gov/, except as stated in FAR 31.205-46.

(1) Vouchers are required when submitting travel claims.

(2) Crew members may submit claims without itemized receipts for subsistence and lodging at the current rate set in labor agreements, if less than the FTR rate.

(3) The Contractor shall use only coach or economy airfares while performing travel under this contract, unless otherwise authorized by the ACO. For travel performed on a cost reimbursable basis all cost documentation must accompany invoices for reimbursement except as identified above.

G.15.2 The Federal Travel directory will be used to verify current maximum allowable subsistence and lodging rates.

G.15.3 Requests for travel reimbursement shall be clearly identified and submitted on a SF 1012, Travel Voucher (Attachment J-18) or other form acceptable to the ACO. Requests for reimbursement of travel expenses, including supporting documentation thereof, shall not include commingled reimbursable and fixed price travel cost data.

G.16 METHOD OF PAYMENTS

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 88 of 100 |
|---|---|---|---|

(1) The Ship Manager shall forward the information required below, to the Department of Transportation, Maritime Administration, MAR-333, Room 7325, 400 7th street, S.W. Washington, DC 20590, not later than fourteen (14) days after receipt of the notice of award. It is the Ship Manager's responsibility to furnish changes promptly to avoid payments to erroneous addresses or bank accounts.

(2) Electronic Funds Transfer Payment Methods
Payments under this contract will be made by the Government either by check or electronic funds transfer (EFT) (through the Automated Clearing House (ACH)), at the option of the Government. Submit a completed SF 3881 (Attachment J-11) to the address above in (a). The SF 3881 designates a financial institution for receipt of EFT payments. See the clause in Section I, FAR 52.232-33, Payment by Electronic Funds Transfer - Central Contractor Registration (Oct 2003).

G.17 CONTRACTORS PURCHASING SYSTEM REVIEW REQUIREMENTS

MARAD requires all contractors to submit procedures for approval of their purchasing system within ninety (90) days of NTP. Attachment J-2 contains the policies and procedures for meeting MARAD's requirements.

G.18 POST AWARD CONFERENCE

A post-award conference may be held within the first sixty (60) days after award. Attendees will include the MARAD CO/ACO, the COTR or ACOTR, and other personnel deemed necessary to represent the Government. The Ship Manager (Contractor) may be represented by the Ship Manager's employees as deemed appropriate. This conference will be scheduled for a time mutually agreeable to the Ship Manager and to the Government. The purpose of this conference is to review the terms and conditions of the contract, to discuss technical matters pertaining to contract performance, and to address any questions brought forth by either the Ship Manager or the Government.
   [END OF SECTION G]

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 89 of 100 |
|---|---|---|---|

## SECTION H -- SPECIAL CONTRACT REQUIREMENTS

## H.1     PERIOD OF PERFORMANCE

The contract base period of performance of four (4) years, with the exception of Ship Groups 6 and 11, may be extended by exercising option(s), up to an additional six (6) years, two 3-year award term periods on the overall contract performance. The total maximum period of performance under this contract, if the Government exercises all award term incentive options is (10) ten years inclusive of the base period. These additional award term incentive option periods will be awarded by the Government based on overall contractor performance as evaluated in accordance with the contract's approved Award Term Incentive Option Plan (ATIOP).

## H.2 AWARD TERM INCENTIVE OPTION PLAN

The Award Term Incentive Option Plan (ATIOP), Attachment J-12, provides for the evaluation of both technical and price performance, and serves as the basis for any award term option decision. The ATIOP may be unilaterally revised by the Government and re-issued to the Contractor no later than fifteen (15) days prior to the commencement of the next evaluation period. Any changes to the ATIOP will be made in writing and incorporated into the contract through a unilateral modification citing this clause. The Government will consult with the Contractor(s) prior to the issuance of a revised ATIOP, but is not required to obtain the Contractor(s) consent to the revisions. A Term Determining Official (TDO) shall be appointed by the Government and is responsible for the overall award term evaluation and award term/additional vessels decisions. The TDO will unilaterally decide whether or not the contractor has earned an award term incentive option extension. The TDO will designate an Award Term Review Board (ATRB).

## H3 GOVERNMENT'S RIGHT TO EXERCISE THE AWARD TERM INCENTIVE OPTION

The Government has the unilateral right not to exercise the Award Term Incentive Option of the contract if:

(1)     the contractor has failed to earn an award term by end of the third year of contract performance, or
(2)     if after earning is first award term the contractor fails to earn an award term in any succeeding year of contract performance, or
(3)     services are no longer needed, or
(4)     option exercise would be inconsistent with FAR Subpart 17.2

If the CO does not exercise the options, the contract period of performance ends at the current contract period of performance. Failure to exercise an award term option that has not yet commenced for any of the reasons set forth in this clause shall not be considered either a termination of convenience or a termination for default, and shall not entitle the contractor to any termination settlement or any other compensation.

## H.4 ORGANIZATIONAL CONFLICT OF INTEREST

a. The Ship Manager warrants that, to the best of its knowledge and belief, there are no relevant facts or circumstances which could give rise to an organizational conflict of interest, as defined in FAR Subpart 9.5, and that all such relevant information has been disclosed.

b. The Ship Manager agrees that if an actual or potential organizational conflict of interest is discovered after award, the Ship Manager will make a full disclosure in writing to the ACO. This disclosure shall include a description of actions the Ship Manager has taken or proposes to take, after consultation with the ACO, to avoid, mitigate, or neutralize the actual or potential conflict.

c. The Ship Manager is required to ensure adherence to this clause in its capacity as a manager of public vessels. Ship Managers, their parent companies or subsidiaries are prohibited from bidding on work for which they wrote the specifications unless specifically authorized by MARAD.

d. The Ship Manager further agrees to insert provisions, which shall conform substantially to the language of this clause, including this paragraph (d), in any subcontract or consultant agreement hereunder.

## H.5 REFUNDS, REBATES, AND CREDITS

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 90 of 100 |
| --- | --- | --- | --- |

As described in FAR 52.216-7 Allowable Cost and Payment, the Ship Manager shall pay to the Government any funds, rebates, credits, or other amounts (including interest, if any) accruing to or received by the Ship Manager or any assignee under this contract, to the extent that those amounts are properly allocable to costs for which the Ship Manager has been reimbursed by the Government. Contract closeout procedures shall include a signed statement by the Ship Manager that this was completed or is not applicable.

## H.6 EMPLOYMENT OF GOVERNMENT PERSONNEL

In performing this contract, the Ship Manager shall not use as a consultant or employ (on either a full or part-time basis) any active duty military personnel or Government civilian employees without the prior approval of the ACO. Such approval may be given only in circumstances where it is clear that no laws or DOT, DOD or Service instructions, regulations, or policies might possibly be contravened and no appearance of a conflict of interest will result.

## H.7 UNUSUAL EMERGENCY, NATURAL DISASTER, CONTINGENCY MOBILIZATION AND/OR WAR

a. The Ship Manager and its employees agree to obey the lawful directives issued by the Maritime Administrator, Secretary of Defense and/or President of the United States in all cases relating to unusual emergency, natural disaster, contingency, mobilization and/or war.

b. The Government shall reimburse the Ship Manager for its actual out-of-pocket expenses, including all taxes, for (1) any war risk bonuses, extra wages based on the areas to be traversed during, or the ports of call of, any voyage hereunder; (2) any required payments to the officers or crew of the ship necessarily incurred by reason of orders or direction of the Government which require the Ship Manager to breach existing Articles of the crew or contracts with the officers, provided such Articles and contracts comply with the instructions of the Government and are over and above the terms and condition of this contract. However, any war risk bonuses and/or extra wages granted by the Government, and based on the areas to be traversed or the ports of call of any voyage hereunder shall not exceed what would be payable, under applicable laws and regulations, to civilian mariners, in the employ of MARAD's Ship Manager, for service on the ship if the ship were privately owned on the same voyage.

c. War risk bonuses and/or extra wages paid for traversing combat areas or war-hazard zones shall be allowable costs under this contract only if those areas have been so designated by the Secretary of Defense or others, as may be delegated by the Secretary of Defense.

## H.8 STATUS OF VESSELS

The ships to be operated under this contract are public vessels of the United States. Material conditions, personnel appearance, discipline, customs and usage should be maintained at a high professional standard such that the operation of these ships will not bring criticism or discredit upon the U. S. Government.

## H.9 SALVAGE

Settlements for salvage services rendered to other vessels, including those owned or controlled by the United States, shall be handled by, and are under the control of the Government. All salvage monies earned, including recovery of fuel consumed and hire during the salvage operation, by any ship hereunder shall issue to and be for the account of the Government after deducting Master's and Crew's share. It is mutually understood and agreed that the Ship Manager shall not be entitled to nor participate in any salvage or salvage awards hereunder. The Ship Manager shall promptly furnish the Government with full reports and information on all salvage services rendered or received.

## H.10 SHIP'S STORES AND MATERIALS

Pursuant to authority of the Defense Production Act of 1950, as amended, and provisions of the Business and Defense Service Administration Regulation No. 1, when instructed by the ACO, the priority rating DO-A3 shall be used to obtain ratable ships' stores and controlled ships' materials required under this contract.

## H.11 UNITED STATES CITIZENSHIP

Given the essential defense function of a contract award under this solicitation, each contractor must satisfy the following criteria throughout the performance of this contract.

a. Meet citizenship requirements as defined in 46 CFR 315 and 46 U.S.C.802(a) and 802 (b).

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 91 of 100 |
|---|---|---|---|

b. As part of this process, Contractor must annually submit to the PCO evidence of continuing U.S. citizenship status, including a current Affidavit of United States Citizenship and any changes to other documents previously submitted in connection with establishing the U.S. citizenship of the Contractor. This annual submission should be filed within thirty (30) days after the annual meeting of the stockholders or annually, within thirty (30) days after the original affidavit if there has been no meeting of the stockholders prior to that time. See Section K.7, Affidavit of United States Citizenship.

c. Contractor shall submit promptly to the PCO any changes in the information set forth in its current Affidavit of U. S. Citizenship and other documents submitted in connection with establishing the U. S. Citizenship of the Contractor.

H.12 PORT CHARGES AND EXPENSES

a. Except as otherwise provided herein the Government will pay expenses of loading and unloading cargo, canal tolls, dues, taxes and similar port charges imposed by public authority including consular charges (all of the foregoing except as pertaining to non-official expenses of the Master, officers and crew), incurred by the ships in ports visited pursuant to the Government's direction. The Government shall pay sales taxes, and similar taxes, and foreign taxes to the extent accepted by the Government as port expenses hereunder, provided the Ship Manager shall have used due diligence to secure immunity from such taxes. Any tax or duty from which the U. S. Government is exempt by agreement with any foreign government, or from which the Ship Manager or any subcontractor is exempt under the laws of any country, shall not constitute an allowable port expense under this contract, unless the Ship Manager has used diligence to obtain exemption and has paid under protest.

The Government shall also pay all expenses incurred by the ships in aforesaid ports, which although not imposed in the instant case by public authority, are usually imposed by public authority, such as wharfage or dockage.

The Government further agrees to pay all expenses necessary incurred by the ships entering or leaving the aforesaid ports (including agent and custom broker fees).

b. The Government shall also pay for (1) pilotage of the ships where such pilotage is customary, or where the ships are required by the Government to enter or transit a hazardous or restricted area or body of water; and (2) pilotage or towage in connection with the bunkering or ballasting of the ships, or in shifting the ships in accordance with the orders of the Government. Nothing herein shall be construed as requiring the Government to pay expenses incurred by the Ship Manager for services rendered for the convenience of the Ship Manager, the ship or her Master, officer or crew, or in connection with the Ship Manager's business such as fees of underwriters, or expenses in moving the ship about the port to obtain stores or provisions. All of the charges and expenses which are incurred for the Government's account as aforesaid will be paid by the Ship Manager, who shall be reimbursed by the Government upon presentation of properly certified vouchers and supporting receipts.

c. All fees of agents as defined in Section C, PWS, appointed by and used by the Ship Manager to husband the ships, including the fees of the agents appointed for canal transits and at bunkering ports, shall be reimbursable pursuant to the instructions of the Government provided that such fees shall not exceed those customarily charged commercial vessels for similar services.

H.13 OPERATING LIMITS

Operating limits shall be worldwide.

H.14 CERTIFICATION OF SEPARATE BUSINESS ENTITY

Requirement to be and remain a separate business entity and annual recertification to remain separate throughout the life of the contract.

H.15 PENSION PLAN WITHDRAWAL LIABILITY

MARAD's payment to the Ship Manager for crew salaries and benefits includes the contribution which the Ship Manager makes to any multi-employer union pension plan for: (a) pension contributions during the time of employment onboard NDRF or RRF vessels, (b) medical insurance plans, or (c) any other contribution required by the contract between the Ship Manager and the union representing the Master and members of the crew.

MARAD's payment to the Ship Manager for crew salaries is not to be construed as creating any responsibility or liability for payment of amounts which may be assessed by the trustees of a multi-employer pension plan against a Ship Manager for the complete or partial withdrawal by the Ship Manager from a multi-employer pension plan.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 92 of 100 |
|---|---|---|---|

H.16 SUBCONTRACTING OF SHIP MANAGER DUTIES

The Ship Manager shall comply with FAR 52.244-2, Subcontracts, contained in Section I of this contract, and obtain the PCO's written consent before placing any subcontract exceeding the stated thresholds for performance of Ship Manager duties throughout the life of this contract as described herein. The Ship Manager shall also obtain the PCO's written consent prior to altering its RRF organizational structure.

H.17 ACTIVATION/OPERATION PER DIEM

a. For No-Notice Activations: Ship Manager per diem and ROS crew wages change to Operations per diem/FOS reimbursable respectively, upon telephonic notification to the Ship Manager by any of the personnel authorized for "activation notification" in Section G.6.

b. Notice Activation. The Ship Manager shall remain in Phase M per diem. Upon the arrival of the first non-ROS crewmember, all crewmembers wages will transition to reimbursable FOS wages. Ship Manager per diem becomes Phase O corresponding to the readiness and deliver date. For example, if the vessel is ROS-5, Phase O starts for the Ship Manager when the vessel would normally have received an activation message of five (5) days before required date.

c. Maintenance Activation: is scheduled in the Business Plan including phase O wages for the crew. Upon the arrival of the first non-ROS crewmember, crew wages transition from ROS to FOS for the entire crew. The Ship Manager per diem remains in Phase M throughout the maintenance activation. See CLIN for SM without ROS crew.

H.18 MARAD NATIONAL DEFENSE RESERVE FLEET SAFETY RULES FOR CONTRACT PERSONNEL

Contractor personnel shall abide by the General Safety Rules found in the NDRF Fleet manual (see technical library.) Each fleet may supplement these general guidelines with its own rules. Contractors shall obtain a copy of the rules from the Fleet Superintendent before commencing any work.

H.19 NONDISCLOSURE OF DATA AND INFORMATION

1. The Contractor, and any of its subcontractors in the performance of this contract, may have need for access to and use of various types of data and information in the possession of the Government which the Government obtained under conditions which restrict the Government's right to use and disclose the data and information, or which may be of such a nature that its dissemination or use other than in the performance of this contract, would be adverse to the interests of the Government or other parties. Therefore, the Contractor and its subcontractors agree to abide by any restrictive use conditions on such data and not to:

(a) Knowingly disclose such data and information to others without written authorization from the CO, unless the Government has made the data and information available to the public; and

(b) Use for any purpose other than the performance of the contract that data which bears a restrictive marking or legend.

2. Except as the CO specifically authorizes in writing, upon completion of all work under this contract, the Contractor shall return all such data and information, including all copies, modifications, adaptations, or combinations thereof, to the CO. The Contractor shall further certify in writing to the CO that all copies, modifications, adaptations or combinations of such data or information which cannot reasonably be returned to the CO, have been deleted from the Contractor's (and any subcontractor's) records.

3. These restrictions do not limit the Contractor's or subcontractor's right to use and disclose any data and information obtained from another source without restriction. As used herein, the term "data" has the meaning set forth in Department of Transportation Procurement Regulations, 48 CFR 1252.227-71, "Rights in Data - General", and includes, but is not limited to, computer software, as also defined in 48 CFR 1252.227-71.

H.20 NOTICE OF PARTIAL RESERVE FOR SMALL BUSINESSES (FAR DEVIATION)

(a)     Definitions. The definitions in FAR Part 19 and 13 C.F.R. Part 121 apply to this clause.

"Small business concern," as used in this clause, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 93 of 100 |
|---|---|---|---|

(b) General.

Rather than setting aside specific vessels or Ship Groups, MARAD will reserve for award to small businesses fifteen percent (15%) of the vessels, as identified elsewhere in this solicitation.

H.21 TOWING

It is strongly recommended that all towing subcontracts be awarded to towing companies whose towing vessels have a safety management certification from an industry-recognized program*. Where international tows are concerned, towing contracts shall be awarded to towing companies that comply with the ISM Code. Where towing services are required as part of an RRF "no-notice" ship movement, or other similar emergency ship movement (e.g., hurricane evacuation), attempted compliance with this requirement shall not be an acceptable cause for delay.

* Such as the ISM Code, the American Waterways Operators (AWO) Responsible Carrier Program, or any other safety management system recognized by the USCG.

[END OF SECTION H]

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 94 of 100 |
|---|---|---|---|

## SECTION I -- CONTRACT CLAUSES

### I.1     52.252-02     CLAUSES INCORPORATED BY REFERENCE

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

http://www.acqnet.gov/far/current/html/FARMTOC.html

| Clause | Title | Date |
|---|---|---|
| 52.202-01 | Definitions | July 2004 |
| 52.203-05 | Covenant Against Contingent Fees | April 1984 |
| 52.203-06 | Restrictions On Subcontractor Sales To The Government | July 1995 |
| 52.203-07 | Anti-Kickback Procedures | July 1995 |
| 52.216-24 | Limitation Of Government Liability | April 1984 |
| 52.216-25 | Contract Definitization (See Note 1.) | October 1997 |
| 52.223-14 | Toxic Chemical Release Reporting | August 2003 |
| 52.225-13 | Restrictions on Certain Foreign Purchases | March 2005 |
| 52.232-01 | Payments | April 1984 |
| 52.233-03 | Protest After Award | August 1996 |
| 52.244-06 | Subcontracts for Commercial Items | December 2004 |

### I.2

| | | |
|---|---|---|
| 52.203-03 | Gratuities | April 1984 |
| 52.203-10 | Price Or Fee Adjustment For Illegal Or Improper Activity | January 1997 |
| 52.203-12 | Limitation On Payments To Influence Certain Federal Transactions | June 2003 |
| 52.204-02 | Security Requirements | August 1996 |
| 52.204-07 | Central Contractor Registration | October 2003 |
| 52.209-06 | Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment July 1995 | |
| 52.215-02 | Audit and Records--Negotiation | June 1999 |
| 52.215-10 | Price Reduction for Defective Cost or Pricing Data | October 1997 |
| 52.215-11 | Price Reduction for Defective Cost or Pricing Data-Modifications | October 1997 |
| 52.217-08 | Option To Extend Services | November 1999 |
| 52.217-09 | Option To Extend The Term Of The Contract | March 2000 |
| 52.219-08 | Utilization of Small Business Concerns | October 2000 |
| 52.219-09 | Small Business Subcontracting Plan | January 2002 |
| 52.219-09 Alt II | Small Business Subcontracting Plan (Jan 2002) - Alternate II | October 2001 |
| 52.222-01 | Notice To The Government Of Labor Disputes | February 1997 |
| 52.222-03 | Convict Labor | June 2003 |
| 52.222-26 | Equal Opportunity | April 2002 |
| 52.222-35 | Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans December 2001 | |
| 52.222-36 | Affirmative Action For Workers with Disabilities | June 1998 |
| 52.222-37 | Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans December 2001 | |
| 52.222-41 | Service Contract Act Of 1965, As Amended | May 1989 |
| 52.222-43 | Fair Labor Standards Act And Service Contract Act - Price Adjustment (Multiple Year And Option Contracts) May 1989 | |
| 52.223-03 | Hazardous Material Identification And Material Safety Data | January 1997 |

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 95 of 100 |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 52.223-06 | Drug Free Workplace | May 2001 | |
| 52.223-12 | Refrigeration Equipment and Air Conditioners | May 1995 | |
| 52.225-01 | Buy American Act - Supplies | June 2003 | |
| 52.227-01 | Authorization and Consent | July 1995 | |
| 52.227-03 | Patent Indemnity | April 1984 | |
| 52.228-14 | Irrevocable Letter of Credit | December 1999 | |
| 52.229-03 | Federal, State And Local Taxes | April 2003 | |
| 52.230-02 | Cost Accounting Standards | April 1998 | |
| 52.232-08 | Discounts For Prompt Payment | February 2002 | |
| 52.232-11 | Extras | April 1984 | |
| 52.232-17 | Interest | June 1996 | |
| 52.232-18 | Availability Of Funds | April 1984 | |
| 52.232-19 | Availability Of Funds For The Next Fiscal Year | April 1984 | |
| 52.232-23 | Assignment Of Claims | January 1986 | |
| 52.232-25 | Prompt Payment | October 2003 | |
| 52.232-32 | Performance-Based Payments | February 2002 | |
| 52.232-33 | Payment by Electronic Funds Transfer—Central Contractor Registration | October 2003 | |
| 52.233-01 | Disputes | July 2002 | |
| 52.237-02 | Protection Of Government Buildings, Equipment, And Vegetation | April 1984 | |
| 52.237-03 | Continuity Of Services | January 1991 | |
| 52.242-13 | Bankruptcy | July 1995 | |
| 52.243-01 Alt II | Changes—Fixed-Price (Aug 1987) - Alternate II | April 1984 | |
| 52.243-07 | Notification Of Changes | April 1984 | |
| 52.244-02 | Subcontracts (Cost-Reimbursement and Letter Contracts) | August 1998 | |
| 52.244-05 | Competition In Subcontracting | December 1996 | |
| 52.245-02 | Government Property (Fixed Price Contracts) | June 2003 | |
| 52.245-04 | Government-Furnished Property (Short Form) | June 2003 | |
| 52.246-25 | Limitation Of Liability--Services | February 1997 | |
| 52.247-34 | F.O.B. Destination | November 1991 | |
| 52.249-02 | Termination for Convenience of the Government (Fixed-Price) | September 1996 | |
| 52.249-04 | Termination for Convenience of the Government (Services) (Short Form) | April 1984 | |
| 52.249-08 | Default (Fixed-Price Supply and Service) | April 1984 | |
| 52.253-01 | Computer Generated Forms | January 1991 | |

I.2     1252.209-70     DISCLOSURE OF CONFLICTS OF INTEREST     OCTOBER 1994

It is the Department of Transportation's (DOT) policy to award contracts to only those offerors whose objectivity is not impaired because of any related past, present, or planned interest, financial or otherwise, in organizations regulated by DOT or in organizations whose interests may be substantially affected by Departmental activities. Based on this policy:

(a) The offeror shall provide a statement in its proposal which describes in a concise manner all past, present or planned organizational, financial, contractual or other interest(s) with an organization regulated by DOT, or with an organization whose interests may be substantially affected by Departmental activities, and which is related to the work under this solicitation. The interest(s) described shall include those of the proposer, its affiliates, proposed consultants, proposed subcontractors and key personnel of any of the above. Past interest shall be limited to within one year of the date of the offeror's technical proposal. Key personnel shall include any person owning more than 20% interest in the offeror, and the offeror's corporate officers, its senior managers and any employee who is responsible for making a decision or taking an action on this contract where the decision or action can have an economic or other impact on the interests of a regulated or affected organization.

(b) The offeror shall describe in detail why it believes, in light of the interest(s) identified in (a) above, that performance of the proposed contract can be accomplished in an impartial and objective manner.

(c) In the absence of any relevant interest identified in (a) above, the offeror shall submit in its proposal a statement certifying that to its best knowledge and belief no affiliation exists relevant to possible conflicts of interest. The offeror must obtain the same information from potential subcontractors prior to award of a subcontract.

(d) The Contracting Officer will review the statement submitted and may require additional relevant information from the offeror. All such information, and any other relevant information known to DOT, will be used to determine whether an award to the offeror may

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 96 of 100 |
|---|---|---|---|

create a conflict of interest. If any such conflict of interest is found to exist, the Contracting Officer may (1) disqualify the offeror, or (2) determine that it is otherwise in the best interest of the United States to contract with the offeror and include appropriate provisions to mitigate or avoid such conflict in the contract awarded.

(e) The refusal to provide the disclosure or representation, or any additional information required, may result in disqualification of the offeror for award. If nondisclosure or misrepresentation is discovered after award, the resulting contract may be terminated. If after award the Contractor discovers a conflict of interest with respect to the contract awarded as a result of this solicitation, which could not reasonably have been know prior to award, an immediate and full disclosure shall be made in writing to the Contracting Officer. The disclosure shall include a full description of the conflict, a description of the action the contractor has taken, or proposes to take, to avoid or mitigate such conflict. The Contracting Officer may, however, terminate the contract for convenience if he or she deems that termination is in the best interest of the Government.

I.3    1252.217-81    GUARANTEE    JANUARY 1996

(a) In the event any work performed or materials furnished by the contractor prove defective or deficient within 60 days from the date of redelivery of the vessel(s), the Contractor, as directed by the Contracting Officer and at its own expense, shall correct and repair the deficiency to the satisfaction of the Contracting Officer.

(b) If the Contractor or any subcontractor has a guarantee for work performed or materials furnished that exceeds the 60 day period, the Government shall be entitled to rely upon the longer guarantee until its expiration.

(c) With respect to any individual work item identified as incomplete at the time of redelivery of the vessel(s), the guarantee period shall run from the date the item is completed.

(d) If practicable, the Government shall give the Contractor an opportunity to correct the deficiency.

(1) If the Contracting Officer determines it is not practicable or is otherwise not advisable to return the vessel(s) to the Contractor, or the Contractor fails to proceed with the repairs promptly, the Contracting Officer may direct that the repairs be performed elsewhere, at the Contractor's expense.

(2) If correction and repairs are performed by other than the Contractor, the Contracting Officer may discharge the Contractor's liability by making an equitable deduction in the price of the contract.

(e) The Contractor's liability shall extend for an additional 90 day guarantee period on those defects or deficiencies that the Contractor corrected.

(f) At the option of the Contracting officer, defects and deficiencies may be left uncorrected. In that event, the Contractor and Contracting Officer shall negotiate an equitable reduction in the contract price. Failure to agree upon an equitable reduction shall constitute a dispute under the Disputes clause of this contract.

I.4    1252.219-70    SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING REPORTING    JUNE 1997

(a) The Contractor shall submit the Summary Subcontract Report (Standard Form 295 (SF-295)) to the Department of Transportation, Office of the Secretary, Office of Small and Disadvantaged Business Utilization (S-42), 400 7th St., SW, Washington, DC, 20590.

(b) The Contractor shall include this clause in all subcontracts that include the clause at (FAR) 48 CFR 52.219-9.

I.5    1252.223-71    ACCIDENT AND FIRE REPORTING    OCTOBER 1994

(a) The Contractor shall report to the Contracting Officer any accident or fire occurring at the site of the work which causes:

(1) A fatality or as much as one lost workday on the part of any employee of the Contractor or subcontractor at any tier;

(2) Damage of $1,000 or more to Federal property, either real or personal;

(3) Damage of $1,000 or more to Contractor or subcontractor owned or leased motor vehicles or mobile equipment; or

(4) Damage for which a contract time extension may be requested.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 97 of 100 |
|---|---|---|---|

(b) Accident and fire reports required by paragraph (a) above shall be accomplished by the following means:

(1) Accidents or fires resulting in a death, hospitalization of five or more persons, or destruction of Federal property (either real or personal), the total value of which is estimated at $100,000 or more, shall be reported immediately by telephone to the Contracting Officer or his/her authorized representative and shall be confirmed by telegram or facsimile transmission within 24 hours to the Contracting Officer. Such telegram or facsimile transmission shall state all known facts as to extent of injury and damage and as to cause of the accident or fire.

(2) Other accident and fire reports required by paragraph (a) above may be reported by the Contractor using a state, private insurance carrier, or Contractor accident report form which provides for the statement of:

(i) The extent of injury; and

(ii) The damage and cause of the accident or fire.

Such report shall be mailed or otherwise delivered to the Contracting Officer within 48 hours of the occurrence of the accident or fire.

(c) The Contractor shall assure compliance by subcontractors at all tiers with the requirements of this clause.

I.6    1252.237-70    QUALIFICATIONS OF EMPLOYEES    OCTOBER 1994

The Contracting Officer may require dismissal from work of those employees which he/she deems incompetent, careless, insubordinate, unsuitable or otherwise objectionable, or whose continued employment he/she deems contrary to the public interest or inconsistent with the best interest of national security. The Contractor shall fill out, and cause each of its employees on the contract work to fill out, for submission to the Government, such forms as may be necessary for security or other reasons. Upon request of the Contracting Officer, the Contractor's employees shall be fingerprinted. Each employee of the Contractor shall be a citizen of the United States of America, or an alien who has been lawfully admitted for permanent residence as evidenced by Alien Registration Receipt Card Form I-151, or who presents other evidence from the Immigration and Naturalization Service that employment will not affect his/her immigration status.

I.7    1252.242-73    CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE    OCTOBER 1994

(a) The Contracting Officer may designate Government personnel to act as the Contracting Officer's Technical Representative (COTR) to perform functions under the contract such as review and/or inspection and acceptance of supplies, services, including construction, and other functions of a technical nature. The Contracting Officer will provide a written notice of such designation to the Contractor within five working days after contract award or for construction, not less than five working days prior to giving the contractor the notice to proceed. The designation letter will set forth the authorities and limitations of the COTR under the contract.

(b) The Contracting Officer cannot authorize the COTR or any other representative to sign documents (i.e., contracts, contract modifications, etc.) that require the signature of the Contracting Officer.

I.8    1252.245-70    GOVERNMENT PROPERTY REPORTS    OCTOBER 1994

(a) The Contractor shall prepare an annual report of Government property in its possession and the possession of its subcontractors.

(b) The report shall be submitted to the Contracting Officer not later than September 15 of each calendar year on Form DOT F 4220.43, Contractor Report of Government Property.

I.9    52.204-01    APPROVAL OF CONTRACT    DECEMBER 1989

This contract is subject to the written approval of [identify title of designated agency official here] and shall not be binding until so approved.

I.10    52.216-24    LIMITATION OF GOVERNMENT LIABILITY    APRIL 1984

(a) In performing this contract, the Contractor is not authorized to make expenditures or incur obligations exceeding                    dollars.

(b) The maximum amount for which the Government shall be liable if this contract is terminated is                    dollars.

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 98 of 100 |
|---|---|---|---|

I.11    52.217-02    CANCELLATION UNDER MULTIYEAR CONTRACTS    OCTOBER 1997

(a) "Cancellation", as used in this clause, means that the Government is canceling its requirements for all supplies or services in program years subsequent to that in which notice of cancellation is provided. Cancellation shall occur by the date or within the time period specified in the Schedule, unless a later date is agreed to, if the Contracting Officer--

(1) Notifies the Contractor that funds are not available for contract performance for any subsequent program year; or

(2) Fails to notify the Contractor that funds are available for performance of the succeeding program year requirement. -

(b) Except for cancellation under this clause or termination under the Default clause, any reduction by the Contracting Officer in the requirements of this contract shall be considered a termination under the Termination for Convenience of the Government clause.-

(c) If cancellation under this clause occurs, the Contractor will be paid a cancellation charge not over the cancellation ceiling specified in the Schedule as applicable at the time of cancellation.

(d) The cancellation charge will cover only--

(1) Costs--

(i) Incurred by the Contractor and/or subcontractor;

(ii) Reasonably necessary for performance of the contract; and

(iii) That would havve been equitably amortized over the entire multiyear contract period but, because of the cancellation, are not so amortized, and

(2) A reasonable profit or fee on the costs.

(e) The cancellation charge shall be computed and the claim made for it as if the claim were being made under the Termination for Convenience of the Government clause of this contract. The Contractor shall submit the claim promptly but no later than 1 year from the date--

(1) Of notification of the nonavailability of funds; or

(2) Specified in the Schedule by which notification of the availability of additional funds for the next succeeding program year is required to be issued, whichever is earlier, unless extensions in writing are granted by the Contracting Officer.-

(f) The Contractor's claim may include--

(1) Reasonable nonrecurring costs (see Subpart 15.4 of the Federal Acquisition Regulation) which are applicable to and normally would have been amortized in all supplies or services which are multiyear requirements;-

(2) Allocable portions of the costs of facilities acquired or established for the conduct of the work, to the extent that it is impracticable for the Contractor to use the facilities in its commercial work, and if the costs are not charged to the contract through overhead or otherwise depreciated;-

(3) Costs incurred for the assembly, training, and transportation to and from the job site of a specialized work force; and--

(4) Costs not amortized solely because the cancellation had precluded anticipated benefits of Contractor or subcontractor learning.-

(g) The claim shall not include--

(1) Labor, material, or other expenses incurred by the Contractor or subcontractors for performance of the canceled work;-

(2) Any cost already paid to the Contractor;-

(3) Anticipated profit or unearned fee on the canceled work; or-

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 99 of 100 |
|---|---|---|---|

(4) For service contracts, the remaining useful commercial life of facilities. ``Useful commercial life" means the commercial utility of the facilities rather than their physical life with due consideration given to such factors as location of facilities, their specialized nature, and obsolescence. -

(h) This contract may include an Option clause with the period for exercising the option limited to the date in the contract for notification that funds are available for the next succeeding program year. If so, the Contractor agrees not to include in option quantities any costs of a startup or nonrecurring nature that have been fully set forth in the contract. The Contractor further agrees that the option quantities will reflect only those recurring costs and a reasonable profit or fee necessary to furnish the additional option quantities.-

(i) Quantities added to the original contract through the Option clause of this contract shall be included in the quantity canceled for the purpose of computing allowable cancellation charges.

[END OF SECTION I]

| Award/Contract | Document No.<br>DTMA8C05020 | Document Title<br>Ship Manager | Page 100 of 100 |
|---|---|---|---|

# SECTION J -- LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS

## J.1    LIST OF ATTACHMENTS

The following document(s), exhibit(s), and other attachment(s) form a part of this contract:

J-1         DOL Wage Determination (Reserved)

J-2         Ship Manger Subcontracting Purchasing Policies

J-3         Processing Seafarer's Personal Injury/Illness Claims (Supplement A)

J-3         Incidents Involving Third Party Personal Injury/Illness and Third-Party Property  Damage/Loss (Supplement B)

J-4         Deliverables

J-5         Ship Manager Performance Evaluation Appraisal Systems (SM-PEAS)        (Reserved)

J-6         Subcontracting Plans (Reserved)

J-7         Past Performance Information Data

J-8         Subcontractor/Teaming Partner Consent Form for the Release of Past and Present Performance Information to the Prime Contractor

J-9         Contract Reimbursables

J-10        2006-2010 M&R Costs

J-11        SF-3881 - ACH Vendor/Miscellaneous Payment Enrollment Form

J-12        Award Term Incentive Option Plan (ATIOP) (Reserved)

J-13        Required Training

J-14        Historical Funding FY00-FY03 M&R

J-15        Alternate Site for Certificate of Inspection (COI)

J-16        RRF Management System (RMS) Brief Overview

J-17        U.S. Custom Form 226

J-18        SF-1012

J-19        Collective Bargaining Agreements (Reserved)

J-20        Notice of Prohibition on Liens

J-21        Manning Matrix

J-22        Business Propriety Information Check List